UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

NORTHWEST BYPASS GROUP, et al.  )
                                )
          Plaintiffs,            )
                                )
     v.                          )     Civil No. 06-CV-00258-JAW
                                )
U.S. ARMY CORPS                 )
OF ENGINEERS, et al.            )
                                )
          Defendants.            )

**ORDER ON PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

Concluding that the Plaintiffs failed to sustain their burden of proof to demonstrate legal justification for the issuance of a temporary restraining order against the City of Concord's commencement of construction of a connector road, this Court denies their motion.[1]

**I. STATEMENT OF FACTS**

Within the capitol city of Concord, New Hampshire, there is a roughly V-shaped parcel of open land that runs from the center of the city to the playing fields of St. Paul's School.[2] The V lies on its side, pointing east. The northern leg of the V is Pleasant Street, the southern leg is Clinton Street, and it is capped on the west by the Silk Farm Road and Dunbarton Road, which wend through St. Paul's campus. Concord has grown around the V. Concord Hospital, a major regional medical center, is located on Langley Drive, which intersects with Pleasant Street;

---

[1] The Plaintiffs actually filed two motions for temporary restraining order. The first was filed with the Complaint on July 13, 2006. *Pl.'s Mot. for Temp. Rest. Or.* (Docket # 2). The second was filed on an emergency basis on September 6, 2006. *Pl.'s Emergency Mot. for Temp. Rest. Or.* (Docket # 32). Between the first and second, there was an indication that the Court considered the first motion moot and was proceeding solely on the motion for preliminary injunction, but no formal order was issued. This Court hereby dismisses the first motion for temporary restraining order as moot; this Order addresses the second motion on its merits.

[2] This statement of facts has been gleaned largely from the allegations in the Plaintiffs' Complaint and matters of public record, such as court and administrative decisions.

downtown Concord and Concord High School lie to the east of the point of the V; and, I-89 intersects with Clinton Street, the southerly leg of the V.

Surprisingly, the land inside the V has remained pristine. The V contains the state-owned White Farm complex, a farm that has been listed on the National Register of Historic Places since May 15, 1981 for its significance as representing the practice and evolution of progressive agriculture. The V includes the Pleasant View Home, also listed on the National Historic Register and known for its beautiful vistas; the Tuttle House, a property eligible for listing on the National Historic Register; and a monastery for the Carmelite Sisters, a cloistered religious order that prizes peace and quiet. This open, undeveloped area not only has an extensive system of cross-country skiing and hiking trials often enjoyed by Concord residents, but also it has significant wetlands.

In the late 1940s, Concord city planners developed a vision for a Northwest Bypass, a circumferential roadway around the City. As Concord grew, only one portion of the Northwest Bypass was constructed and the remaining plans to ring the city remained visionary. In 1956, Concord Hospital, now one of the busiest hospitals in New Hampshire, moved to Pleasant Street and as patient volume grew, so did traffic volume. After I-93 and I-89 were built and as the surrounding area developed, the streets that formed the V became increasingly congested funnels into and out of Concord. The worst of the problem centered around the notorious five prong intersection of Pleasant and Fruit Streets, a problem exacerbated by its location between Concord High School and its athletic fields and the constant ebb and flow of students. City planners began to conceive of ways to loosen the snarl; they harkened back to the old concept of a Northwest Bypass and began to focus on placing a road transecting the V, directly connecting

Pleasant and Clinton Streets, and building a separate access road off Pleasant Street to Concord Hospital.

In the early 1990s, the city filed for governmental approvals of the entire Northwest Bypass project and on April 30, 1993, it received the necessary approvals from the state of New Hampshire Department of Environmental Services (NHDES) for the whole project. The Corps also issued a permit, but restricted its approval to so-called Phase I, the access road to Concord Hospital as a spur from Pleasant Street on the side of the street away from the V.[3] This relatively short roadway – only 1,500 feet long – was non-controversial. As originally designed, it was limited to a single curb-cut,[4] and did not impinge on the unspoiled land in the center of the V. Once Phase I was completed in 1995, the city turned back to Phase II, the road transecting the V.

From a planning perspective, Phase II made good sense. The residential streets were never designed to carry such heavy traffic loads, patients and emergency vehicles were caught in interminable, unsafe delays, and traffic had shifted over to Silk Farm Road, which leads to Dunbarton Road, and through the campus of St. Paul's School, a private secondary residential school of about 525 students. Silk Farm Road and Dunbarton Road even now remain bucolic, winding country roads, but they endure approximately 1,600 motor vehicles daily, some racing through the campus and placing the students and others at risk. St. Paul's, anxious to restrict access, and Concord Hospital, anxious to facilitate access, joined forces with the City and agreed to share the cost of the project equally. In addition, the City agreed to declare Silk Farm Road and Dunbarton Road private, thereby limiting access to those who have business at St. Paul's.

---

[3] In February, 1993, the Army Corps of Engineers suspended processing the application at the city's request. The city later continued with Phase I, which because of its small impact, qualified for the New Hampshire State General Permit and did not require individual permitting.

[4] Plaintiffs allege that the original design has been altered and the city has allowed "six serial violations of the express single-curb-cut condition of its Phase I permit…." *Compl.* ¶ 216 (Docket # 1).

In November, 2000, the City announced its intention to proceed with Phase II by filing an application with the New Hampshire Department of Environmental Services (NHDES) for a wetland fill permit and water quality certificate. The City's decision provoked a firestorm of controversy. A nonprofit unincorporated association of residents, called the Northwest Bypass Group (NBG), coalesced opposition to Phase II, which the Complaint aptly describes as "fierce." *Compl.* ¶ 5. NBG is dedicated to protecting and preserving "the scenic, historical, ecological and aesthetic values that would be impacted by this project's construction, and [raising] public awareness about the impact it would have on nearby neighborhoods." *Id.* The opponents of Phase II have determinedly fought the project at each stage beginning with the multiple state approvals and continuing with the final approval process of the United States Army Corps of Engineers (Corps). Thus far, the opponents have lost each skirmish, culminating in a decision of the state of New Hampshire Supreme Court, affirming the trial court's decision to grant summary judgment in favor of the city. *Blakeney v. City of Concord*, No. 2004-0438, slip op. (N.H. August 19, 2005) (Corrected Order).

On January 10, 2006, the Corps issued its Environmental Assessment and Statement of Findings (EA/SOF) and granted the City's application for a permit to construct the proposed road (Phase II). *Def. City of Concord's Memo. of Law in Support of Their Opp. to Pl.'s Mot. for Temporary Restraining Order and Preliminary Injunction* Ex. C (Docket # 19) (*City Memo*). By Complaint dated July 13, 2006, the opponents waged an all out assault against the Corps' decision. Consisting of one hundred and forty pages and nineteen separate counts, the Complaint is an articulate treatise on environmental and administrative law complete with case law, statutory, and regulatory support. In addition to NBG, the plaintiffs include Morton C. and Carolyn H. Tuttle, owners and residents of the historic Tuttle House, and Leslie J. Ludtke, a New

4

Hampshire resident and avid user of the Turkey River White Farm Trials system that the connector road would intersect. The Defendants include the Corps and the city of Concord and, as intervenors, Concord Hospital and St. Paul's School. After the case was filed, the judges of the United States District Court, which is located in Concord, began to recuse themselves. Following a hearing on August 22, 2006 on the Plaintiffs' motion for preliminary injunction, Judge McAuliffe issued a recusal order and Judge DeClerico soon followed suit. *See Recusal Orders* (Docket # 29, 30). At that point, all New Hampshire federal judges were recused and the case was reassigned by designation to this Court on September 8, 2006. *See Procedural Order* (Docket # 34).

Late August turned to September and the spectre of a New Hampshire winter loomed. The City became concerned about its construction schedule. It informed the Plaintiffs that it intended to put shovel to ground in early September and later backed the date up to September 18, 2006. This news stirred the Plaintiffs to file an Emergency Motion for Temporary Restraining Order on September 6, 2006. *Emergency Mot. for Temp. Rest. Order and Request for Expedited Hearing* (Docket # 32) (*Pl.'s Mot.*). On September 13, 2006, this Court held a hearing on both the motion for temporary restraining order and the motion for preliminary injunction. The parties informed the Court that for various intractable reasons, time was of the essence and they urgently requested this Court to rule on the motion for temporary restraining order by the close of business on Friday, September 15, 2006.[5]

---

[5] The Court cautioned the parties that they had placed difficult time constraints on the Court. The Court first became aware of the existence of this controversy on Friday, September 8, 2006, but the information was incomplete. A hearing was scheduled for Wednesday, September 13, 2006. As the Court attempted to familiarize itself with the magnitude of the parties' disagreements, the parties filed multiple new memoranda on September 11, 2006, a 105 page transcript of the August 22, 2006 oral argument before Judge McAuliffe on September 12, 2006, and in the late afternoon of September 12, 2006, a record consisting of seven full volumes containing approximately seven thousand pages of material. This Court has done its level best, but the parties should appreciate "the temporal constraints under which the district court labored" in arriving at this decision. *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004).

## II.  Standard of Review

To determine whether to issue a temporary restraining order, this Court applies the same four-factor analysis used to evaluate a motion for preliminary injunction. *Largess v. Supreme Judicial Court for Mass.*, 317 F. Supp. 2d 77, 81 (D. Mass. 2004) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 70 (D. Me. 1993)). Those well established factors are:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Std. Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)). As with a preliminary injunction, the party seeking relief bears the burden of demonstrating that these factors "weigh in its favor." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003). However, the authority of a judge to grant such injunctive relief should be used "sparingly." *Mass. Coalition of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981); see also *Augusta News Co. v. News America Pub., Inc.*, 750 F. Supp. 28 (D. Me. 1990) ("Preliminary injunctions must be used sparingly and only in cases where the need for extraordinary equitable relief is clear and plain.").

Because this is a review of an action by a federal agency – the Army Corps of Engineers – the action is governed by the Administrative Procedures Act (APA). *See* 5 U.S.C. § 702. Under the Administrative Procedures Act (APA), a district court will uphold an agency's decision unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706; *see also Granite State Concrete Co. v. Surface*

*Transp. Bd.*, 417 F.3d 85, 88 (1st Cir. 2005).[6] An agency action is "arbitrary and capricious if the agency lacks a rational basis for adopting it." *Assoc. Fisheries v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997). Accordingly, this Court's review under this standard is "highly deferential," in that the agency action is presumed to be valid. *Id.* This Court will not substitute its own judgment for that of the Corps.

### III. A Limited Range of Considerations

Upon analysis, the range of considerations for issuance of the temporary restraining order is more limited than what initially appears. The Plaintiffs argue that the Court should evaluate the merits of the entire claim and determine whether they have satisfied the four injunction factors in any of the Plaintiffs' multitudinous contentions, ranging from weighing the competing public interests in the project as a whole to assessing whether the Corps properly addressed the mitigation proposals for the affected wetlands. If so, the Plaintiffs contend, the Court should temporarily enjoin the entire project.

But, the City proposes to begin construction only on the White Farm, a discreet portion of the entire parcel. It contemplates beginning construction on September 18, 2006, at an entry point

---

[6] The full text of this statutory provision reads:
> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>> (B) contrary to constitutional right, power, privilege, or immunity;
>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>> (D) without observance of procedure required by law;
>> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 USCS §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute; or
>> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

on Clinton Street and proceeding north through the White Farm portion of the parcel, ending no later than December 15, 2006 about two thirds of the way through the parcel. The work during this interval will not directly affect many of the properties the Plaintiffs have focused on in their Complaint. As such, this Court is not required to evaluate the four temporary restraining order factors relating to arguments unaffected by the work on the White Farm. For example, the likelihood of success on the issues the Plaintiffs have raised about the Tuttle House, Pleasant View Home, the Carmelite Monastery, and the wetlands are not material to whether the temporary restraining order should be granted, since the work that is the subject of the motion for temporary restraining order will not directly affect them.[7]

Also, the relevant time period runs from September 18, 2006, when the earth moving is to begin, to the issuance of an order on the motion for preliminary injunction. Although given the voluminous record, the extensive memoranda, and the complexity of the legal issues, this Court is unable to predict with certainty when its decision on the motion for preliminary injunction will issue; however, the record has been filed, the memoranda have been submitted, and oral argument has been held.

The Plaintiffs have pointed out that, once begun, a certain momentum takes hold and the project will become more difficult to stop. To that point, this Court expressly warned the City that, if the motion for temporary restraining order were denied, it would proceed at its own risk. If this Court later determines that the Plaintiffs sustained their burden and a preliminary injunction issues, the City will be required to undo what it has done.

## IV. The White Farm Complex and the Tile Drainage System

---

[7] Plaintiffs argued that the panorama from the Pleasant View Home would be affected by the construction on White Farm, but apart from a general assertion of visual impact, there was no evidence as to what that impact would be.

8

The White Farm complex is registered on the National Register of Historic Places "for its significance in New Hampshire development and history… and as a representative complex illustrating the practice and the evolution of progressive agriculture in the 19th and early 20th century New Hampshire both in private and public realms." *Comp.* ¶ 404 (quoting the state of New Hampshire Historic Preservation Office).  The farm's "varied landscape incorporates representative contiguous examples of its significant historical setting and production units, including river edge marsh, meadow, mowing, tillage, garden, orchard, and woodlot, which together with its grouping effectively convey its historical importance." *Id.*  The White Farm's land is naturally wet and to alleviate this problem, the farmers installed an elaborate underground tile drainage system that has remained effective in keeping the fields arable.  The tile drainage system as a whole is integral to the historic significance of the farm and the City acknowledges that the fall construction work will affect a portion of the tile drainage system.

V.     **The Temporary Restraining Order Factors**

   A. **Likelihood of Success on the Merits**

   For purposes of the TRO motion, the narrow question is whether it is more likely than not the Plaintiffs will prevail on their claims relating to White Farm.  To do so, Plaintiffs must satisfy the formidable burden of demonstrating that the Corps' decision to grant the City's permit was arbitrary and capricious with respect to the White Farm property.  The importance of this part of the four-factor analysis cannot be understated: "The sine qua non of that formulation is whether the plaintiffs are likely to succeed on the merits."  *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993).

   The chief concern of the Plaintiffs with respect to the White Farm property is that the drainage system currently in place underneath the land will be harmed by the construction of the

9

Phase II project. Although specific discussion of the drainage issue is absent from Plaintiffs' TRO motion (and, consequently, from the Defendants' reply), Plaintiffs' counsel made clear at oral argument that, because of the proposed construction schedule, damage to the White Farm property – and the drainage tiles beneath it – is the most pressing concern. Plaintiffs also devoted significant attention to the issue in their Complaint, alleging that a disruption of the tile system could cause "increased and prolonged flooding," which would threaten "the continued viability and existence of the White Farm as an historical agricultural exemplar." *Compl.* ¶ 417.[8]

Section 106 of the National Historic Preservation Act (NHPA) provides that, before issuing any license or permit, a federal agency must "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." 16 U.S.C. § 470(f). Pursuant to the regulations under the NHPA, when considering a proposed federal action, the agency is required to make a "reasonable and good faith effort" to identify historic properties, and to consider any adverse effects that may result from the action. 36 C.F.R. §§ 800.4, 800.5.[9] In order to complete this task, the agency may seek information and assistance from numerous parties, including consultants, local governmental officials, and the applicant itself. 36 C.F.R. § 800.2.

First, limited to the impact on the White Farm, Plaintiffs will not likely prevail on the merits of its claim that the Corps' decision to grant the permit was arbitrary and capricious. Plaintiffs assert that the Corps failed to take into account the potential damage to the White Farm drainage system – as evidenced by its absence from the Environmental Assessment and Statement of Findings (EA/SOF) – and its failure makes the decision arbitrary and capricious. The

---

[8] Count XII of Plaintiffs' complaint is devoted entirely to a discussion of White Farm. *See Compl.* ¶¶ 403-421. Plaintiffs claim that the Corps violated the NHPA because it failed to take into account "significant, extensive and permanent adverse effects upon the White Farm National Register historical resource." Compl. ¶¶ 414, 418.
[9] The Complaint alleges that the Corps failed to "identify, evaluate, and resolve" potential adverse effects upon White Farm, *see Compl.* ¶ 420. This language goes further than what the regulation requires.

10

administrative record, however, contradicts that assertion. After the Corps' public comment period, Martha L. Drukker, City Engineer, wrote the Corps on April 9, 2001, to respond to certain public comments. An attachment to that letter, entitled "Response by the City of Concord to Comments Received by the ACOE During the Public Comment Period for the NW Bypass Application," represents:

> Those drainage tile systems in the White Farm agricultural fields that will be interrupted by the Bypass will be replaced and reconnected to assure continued proper drainage for agricultural use. The State Division of Forests and Lands which manages the White Farm on behalf of the State has been involved in the review of the designs to insure the continuity of drainage.

*AR* 2:306.[10]

The record reflects other examples of the Corps' consideration of the White Farm issue. The Corps' EA/SOF itself confirms that it considered the general impact on White Farm – above surface:

> Three National Register properties will be adversely effected (sic) in a minor way. The setting of the White Farm will be altered slightly by having a paved road crossing between two fields. The eastern-most field will be separated from the other fields by a road. Farm equipment will have to cross the road to get from one field to the other.

*See EA/SOF* at 10. The Memorandum of Agreement also states that the Corps considered the provision of mitigation of adverse effects, such as the installation of fencing and shrubs. To the extent the record reveals that the Corps was aware of the tile drain system, had received assurances from the City, and had taken into consideration the historical and environmental uniqueness of the White Farm in arriving at its decision, this militates against a conclusion that the decision was arbitrary or capricious regarding the farm.

---

[10] This statement was in response to a public comment by Gordon Blakeney – Plaintiffs' counsel – that "there are unacceptable adverse impacts to wetlands, historic values, wildlife, recreation, traffic safety, environmental concerns, economic concerns, and land use." AR 2:306.

11

Second, the Plaintiffs have not demonstrated that construction of Phase II will have a wide-ranging, detrimental impact on White Farm. Plaintiff's engineering expert is Raymond Helmer testified by telephone at the September 13, 2006 hearing. Mr. Helmer asserted that the method for locating the drainage tiles, described in the study by GEI Consultants, is improper. Furthermore, in his opinion, the Phase II construction project could result in significant damage to the tiles. On cross-examination at the hearing, however, Mr. Helmer admitted that he had no personal knowledge of the tile system at White Farm, had never visited the project site to see the property, had relied solely on a hard-to-read schematic to determine the placement of the drain tiles, and had not ascertained the contractor's planned method for locating the tiles.

The City responded that, of the fifty drain lines that comprise the system underneath White Farm, only one would be affected by the Phase II construction and that it intended to construct a separate drainage system in the area of road construction. Finally, the City explained that it has a plan to remediate the one tile that will be affected. In sum, the Defendants have adequately addressed the concerns expressed in the report of Mr. Helmer. Standing on this ground alone, Plaintiffs have not met their burden.

The Corps identified White Farm as a historic property on that National Register, ascertained the potential adverse effects from the construction of Phase II, and consulted with local officials regarding plans for remediation. The Plaintiffs failed to demonstrate that its conclusion was either arbitrary or capricious and, therefore, they have failed to demonstrate that they have a likelihood of success on the merits. As such, the Court's analysis could stop. *Esso*, 445 F.3d at 18. However, in excess of caution and aware of the public interest in this decision, the Court will proceed to the remaining three considerations. *Bl(a)ck Tea*, 378 F.3d at 15 ("In the interests

of completeness, however, we briefly mention the remaining three parts of the preliminary injunction calculus.").

### B. Irreparable Harm to the Movant

The next factor is whether Plaintiffs would suffer irreparable harm if this Court denies its request for a TRO, and the City is allowed to begin construction of Phase II. Generally, a demonstration of irreparable harm is a "necessary threshold showing for awarding preliminary injunctive relief." *Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). In fact, even the existence of "some irreparable harm" does not conclusively justify a preliminary injunction. *See Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004) (upholding the denial of a preliminary injunction on a First Amendment claim even though "a burden on protected speech always causes some degree of irreparable harm"). Thus, even if Plaintiffs could feasibly cross this threshold, the other factors in the balance might weigh against awarding temporary injunctive relief in this case.

In addition, the irreparable harm must be fairly concrete; that is, "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004); *see also Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004) (requiring a "realistic prospect of irreparable harm"); *Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991) (requiring an "actual, viable, presently existing threat of serious harm"). Thus, Plaintiffs must demonstrate that the potential for irreparable harm is immediate and serious rather than merely remote and speculative.

Here, Plaintiffs' fears of damage to White Farm tile drainage system remain speculative. Again, the primary support for this position came from Mr. Helmer and for the reasons reviewed

earlier, Mr. Helmer's testimony was insufficient to carry the Plaintiffs' substantial burden. This Court has concluded that the Corps took into consideration the potential danger to the tile drainage system and obtained the City's assurances that any damage to the tiles would be ameliorated. Thus, the Plaintiffs have not demonstrated that, without the issuance of a TRO, the White Farm will be harmed beyond repair. Even if there were *some* potential harm to White Farm, this fact alone would not justify the issuance of a temporary restraining order. *See Bl(a)ck Tea Soc'y*, 378 F.3d at 15.

Finally, to demonstrate irreparable harm, the Plaintiffs must show that any damage is in fact irreparable. The Plaintiffs failed to sustain this burden, especially in the face of the City's assurance that if necessary, it can and will remediate any damage to the tiles. Thus, for the narrow purposes of the TRO, the risk of irreparable harm to the Plaintiffs is not sufficiently immediate or certain to sustain their burden.

### C. The Balance of Relevant Impositions

The third factor is what the First Circuit terms the "balance of relevant impositions," an assessment of "the hardship to the nonmovant if enjoined as contrasted to the hardship to the movant if no injunction is granted." *Esso*, 445 F.3d at 18.

#### 1. Hardship to the City

The City presented a convincing case that if not allowed to proceed with construction on or near September 18, 2006, the entire project would be delayed and would not be completed for an additional year. Timing becomes critical due to two factors: 1) the irreducible amount of time necessary to prepare the earthwork for the roadway; and, 2) a five to seven month period the earth must settle before it is finally prepared and hot topped. Concord contends the earthwork must be completed by December 15, 2006 so that the five to seven months can lapse over the

winter and work can proceed in the spring with an anticipated completion date of January 2008. Further, the engineering consultants have recommended against the placement of any fill or the exposure of any subgrades when the ambient temperature is below 25 degrees Fahrenheit, absent special procedures approved by the geotechnical engineer. If the preparatory work is not finished this fall, the five to seven month fallow period must take place during the spring and summer and, given the difficulty of continuing road construction work during the winter months, the City estimated the entire project would be delayed for an additional year and would not be complete until January 2009. The City, relying on the principle that time is money, noted that the cost of the project had mushroomed during the extended period of contention from $3.7 million to $6.5 million; it estimated the additional cost to the project from the delay would total $580,000.00.[11]

The Plaintiffs presented an alternative view at the hearing. During his testimony, Mr. Helmer agreed that the earthwork must settle for five to seven months, but he opined that the project could safely be delayed because more recent experience of milder winters means that the ground does not freeze until January or even February. In practical terms, therefore, the Plaintiffs contend that if the Court granted the TRO, the City could start later in the fall and still be on schedule.

The Plaintiffs have not sustained their burden on this point. The Court is unwilling to force the City to submit its construction schedule to the vagaries of a New Hampshire winter. Although Mr. Helmer may be correct and the upcoming winter may be mild, weather predictions - months out - remain chancy and the risk falls hard on the City. This risk is not solely financial,

---

[11] These figures are found in the Affidavit of Martha Drukker, an employee of the City's Engineering Department. *City Memo* Ex. J.

but would delay the benefits of the connecting road, including improved access of emergency vehicles to the Concord Hospital, for as much as an additional year.

### 2. Hardship to the Plaintiffs If Not Granted

By contrast, the hardship to the movant if no injunction is granted is more speculative. Again, the relevant time is from September 18 – when the construction would begin – to whenever the order is issued on the preliminary injunction. During this interval, the City intends only to work on the White Farm portion of the project. The Plaintiffs' best contention is that the earthwork will destroy the tile drainage system underlying the White Farm. They press the argument that there is a paucity of information about where the tile drains actually are and what impact major earthmoving will have on the agricultural fields. Mr. Helmer, drawing from his mid-west experience where this type of drainage system is more common, testified that the City should have mapped the system and designed the construction to minimize the impact of construction.

The City responds that, contrary to Plaintiffs' assertions, it has in fact considered the White Farm tile drainage system and has planned the construction to minimize the impact on the system as a whole. It goes on to say that, based on its analysis of the location of the drain tile, the construction will affect only one drain tile line and it has designed a drainage system that will alleviate any damage to that line. Although the City's commitment regarding the tile drainage system was not included in the formal Memorandum of Agreement between the Corps and the City, as noted earlier, the City affirmatively represented to the Corps that it would act to assure continued drainage to the White Farm site.

Based on the record, the Plaintiffs have failed to convince the Court that the commencement of work on September 18, 2006 will cause other than minimal damage to the tile

16

drainage system, that Concord's remediation of the damage will be insufficient, or that if necessary whatever damage does occur to the system could not be repaired, if the preliminary injunction is granted.

The Court concludes that the harm to Concord from granting the temporary restraining order exceeds the harm to the Plaintiffs from failing to grant it.

### D. The Public Interest

The best measure of competing public interests is the array of parties lined up on either side of this community divide. The Court assumes the Plaintiffs are a group of affected citizens, many from residential areas surrounding the project, who represent the passionate viewpoint that this large swath of open space so close to downtown Concord is a precious and invaluable environmental and historic treasure, which will be forever marred and lost to future generations for the sake of short-term, minuscule, and illusory changes in traffic patterns. The presence as a Plaintiff of Morton C. Tuttle, the son of Donald D. Tuttle, the person for whom the home is named, adds special emphasis to what is at risk in the potential loss of Concord's sense and pride of place. Underlying the Plaintiffs' determined advocacy may be a distrust of what will happen to the land on either side of the road, once the economic opportunity represented by the volume of traffic entices developers. The Plaintiffs point to the City's decision to allow multiple curb cuts in Langley Drive as a harbinger for future development along the connecting road once it is built.

Against these legitimate concerns are the significant public interests represented by Concord Hospital. The current routes to the hospital from the interstate exchanges are tortuous, leading ambulances and patients through a warren of streets, stop lights, and traffic jams. Rapid

access to a critical care hospital like Concord Hospital carries profound health and safety implications. The last thing a person suffering from congestive heart failure should have to battle is traffic congestion. The record provides ample support for the proposition that the project, if completed, will lessen the delays emergency vehicles now encounter before delivering their critically ill patients to the emergency room.

Because St. Paul's School is a small, elite, private school, its desire to limit public access to its campus has less resonance. However, here, the students of Concord High School are also posited as beneficiaries of the project and the undercurrent of class and socio-economic differences, if present, has not been overtly pressed.

But, the main measure of the balance among competing public interests must be that Concord city government itself has consistently been the major proponent of this project. The Concord City Councilors must stand for public election and are entrusted by the citizens of Concord to make policy decisions for the greater good. If the connector road were not a reflection of the wishes of the majority of Concord citizens, the citizens have had the means and opportunity to elect a Council that does reflect their views. They have not done so. Instead, throughout the long history of this controversial project, the City has remained its main advocate. This Court is chary about making a policy judgment for the citizens of Concord that they have manifestly not made for themselves.

Finally, in the narrow context of the motion for temporary restraining order, the Court cannot conclude that the public interest in whatever damage will occur to a line of tile drains within the White Farm exceeds the public interest in avoiding the substantial additional costs and delay that will occur if the construction does not go forward as scheduled.

VI.   **CONCLUSION**

This Court DENIES Plaintiffs' emergency motion for temporary restraining order (Docket # 32).

SO ORDERED.

                                              /s/ John A. Woodcock, Jr.
                                              JOHN A. WOODCOCK, JR.
                                              UNITED STATES DISTRICT JUDGE
                                              SITTING BY DESIGNATION

Dated this 15th day of September, 2006