# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

NORTHWEST BYPASS GROUP, et al.   )
                                )
           Plaintiffs,      )
                                )
           v.            )     Civil No. 06-CV-00258-JAW
                                )
U.S. ARMY CORPS             )
OF ENGINEERS, et al.         )
                                )
           Defendants.   )

## ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## I.    Introduction

Northwest Bypass Group,[1] Morton and Carolyn Tuttle,[2] and Leslie Ludtke,[3] allege that the United States Army Corps of Engineers (Corps) violated the Clean Water Act (CWA), the National Environmental Policy Act (NEPA), and the National Historic Preservation Act (NHPA), when it issued a permit pursuant to Section 404 of the CWA, allowing the City of Concord to fill 3.5 acres of wetlands to build a 4,300-foot connector road.[4] In a comprehensive 19-count complaint spanning 140 pages, the Plaintiffs allege that the Corps committed numerous

---

[1] Northwest Bypass Group – composed of unnamed members – was formed in 2001 to oppose construction of the Northwest Bypass. *Compl.* ¶ 5.

[2] The Tuttles are the owners of the Tuttle House, a historic home which stands in the path of Phase II of the Northwest Bypass. *Compl.* ¶ 6.

[3] Ms. Ludtke is a recreational user of the Turkey River White Farm Trails system, which would be bisected by Phase II. *Compl.* ¶ 7.

[4] This Court set forth the extensive history of this project in its Order on Plaintiffs' Motion for Temporary Restraining Order (Docket # 46). To avoid unnecessary repetition, the Court will not recount the same facts in this Order. *See Northwest Bypass Group v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 2d 333, No. 06-CV-00258-JAW, 2006 U.S. Dist. LEXIS 67117 (D.N.H. September 15, 2006). In its Order on the Temporary Restraining Order, this Court already addressed many of the same issues presented in the pending motion for preliminary injunction. To repeat those rulings would be a waste of time and therefore, the Court incorporates its Order dated September 15, 2006 as part of this Order. The Court will endeavor, however, to address those aspects of Plaintiffs' claims not addressed or that bear further explanation.

statutory violations.  *See generally Compl.* (Docket # 1); *Pls.' Memo. of Law in Support of Motion for TRO and Prelim. Inj.* at 17-19 (Docket # 2) (*Pls.' Mot.*).

## II.    Procedural History

On September 15, 2006, this Court denied Plaintiffs' motion for temporary restraining order.  *See Order* (Docket # 46).  The City began preparation of the roadway for construction of Phase II of the Northwest Bypass project. Plaintiffs moved for reconsideration on September 24, 2006 (Docket # 50), and filed an addendum to that motion on September 26, 2006 (Docket # 54).[5]  The several defendants opposed the motion for reconsideration.[6]  Plaintiffs filed a motion for leave to file a reply (Docket # 57), which this Court granted on October 31, 2006.  *See Order Granting Motion for Leave to File a Reply* (Docket # 67).

## III.    The Corps Decision

In November, 2000, the City filed an application with the New Hampshire Department of Environmental Services (NHDES) for a wetland and water quality permit, beginning the complex approval process for Phase II of the project.[7]  The City also sought the requisite CWA section 404 permit from the Corps to fill wetlands in the path of the proposed Phase II.  AR 1:137.  On December 12, 2000, the Corps issued a public notice, soliciting comment on whether to approve the permit with respect to Phase II.  *Id.*; AR 1:38.  The NHDES held two public hearings, which the Corps's regulatory project manager attended.  *Id.*  In addition, in response to the 2000 public notice, the Corps received and considered numerous public comments.  AR 1:39-41.

---

[5] The Court DENIES the Plaintiffs' Motion to Reconsider Order on Plaintiffs' Motion for Temporary Restraining Order. *Pls.' Mot. to Reconsider Order on Pls.' Mot. for TRO* (Docket # 50) (*Pl.'s Mot. to Reconsider*).  This Court considered the bulk of Plaintiffs' arguments in its September 15, 2006 Order and to the extent the motion raised new issues, this Court addresses them in this Order.

[6] The Defendants include the Corps and the City of Concord; on August 22, 2006, the Court granted intervenor status as Defendants to Concord Hospital and St. Paul's School. *See Mot. to Intervene as Defendants* (Docket # 12).

[7] The NHDES initially approved the project in 1993, AR 6:48; after the permit expired, NHDES approved it again on March 12, 2002.  AR 4:67-69.

On January 10, 2006,[8] the Corps completed an environmental assessment (EA) of the proposed project to determine whether an environmental impact statement (EIS) was necessary. *See* AR 1:32.  The EA identified the basic purpose of the project:  "to relieve traffic congestion and to allow for the safe and efficient flow of traffic in this quadrant of the city.   Improved pedestrian safety is an inherent part of the basic project purpose.    Next, the Corps considered and rejected three alternatives.  AR 1:34.  The Corps determined that, "[f]rom our environmental assessment of the project we find that our decision to permit fill for this project is not a major Federal Action significantly affecting the human environment.  Therefore, an EIS is not required and our Environmental Assessment will suffice for the purposes of compliance with NEPA. AR 1:41.  According to the EA, the Corps considered "all factors relevant to this proposal including cumulative effects   and concluded that "this project is not contrary to the public interest and that a Department of the Army permit should be issued.   *Id*.  Consistent with their determined opposition to the project, the Plaintiffs have waged a full scale assault in this Court against the Corps's approval.[9]

## IV.    Standard of Review

### A.    Preliminary Injunction Standard

This Court analyzes a request for a preliminary injunction through application of the following four well-established factors:

---

[8] Between 2000 and 2006, the project was held in abeyance due to state court proceedings.  The opponents were unsuccessful, the culmination being a New Hampshire Supreme Court decision affirming summary judgment in favor of the City. *See Blakeney v. City of Concord*, No. 2004-0438, slip. op. (N.H. August 19, 2005) (Corrected Order).

[9] This Court is sitting by designation.  The Plaintiffs filed the Complaint on July 13, 2006 in the United States District Court for New Hampshire.  Chief Judge McAuliffe recused himself by Order dated September 1, 2006, *Order* (Docket # 29); Judges DiClerico and Barbadoro followed suit on September 5, 2006 and September 6, 2006. *Orders* (Docket # 30, 33).  Once all judges of the District of New Hampshire were recused, Chief Judge McAuliffe referred the case to the District of Maine, sitting by designation.  Chief Judge McAuliffe concluded the recusal of all the judges in New Hampshire constituted an "emergency   within the meaning of 28 U.S.C. § 636(f) and concurred in the assignment of a magistrate judge to perform the duties specified in 28 U.S.C. § 636(a)– (c). *Order* (Docket # 33).  A procedural order issued on September 8, 2006 referring the case to this Court. *Order* (Docket # 34).

(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and, (4) the effect (if any) of the court's ruling on the public interest.

*Esso Std. Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)); *see also Puerto Rico Conservation Foundation v. Larson*, 797 F. Supp. 1066, 1069 (D.P.R. 1992).  The party seeking relief bears the burden of demonstrating that these factors "weigh in its favor.   *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003).  This burden is a heavy one: "Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal.   *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003) (reversing the denial of a preliminary injunction in a CWA permitting case); *W. Ala. Quality of Life Coal. v. United States FHA*, 302 F. Supp. 2d 672, 679 (D. Tex. 2004) (a grant of the preliminary injunctive remedy "must be supported by specific findings of the court.  ).

## B.    Arbitrary and Capricious Standard

Because this is a review of an action by a federal agency – the Army Corps of Engineers – the standard of review is supplied by the Administrative Procedures Act (APA).  *See* 5 U.S.C. § 702.  Under the APA, a district court will uphold an agency's decision unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .   5 U.S.C. § 706(2)(A);[10] *see also Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97-

---

[10] This statutory provision reads:
> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>       (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>       (B) contrary to constitutional right, power, privilege, or immunity;
>       (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

98 (1983) ("The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious. ).  The First Circuit explained that the task of a court reviewing agency action under the APA's "arbitrary and capricious  standard is "to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made.   *Dubois v. United States Dep't of Agric.*, 102 F.3d 1273, 1284 (1st Cir. 1996); *see also Associated Fisheries of Maine v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) (explaining that an agency action is "arbitrary and capricious if the agency lacks a rational basis for adopting it — for example, if the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise. ); *see also Penobscot Air Servs. v. FAA*, 164 F.3d 713, 719 (1st Cir. 1999) ("The task of a court reviewing agency action under the APA's 'arbitrary and capricious' standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made. ).

Conversely, an agency decision is not arbitrary or capricious if "the agency decision was based on a consideration of the relevant factors and there has not been 'a clear error of judgment' . . . .  *Dubois*, 102 F.3d at 1285 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401

---

        (D) without observance of procedure required by law;
        (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 USCS §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute; or,
        (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
    In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
5 U.S.C. § 706.

U.S. 402, 416 (1971)).  "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result and respond to relevant and significant public comments.   However, neither requirement is particularly demanding. *Penobscot Air Servs.*, 164 F.3d at 719 n.3 (internal citations and quotation marks omitted).

The Court's review under this standard is "highly deferential,  in that the agency action is presumed valid. *Associated Fisheries*, 127 F.3d at 109.   In other words, this Court "is not empowered to substitute its judgment for that of the agency.   *Overton Park*, 401 U.S. at 416; *see also* 33 Charles Alan Wright & Charles H. Koch, Jr., Federal Practice & Procedure § 8334 ("Arbitrary and capricious review communicates the least judicial role, short of unreviewability, in the word formula system. ).   Notwithstanding the deferential standard of review, "it is not a rubber stamp.   *Dubois*, 102 F.3d at 1285.   Rather, the Court "must undertake a 'thorough, probing, in-depth review' and a 'searching and careful' inquiry into the record.   *Id*. (quoting *Overton Park*, 401 U.S. at 415-16).   In carrying out its task under the APA, the scope of the Court's review will include the whole administrative record. *See* 5 U.S.C. § 706; *Overton Park*, 401 U.S. at 420 (district court review "is to be based on the full administrative record that was before the [agency head] at the time he made his decision ); *Cousins v. Sec'y  of United States Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989).

### C.      Substantial Evidence:  5 U.S.C. § 706(2)(E)

Plaintiffs suggest this case calls for the higher "substantial evidence  standard of review than the typical APA case. *See Pls.' Mot. to Reconsider* at 5.  They argue that a "record-based analysis . . . fail[s] the rigorous standard, in judicial scrutiny of regulatory decisions, that a court find *'substantial* evidence' to support a decision . . . .   *Id.*  Plaintiffs cite Justice Kennedy's concurrence in the recent Supreme Court case *Rapanos v. United States*, 547 U.S. __, 126 S. Ct.

2208, 2251, 165 L. Ed. 2d 159, 207 (2006) ("The conditional language in [the Corps's assessments] . . . could suggest an undue degree of speculation, and a reviewing court must identify substantial evidence supporting the Corps' claims, see 5 U.S.C. § 706(2)(E). ). The Corps objects, asserting that the substantial evidence standard is applicable only to rule-making and formal adjudications. *Federal Defs.' Memo. in Opp'n to Mot. to Recons. Order on Pls.' Mot. for TRO* at 3 n.1.

The Plaintiffs have raised a confusing issue. "Arbitrary and capricious  and "substantial evidence  are not the same. Professors Wright and Koch have pointed out: "Courts have recognized that the substantial evidence standard requires greater judicial scrutiny of an agency decision than does the arbitrariness standard. Thus, on the continuum . . . , this word formula communicates judicial scrutiny somewhere between de novo and arbitrariness review. 33 Charles Alan Wright & Charles H. Koch, Federal Practice and Procedure § 8333 (2006). As Justice Kennedy did in his concurrence,[11] some courts have applied both standards to their review of an agency action. For example, in its decision in *Carabell v. United States Army Corps of Engineers*, the Sixth Circuit described the standard of review:

> Where, as here, the district court's order is based on its review of an administrative agency's final decision, our review is governed by the Administrative Procedures Act ("APA ) The APA provides that a court shall set aside an agency's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law …. An agency's factual findings are conclusive if supported by substantial evidence….

391 F.3d 704, 707 (6th Cir. 2004) (citations omitted). *See also Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 61 (4th Cir. 1991) ("Our review, like that of the district court, is limited to a determination of whether the Corps' decision was arbitrary, capricious, otherwise not in

---

[11] Earlier in his concurrence, Justice Kennedy noted that the Carabells had "sought judicial review pursuant to the Administrative Procedures Act, 5 U.S.C. § 706(2)(A),  the statutory arbitrary and capricious standard. *Rapanos*, 126 S. Ct. at 2240. His later express reference to the "substantial evidence  standard, 5 U.S.C. § 706(2)(E), supports the conclusion that he views the standards as cumulative. *Id.* at 2251.

accordance with law, or unsupported by substantial evidence. ); *Hoosier Envtl. Council, Inc. v. United States Army Corps of Eng'rs*, 105 F. Supp. 2d 953, 965 (D. Ind. 2000) ("In an action for review of the grant of a § 404 permit, courts must examine the administrative record to determine whether the COE made an arbitrary or capricious decision, abused its discretion, acted contrary to law or regulation, or lacked the support of substantial evidence. ).

The vast majority of courts, however, focuses solely on the arbitrary and capricious standard as the proper one for review of agency action. *Dubois*, the most recent First Circuit case addressing the review of an agency action under NEPA and the CWA, states unequivocally:

> [T]he appropriate scope of review for both NEPA claims and CWA claims is the standard set forth in the APA. 5 U.S.C. § 706(2)(A)(1994) (citations omitted). Under the APA, "the reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

*Dubois*, 102 F.3d at 1284. Nowhere does *Dubois* mention the substantial evidence standard. *See also Utahns v United States Dep't of Transp.*, 305 F.3d 1152, 1164 (10th Cir. 2002); *Preserve Endangered Areas of Cobb's History v. United States Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996); *Advocates for Trans. Alternatives, Inc. v. United States Army Corps of Eng'rs*, 453 F. Supp. 2d 289 (D. Mass. 2006).

The substantial evidence standard of § 706(2)(E) applies only if it involves a "case subject to sections 556 and 557 of [title 5] or otherwise reviewed on the record of an agency hearing provided by statute. 5 U.S.C. § 706(2)(E). 5 U.S.C. § 556 applies to "hearings required by [5 U.S.C. § 553 or 554] to be conducted in accordance with this section. 5 U.S.C. § 553 involves procedures for rulemaking, not applicable here. 5 U.S.C. § 554 applies to cases of "adjudication required by statute to be determined on the record after opportunity for an agency hearing…. 5 U.S.C. § 557 applies "when a hearing is required to be conducted in accordance

with section 556.... *See Camp v. Pitts*, 411 U.S. 138, 141 (1973) ("[N]either the National Bank Act nor the APA requires the Comptroller to hold a hearing or to make formal findings on the hearing record when passing on applications for new banking authorities. . . . [T]he proper standard for judicial review of the Comptroller's adjudications is not the 'substantial evidence' test which is appropriate when reviewing findings made on a hearing record . . . . ) (citations omitted); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ("Review under the substantial-evidence test is authorized only when the agency action is taken pursuant to a rulemaking provision of the Administrative Procedure Act itself, 5 U.S.C. § 553 (1964 ed., Supp. V), or when the agency action is based on a public adjudicatory hearing. ); *Penobscot Air Servs.*, 164 F.3d at 718 n.1 (The "substantial evidence  standard is "specifically applicable only in certain specifically delineated contexts, including rulemaking and formal adjudications. ).[12]

The CWA, however, does not mandate that the Corps "hold a formal hearing or [] make formal findings of fact on the hearing record  when passing on a CWA permit application.[13]  The

---

[12] Plaintiffs rely on a string citation to support application of the heightened standard. *See Pls.' Mot. for Recons.* at 6.  The cited cases do not support the argument, and at least one does not involve any claim under NEPA, CWA, or NHPA. *See Federal Power Comm'n v. Florida Power & Light Co.*, 404 U.S. 453, 463 (1972) ("[W]e recognize the relevant agency's technical expertise and experience, and defer to its analysis unless it is without substantial basis in fact. ). *Environmental Defense Fund, Inc. v. Corps of Eng'rs of United States Army* is a NEPA case in which the Eighth Circuit held that "the *district court's* findings and conclusions as to the objectivity of an EIS were supported by substantial evidence.  470 F.2d 289, 296 (8th Cir. 1972) (emphasis supplied).  Later in the opinion, the Eighth Circuit stated: "The standard for review to be applied here and in similar cases is set forth in *Citizens to Preserve Overton Park v. Volpe*.  The reviewing court must first determine whether the agency acted within the scope of its authority, and next whether the decision reached was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  *Id*. at 300. (citation omitted).  *Wetlands Action Network v. United States Army Corps of Eng'rs*, 222 F.3d 1105, 1120 (9th Cir. 2000) is a NEPA case which held: "The Corps' conclusion that the construction of the freshwater wetland system will result in a net environmental benefit was based on relevant and substantial data.   The standard of review applied in that case was not "substantial evidence,  however, but rather the arbitrary and capricious standard *Id*. at 1114.  Finally, in *Van Abbema v. Fornell*, 807 F.2d 633, 642 (7th Cir. 1986), the Seventh Circuit wrote: "The Corps does not appear to have conducted any *substantial* investigation of alternatives on its own.  *Id*. (emphasis added).  Simply because a court includes the word "substantial  in a NEPA opinion does not mean that it is applying the "substantial evidence  standard.
[13] 33 U.S.C. § 1342(a)(1) requires only that the administrator give the "opportunity for a public hearing.  *See generally* 33 C.F.R. § 320.4.  This mandate contrasts, for example, with statutory directive for the National Labor Relations Board, which is required to give notice of the hearing, to conduct hearings in accordance with the rules of evidence and civil procedure, to reduce testimony to writing, to state its findings of fact, and to issue an order. 29

same is true for the Corps's review under NEPA.  *See* 42 U.S.C. § 4332; *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 370-78 (1989).  Thus, by its own terms, as explained in *Camp*, § 706(2)(E) does not apply.

This Court confesses some confusion as to why Justice Kennedy and some courts have incorporated the substantial evidence standard in judicial review of agency decisions.  There may be something different about those cases not present here.[14]  But, if the substantial evidence standard applies along with the arbitrary and capricious standard, this would essentially eviscerate the arbitrary and capricious standard, since substantial evidence – as a heightened standard and more generous to the challenger – would trump the arbitrary and capricious standard for purposes of judicial review of the sufficiency of the evidence before the agency.  Justice Kennedy's reference to substantial evidence is dictum and not binding on this Court.[15]  Absent a new holding from the Supreme Court or First Circuit, the doctrine of *stare decisis* applies.[16]  The last word on the appropriate standard for review for NEPA and CWA claims is the "arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law   standard the First Circuit applied in *Dubois*.  It is this standard that this Court will apply.

This Court concludes the substantial evidence standard of 5 U.S.C. § 706(2)(E) does not apply and the arbitrary and capricious standard of 5 U.S.C. § 706(2)(A) does.

---

U.S.C. § 160(b)-(c).  The law provides that the reviewing court must consider the NLRB's findings to be conclusive "if supported by substantial evidence.   29 U.S.C. § 160(e).

[14] *Carabell* came to federal court in a slightly different posture than this case.  The land owners sought state approval, and under 33 U.S.C. § 1344(g), the Michigan Department of Environmental Quality (MDEQ) had assumed permitting functions of the Corps.  *Rapanos*, 126 S. Ct. at 2239.  The MDEQ denied the permit, but a state administrative judge directed the agency to approve an alternative plan the Carabells proposed.  *Id.*  Once the EPA objected, jurisdiction was transferred to the Corps pursuant to 33 U.S.C. § 1344(j).  *Id.* at 2239-40.  The Corps district office denied the permit and the Corps upheld the denial in an administrative appeal.  *Id.* at 2240.  The Carabells sought judicial review in the United States District Court.  But, this different posture does not seem to justify a different standard of judicial review.

[15] No other justice mentions the substantial evidence standard.  *See Rapanos*, 126 S. Ct. 220.

[16] This is not one of those rare occasions where the "iron grip of *stare decisis*   should be loosened.  *United States v. Reveron Martinez*, 836 F.2d 684, 687 n.2 (1st Cir. 1988).  Justice Kennedy's concurrence does not establish a change in the "contours of the law   so as to justify the application of the substantial evidence standard.  *See Gately v. Massachusetts*, 2 F.3d 1221, 1226 (1st Cir. 1993).

## V.     Discussion

### A.     Likelihood of Success on the Merits

The importance of the first of the four factors comprising the preliminary injunction analysis cannot be understated: "The sine qua non of [preliminary injunction analysis] is whether the plaintiffs are likely to succeed on the merits: if the moving party cannot demonstrate that he is likely to succeed on his quest, the remaining factors become matters of idle curiosity." *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993); *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 115 (1st Cir. 2006). With respect to this prong of the test, "a court's conclusions . . . are to be understood as statements of probable outcomes. *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991). To satisfy this prong of the preliminary injunction test, Plaintiffs must show that they are likely to succeed in showing that the Corps's decision to grant the City a permit to fill wetlands was arbitrary and capricious. As the Plaintiffs rely on asserted violations of federal statute to meet the arbitrary and capricious standard, the Court will consider each statute separately.

### 1.     CWA

The Clean Water Act (CWA) was a "bold and sweeping legislative initiative, *Dubois*, 102 F.3d at 1294 (citation omitted), enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters. 33 U.S.C. § 1251(a). "This objective incorporated a broad, systemic view of the goal of maintaining and improving water quality: as the House Report on the legislation put it, 'the word "integrity . . . refers to a condition in which the natural structure and function of ecosystems [are] maintained. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132 (1985) (quoting H.R. Rep. No. 92-911, at 76 (1972)). In contrast to NEPA's "focus on process,  the CWA "is substantive, focusing on the integrity of

the nation's water, not the permit process.   *Dubois*, 102 F.3d at 1294 (citation and internal punctuation omitted).

Pursuant to Section 404 of the CWA (33 U.S.C. § 1344), the Corps "may issue permits, after notice and opportunity for public hearings, for the discharge of dredged or fill materials into navigable waters at specified disposal sites.   33 U.S.C. § 1344(a).[17] Before issuing a fill permit, the Corps must insure that the proposed action complies with CWA § 404(b)(1) guidelines issued by the Environmental Protection Agency (EPA).   33 C.F.R. § 320.4(a)(1).   These guidelines – outlined in the EPA regulations – provide that the Corps shall not issue a fill permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant environmental consequences.   40 C.F.R. § 230.10(a).[18] In addition, the EPA guidelines prohibit a fill permit if it would result in "significant degradation of the waters of the United States,   taking into account any potential adverse effects on human health or welfare, wildlife and aquatic ecosystems, or recreational, esthetic, and economic values.   40 C.F.R. § 230.10(c).

If the Corps determines that the proposed action complies with the Section 404(b) requirements, it "will grant the permit unless issuance would be contrary to the public interest. 33 C.F.R. § 323.6(a).   The "public interest review   involves a weighing of the benefits of the proposed activity against the foreseeable detriments.   33 C.F.R. § 320.4(a)(1).   The "permit will

---

[17] The CWA broadly defines "navigable waters   to mean "the waters of the United States, including the territorial seas.   33 U.S.C. 1362(7).   The regulations promulgated under the CWA further define "waters of the United States   to mean wetlands adjacent to "waters used in interstate commerce,   tributaries of those waters, or territorial seas.   33 C.F.R. § 328.3.   Here, there is no argument on either side that the Corps lacked jurisdiction over the wetlands at issue. *Cf. United States v. Johnson*, 467 F.3d 56 (1st Cir. 2006).

[18] The regulations further explain: "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics *in light of overall project purposes*.   40 C.F.R. § 230.10(a)(2) (emphasis added).   *See also Sylvester v. United States Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989) ("The Corps has a duty to take into account the objectives of the applicant's project. Indeed, it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable.  ) (citation omitted).

be granted unless the district engineer determines that it would be contrary to the public interest. *Id.*

### a.    Balancing Analysis

The Plaintiffs' claims under the CWA occupy several counts of the Complaint. In Count I, Plaintiffs allege a violation of the CWA's requirement of weighing the benefits against the detriments, asserting that the Corps's balancing was "arbitrary and capricious because the agency could not plausibly have found that the project would accomplish its central claimed benefit. *Compl.* ¶ 105. According to the EA, the principal intended benefit of Phase II was "to relieve traffic congestion and to allow for the safe and efficient flow of traffic in this quadrant of the city. Improved pedestrian safety is an inherent part of the basic project purpose.   AR 1:34.

In their Complaint, Plaintiffs claim the Corps relied on traffic studies that considered the potential impact of the development of both Phase II and Phase III of the Northwest Bypass project and failed to assess the impact of Phase II alone. *Compl.* ¶¶ 98, 103. They state that when only Phase II is considered, the traffic studies demonstrate an increase, not a decrease in traffic congestion. *Id.* at 99. By relying on studies that incorporate Phase III and ignoring studies that focus solely on Phase II, they claim the Corps's decision was arbitrary and capricious. *Id.* The Defendants, on the other hand, have pointed to several traffic studies directed to the impact of Phase II alone, which the Corps reviewed in the permitting process.[19] *See Federal Defs.' Memo. in Opp'n to Mot. for TRO and Prelim. Inj.* at 9, 21-23 (Docket # 20)

---

[19] *See, e.g.,* AR 6:15 (Rizzo Associates' September 12, 2001 study finding that "Phase II alone will improve actual access for emergency vehicles, improve emergency access times, remove traffic passing through neighborhoods, alleviate congestion and serious safety concerns ); AR 6:16 (referring to the April 2001 Rizzo study entitled "Traffic Impact and Access Study, Proposed Hospital Expansion Capital Expansion Capital Regional Healthcare Campus); AR 6:24 (referring to the Vision 20/20 project, "prepared by highly qualified Transportation and Planning Consultants in the area ); AR 6:582 (study prepared by Resource Systems Group on April 17, 1998, entitled "Travel Demand Model Development and Traffic Impact Study for the Northwest Bypass ); AR 6:530 (study prepared by Vanasse Hangen Brustlin, Inc. (VHB) in February 1999, entitled "Concord Parking Shuttle Policy and Operations Feasibility Analysis ); AR 6:1134 (study prepared by VHB entitled "Pleasant Street Corridor Improvement Plan ).

(*Corps Opp'n*); *Defendant City of Concord's Objection to Mot. for TRO and Prelim. Inj. with Request for Expedited Hearing* at 15-17 (Docket # 18) (*City's Opp'n*).   To the extent the Plaintiffs contend that there was no evidence of the likely impact of Phase II alone on traffic congestion, the Plaintiffs are simply wrong.

Next, Plaintiffs claim that a report by their expert, Laurie Rauseo, refutes the City's studies.  *Compl.* ¶ 99.  Ms. Rauseo opines that building Phase II would actually increase the traffic volumes on Pleasant Street and Clinton Street and Plaintiffs assert that the City's consultant agreed with her analysis.  *Id.* ¶¶ 99, 100-101.  The Corps responds, arguing "while more vehicles will use Phase II to access the Hospital (leading to higher volume overall), *congestion* will decline on other roads like South Fruit Street and Pleasant Street because traffic volume on those roads will decline.   *Corps Opp'n* at 23 (emphasis in original); *see also* AR 6:18-19; *City's Opp'n* at 17 & n.13.   Notwithstanding the allegations in the Complaint, the record reflects that Domenic J. Ciavarro, the City's traffic consultant, disagreed with many of Ms. Rauseo's views.  *See* AR 6:14-24 (letter from Mr. Ciavarro to Ms. Martha Drukker dated September 12, 2001).

The existence of opposing views does not render the Corps's decision arbitrary and capricious.  *See Franklin Sav. Ass'n v. Director, Office of Thrift Supervision*, 934 F.2d 1127, 1144 (10th Cir. 1991) ("Conflicting expert opinion, however, is not sufficient to allow a reviewing court to conclude the agency decision was arbitrary, capricious or an abuse of discretion, nor is such evidence sufficient to overcome the presumption of regularity and correctness afforded to the appointment decision.  ).  There is sufficient evidence in the record to support the Corps's position that the project would accomplish its principal goal:  to relieve

traffic congestion and to promote public safety.   The Plaintiffs have not demonstrated a likelihood of success on the merits of Count I.

b.      **Alternatives Analysis**

In Count II, Plaintiffs allege that the Corps's issuance of the Section 404 permit was arbitrary and capricious because the evidence before the Corps failed to rebut "the very strong presumption of the existence of practicable alternatives to the proposed discharge which do not involve a discharge into a wetland . . . .   *Compl.* ¶ 142.   In particular, Plaintiffs claim that the EA overstated the impracticality of the no build option, *Compl.* ¶ 115, and that the Corps failed to analyze alternatives to the specific project under consideration: "to build Phase II alone and to close Silk Farm Road/Dunbarton Road.   *Id.* ¶ 116.

Under 40 C.F.R. § 230.10(a)(3), there is a  presumption that alternatives exist when the proposed project is not "water dependent.   The Phase II construction does not "require access or proximity to . . . the special aquatic site in question to fulfill its basic purpose.   40 C.F.R. § 230.10(a)(3).   Thus, "when the basic purpose of a project may be accomplished without 'access or proximity' to a 'special aquatic site . . . practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise.'   *Greater Yellowstone Coal.*, 321 F.3d at 1262 n.12 (quoting 40 C.F.R. § 230.10(a)(3)).   In other words, "under the CWA, it is not sufficient for the Corps to consider a range of alternatives to the proposed project:  the Corps must rebut the presumption that there are practicable alternatives with less adverse environmental impact.   *Id.*; *see also Nat'l Wildlife Fed'n, v. Whistler*, 27 F.3d 1341, 1344 (8th Cir. 1994) ("This presumption of practicable alternatives is very strong, creating an incentive for developers to avoid choosing wetlands when they could choose an alternative

15

upland site . . . .  (citations and internal quotation marks omitted)).[20]  Therefore, it is presumed

that there existed alternatives to the chosen course of action, because the Phase II project does

not depend on an "aquatic site  for its existence.  The question becomes whether any of the

existing alternatives were practicable, such that the discharge of fill could be avoided.

The Corps contends that it weighed alternatives, including different routes and the "no

build  option, but rejected them.  *Corps Opp'n* at 22.  The administrative record supports the

Corps's position.  The EA contains a section entitled "Alternatives: Section 404 Mitigation MOA

Requirements.  *See* AR 1:34.  The Corps measured alternatives against the basic project

purpose, which was "to relieve traffic congestion and to allow for the safe and efficient flow of

traffic in this quadrant of the city.  *Id.*  The Corps considered (1) alternate alignments of the

roadway, which were found to have greater direct impact on the wetlands and forest

fragmentation; and, (2) an "[u]pgrade alternative,  wherein the City would widen existing roads

and add more lanes.  *Id.*  According to the Corps, the alternate alignments  would "be more

damaging.  AR 1:34-35.

The Corps characterized the first alternative – and the eventual winner – as "crossing at a

narrow point and nipping the edge of the existing wetlands.  AR 1:34.  The second alternative

would have cut "straight across a wide segment of wetland,  resulting in a "greater direct impact

and greater impact from the point of view of forest fragmentation.  *Id.*  A third alternative –

upgrading existing city streets – was found impractical because of the large number of properties

affected. *Id.*

---

[20] The Plaintiffs cite this case in paragraph 109 of the Complaint.  In *Whistler*, the Corps approved conversion of
approximately 14.5 acres of wetlands into deep water habitat, to allow a housing project boat access to the nearby
Missouri River.  27 F.3d at 1343.  The National Wildlife Federation sought a preliminary injunction, alleging that
the Corps conducted an improper alternatives analysis. *Id*. at 1344.  The court noted the very deferential standard of
review, even in light of the presumption of alternatives, and emphasized that "[c]entral to evaluating practicable
alternatives is the determination of a project's purpose.  *Id*. at 1345.  Ultimately, the court found that the
alternatives analysis was proper, explaining that because this project was water-dependent, the regulatory
presumption did not exist. *Id.*

Regarding the "no build" option, the Corps observed that "[u]pgrade alternatives, to the extent that they might relieve congestion by widening the roads and adding more lanes for cars, would be of dubious value in achieving the pedestrian safety that is a part of the purpose of the project and would have occasioned the need for taking portions of numerous properties along South fruit (sic) Street and Pleasant Street. *Id.* The Corps also determined that "[u]pgrades of existing streets were not practicable because of the number of properties that would be effected (sic) in such an urbanized part of the city." AR 1:34-35. The Corps concluded that the proposed roadway was the "least environmentally damaging practicable alternative." AR 1:35.

Therefore, while alternatives are presumed to exist under CWA, the Corps overcame the presumption by evaluating alternative alignments and the no-build option and concluding they were not practicable. Plaintiffs are not likely to demonstrate that the Corps's conclusion was arbitrary or capricious.

**c.    Diminished Deference for Prejudgment**

Although the title of Count III announces a cumulative impact claim, the first several paragraphs argue that "the Army Corps decision must be accorded diminished deference due to issues prejudgment." *See Compl.* ¶¶ 144-164. Citing *Davis v. Mineta*, Plaintiffs argue that federal decisionmakers are accorded diminished deference where they "prejudged the . . . issues." 302 F.3d 1104, 1112 (10th Cir. 2002); *see Int'l Snowmobile Mfrs. Ass'n v. Norton*, 304 F. Supp. 2d 1278, 1291 (D. Wyo. 2004).

Plaintiffs allege that the Corps prejudged the issue when it took part in a "decisive private meeting" on August 15, 2001, attended by NHDES, the City's engineer and attorney, and representatives of other federal agencies. *Compl.* ¶ 150. From the Complaint, it appears that the principal basis for the Plaintiffs' allegation of prejudgment is a newspaper article published in

the *Concord Monitor*, which states that Dr. Richardson, an NHDES hearings officer, was leaning toward denial, and was subsequently overruled by "Dr. Richardson's NHDES administrative superiors.   *Id.*   Later, the Plaintiffs allege NHDES hosted a private meeting with the Corps to "formulate a strategy to get Phase II approved  and received "clear implicit assurance of ultimate Army Corps approval. [21]  *See Compl.* ¶¶ 150-51.

The City strenuously objected to the Plaintiffs' characterization of the meeting.[22]  *See City's Opp'n* at 21 n.18. At oral argument, the City's attorney again argued that the meeting was public. *See Hearing Transcript* at 140-41 (stating that there was nothing "nefarious  about the meeting). The City points out that the Corps's familiarity with this case dates back to 1992, and Corps staff – including senior project manager Richard Roach – has "attended every public hearing and had access to the entire State record.   *City's Opp'n* at 19 n.17.

Based merely on the allegations in the Plaintiffs' Complaint and the record before it, this Court has no greater reason to accept the Plaintiffs' allegations than to credit the Defendants'

---

[21] Paragraph 149 of the Complaint alleges:

On August 22, 2001, the <u>Concord Monitor</u> reported: "Last month, with most signs from the bureau pointing toward denial, the city requested a 60-day extension. The bureau decided on Aug. 14 to grant it.   The newspaper again quoted Dr. Richardson:

…[who] said he could not forecast approval. "So the [City] <u>contacted an attorney</u> and did some 11th-hour maneuvering, much to the chagrin of the opposition,  he said

Richardson said <u>higher-ups made the decision</u> to extend the review. "The department made an exception and allowed an extension because it is a municipal project,  he said.

Richardson said he was <u>leaning toward denying the permit</u>.

"If the pans on the scale are approval on one side and denial on the other, I think the scale was slowly slipping towards denial, and I think the city saw that,  he said.

*Id.* (emphasis in Complaint).
The Complaint also alleges that the "meeting notes state that Mr. Roach provided on behalf of the Army Corps:  (a) explicit favorable assessments on several matters in controversy, including project alignment, wetlands mitigation and wildlife habitat fragmentation; (b) explicit advance assurance of favorable Army Corps review on those matters; and, (c) clear implicit assurance of ultimate Army Corps approval.   *Compl.* ¶ 153.
[22] The City states:  "In fact, this meeting was a regularly scheduled coordination meeting among State and federal regulators who routinely meet for coordination purposes. It was not "by invitation  as claimed by Plaintiffs. It was not a "private meeting  as claimed by Plaintiffs. It was open to the public (and members of the public attended). *City Opp'n* at 21 n.18.

denials.  As the burden rests with the Plaintiffs, it cannot be said, based on this record, that Plaintiffs are likely to succeed on the merits of this part of their claim.

Plaintiffs also argue for diminished deference because they allege the Corps "failed to conduct an independent review of [Mr. Roach's] work to insulate itself from the biases toward a FONSI [it] reflect[s].… *Compl.* ¶ 157.  In support, Plaintiffs again cite *Davis*, 302 F.3d 1104. *Davis* dealt with a NEPA challenge of a decision by the Department of Transportation and the Federal Highway Administration to prepare an Environmental Assessment (EA) leading to the issuance of a Finding of No Significant Impact (FONSI) instead of an Environmental Impact Statement (EIS).  *Id.* at 1109.  The court of appeals remanded the case for an entry of preliminary injunction barring further road construction.  *Id.* at 1126.  Distinct from the case at bar, the EA in *Davis* was prepared by Horrocks, an engineering firm, and was subsequently adopted by the agency.  *Id.* at 1110.  In *Davis*, the Tenth Circuit characterized Horrocks' analysis as "tainted and concluded that the "record establishes that [the agency] failed to conduct a sufficient independent review of Horrocks' work to insulate itself from the biases toward a FONSI reflected in Horrocks' draft EA.  *Id.* at 1113.  Here, the Corps itself prepared the EA.  Thus, even if Plaintiffs' assertions are accurate – that is, that the Corps failed to independently review the recommendation of its own senior project manager's recommendations – *Davis* does not support their argument.

The record here does not sustain Plaintiffs' burden to demonstrate pre-judgment by the Corps.

### d.    Other Impacts

#### 1.  The Cumulative Impact

Plaintiffs allege, in Counts III, IV, and V, that the Corps failed to consider the cumulative impact of the project as required by 33 C.F.R. § 320.4, 40 C.F.R. § 230, and 40 C.F.R. § 1508.25(a).  *Compl.* ¶ 165-223.  In other words, Plaintiffs charge the Corps with "incremental segmentation, meaning that the Corps did not consider the extent of the entire Northwest Bypass project, but rather Phase II as a segmented piece of the whole.[23]  According to the Complaint, the Corps's only mention of cumulative impact is a "short conclusory sentence in the EA, *id.* ¶ 166, and the Plaintiffs allege that the Corps's decision relies on the City's assurance that it has "no present plans to construct Phase III of the project.  *Id.* ¶ 177.  Plaintiffs further claim that the construction of Phase II would have a "coercive effect as to the construction of Phase III.  *Id.* ¶ 170.  In sum, Plaintiffs are concerned that the Corps omitted from its analysis important environmental impacts that could potentially result from the construction of Phase III, *id.* ¶ 185, and certain alternatives to Phase III – such as "no build – that could be made obsolete by an approval of Phase II.  *Id.* ¶ 187.  The Corps responds that Phase II has "separate utility from the rest of the project, and that "the City has no present plans to construct Phase III, has requested authorization to fill only those wetlands in the path of Phase II, and would build Phase II whether or not Phase III is ever built.  *Corps Opp'n* at 11; AR 1:32.

Under 40 C.F.R. § 1508.25, part of the Council on Economic Quality (CEQ) regulations promulgated pursuant to NEPA, an agency is required to consider connected, cumulative, or similar actions in the same environmental impact statement.  *Id.*  The regulations define "[c]onnected actions as those that are "closely related and therefore should be discussed in the

---

[23] As a related segmentation issue, Count V of the Complaint asserts that the Corps considered an incomplete application; that is, that the Corps provided permitting of Phase II "without determining the impacts of constructing the full project for which the permit is sought.  *Compl.* ¶ 257.  Plaintiffs claim that because "[c]onstruction of Phase I, Phase II, and Phase III of the Northwest Bypass are reasonably related activities,  *id.* ¶ 71, the permit application should have included consideration of Phase I (already constructed) and Phase III (foreseeably constructed).  *Id.* ¶¶ 250-52.  However, the EA reflects that Phase III did receive some attention from the Corps.  *See* AR 1:32 ("The City asserts that it has no present plans to construct Phase 3 of the original project and has requested authorization to fill only those wetlands in the path of Phase 2. ).

same impact statement.   40 C.F.R. § 1508.25(a)(1).   According to the regulation, actions are connected if they: "(i) Automatically trigger other actions which may require environmental impact statements; (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; [or] (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.   40 C.F.R. § 1508.25(a)(1)(i)-(iii).   "Cumulative actions  are those that, "when viewed with other proposed actions have cumulatively significant impacts.   40 C.F.R. § 1508.25(a)(2).   Finally, similar actions, "when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together . . . in the same impact statement.   40 C.F.R. § 1508.25(a)(3).   Segmentation is improper when the segmented project "'has no independent justification, no life of its own, or is simply illogical when viewed in isolation.'   *One Thousand Friends v. Mineta*, 364 F.3d 890, 894 (8th Cir. 2004) (quoting *Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1139 (5th Cir. 1992)).[24]   The First Circuit has said that the agency "need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.   In this context, reasonable foreseeability means that the impact is sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision.   *Dubois*, 102 F.3d at 1286 (citations and internal punctuation omitted).

Based on this standard, the Phase II project alone – taking away the existence of Phase I or the possibility of a Phase III – has a clear independent utility: to relieve traffic congestion, promote public safety, and provide a more direct route to the hospital.   Moreover, the relationship between Phase II and Phase III is much too speculative to mandate Phase III

---

[24] In *One Thousand Friends of Iowa*, the Eighth Circuit concluded that a highway interchange was not improperly segmented because it had independent utility.  364 F.3d at 894.

consideration.  In short, Phase III may never be built and the City has represented that it has no current plans to do so.  This Court cannot conclude that something which may never happen is reasonably foreseeable and Phase III does not otherwise fit the regulatory definitions.

### 2. Secondary Impacts

Plaintiffs assert that the Corps should have considered the impact Phase II will have on other roadways in that area of the city, asserting: "The EA/SOF nowhere discusses the potential secondary effects of a potential realignment of Birch Street with Phase II . . . . *Pls.' Mot.* at 18. The Corps responds that it is only required to consider indirect effects of an agency action that are "reasonably foreseeable.  *Corps Opp'n* at 11.  Indeed, the CEQ regulations define "indirect effects  as those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.   40 C.F.R. § 1508.8.  The First Circuit has said that agencies "need not consider potential effects that are highly speculative or indefinite. *Sierra Club v. Marsh*, 976 F.2d 763, 768 (1st Cir. 1992).

The administrative record reflects that the City responded to a public comment on this very topic made by Plaintiffs' counsel, Mr. Blakeney.  AR 6:149.   Mr. Blakeney asserted that the project would have an impact on the First Baptist Church, which had applied to the City for permits to construct a church and school on Clinton Street.  *Id.*  The City responded that "the Bypass is not planned for any extensions southerly of Clinton.  Birch Street is an unpaved, seasonally maintained street which has little likelihood of being upgraded as it is surrounded by land owned by the State, a City recreation parcel acquired under the protections of the Land and Water Conservation Fund, and a private tract that is subject to restrictions as open space.  *Id.*

The City's statement – made in response to public comments the Corps received – is contained in the administrative record the Corps reviewed.  As such, it cannot be said that they

failed to consider secondary effects of the Phase II construction.   Additionally, given the City's response, the Plaintiffs have not demonstrated that realignment is reasonably foreseeable. Because the secondary impact on Birch Street is speculative or indefinite at best, Plaintiffs have not met their burden of showing a likelihood of success on the merits of this aspect of the claim.

### 3. Secondary Development – *City of Davis*

Within Count IV, Plaintiffs advance the argument that the Corps decision was arbitrary and capricious in that it did not consider the potential impacts of secondary development. *Compl.* ¶ 209; *Pls.' Mot.* at 18.  The Corps counters: "With much of the areas as wetlands, within state ownership, and/or subject to conservation easements under the project's mitigation plan, the Corps reasonably concluded that these lands were not likely to be subject to development pressure.   *Corps Opp'n* at 12.   Indeed, the Corps's EA itself points out why this result is unlikely: "Two acres of plowed farm fields will be paved over.   The remainder of farm fields will likely remain in agricultural use for some time as they are in state ownership.   However, being adjacent to another road may make the farm fields next to the road easier to develop, [if] the state chooses to use the land for another purpose.   AR 1:36-37.

Plaintiffs claim this case is similar to a Ninth Circuit case, *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975).  The Court disagrees.  *Coleman* addressed a "proposal to build a major interchange in an agricultural area near the edge of urban development . . . .   *Id*. at 676.  But, "the main purpose of the interchange . . . [was] to provide access to the Kidwell area for future industrial development.   *Id*. at 677.  The interchange, located near the campus of the University of California at Davis, would have opened thousands of acres of farmland to "research and high technology concerns,  the first stage of which the agency promoting the project had already begun to advertise.  *Id*. at 667-68.  *Davis* noted "growth-inducing effects of the Kidwell

Interchange project are its raison d'etre, and with growth will come growth's problems: increased population, increased traffic, increased pollution, and increased demand for services such as utilities, education, police and fire protection, and recreational facilities. *Id.* at 675. Yet, the California Department of Public Works and the Federal Highway Administration concluded that "the environmental impact of the proposed interchange will be insignificant. *Id.* Under those circumstances, pretending that there would be no secondary effects beyond the construction of the intersection itself did not comply with NEPA. *Id.* at 677.

*Davis* is a far cry from this case. *Davis* itself was careful to observe that, "[w]e do not say that secondary impacts are *always* more important, or even that they must *always* be considered in an EIS. Here it is clear that the secondary impacts may be significant and they must therefore be included in the EIS. *Id.* at 676 n.18 (internal citation omitted). Here, the purpose of Phase II is not to promote development, but rather to ease traffic congestion and provide access to the hospital. Unlike *Davis*, there is no evidence in this record that Phase II is a stalking horse for a more elaborate scheme of development. In the case at bar, although the Corps acknowledged the potential for some development, it noted that much of the remaining area is wetlands, that the state itself owns a significant portion of the land adjacent to the Phase II roadway, and that a portion of the lands will be subject to conservation easements under the project's mitigation plan. AR 1:36-37.

Based on this record, the Court concludes that the Plaintiffs are not likely to succeed on the merits of their claim that the Corps was arbitrary and capricious by failing to consider secondary development.

        e.        **Public interest review**

Plaintiffs' Count VI contains another CWA claim: that the Corps's decision is arbitrary and capricious because it failed "to properly weigh or consider all relevant factors under 33 C.F.R. § 320.4(a). [25] *Compl.* ¶ 293. Plaintiffs make the novel argument that "a comparison of the respective lengths of the agency's written descriptions of adverse versus beneficial impacts is a reasonable measure of a proposal's adverse versus beneficial impacts . . . . *Compl.* ¶ 265. Under this argument, for example, because the section on safety (which was listed as the sole beneficial impact) was fairly brief in comparison with the discussion of the detrimental impact on the wetlands, the Plaintiffs allege that the Corps's decision was arbitrary and capricious.[26] This argument equates wordiness with substance, a demonstrably false premise.

Although the CWA and 33 C.F.R. § 320.4 require the Corps to evaluate the impact to public interest factors, these statutory and regulatory provisions neither mandate what the Corps must put in the EA nor what the Corps's decision should be. What is important for measuring the Corps's decision against the arbitrary and capricious standard is whether the Corps performed an analysis and took into account the appropriate factors. Here, the EA contains a checklist that references each statutory factor and the Corps has noted its assessment as to whether, in its judgment, the project will have a beneficial, adverse, or negligible effect for each factor. AR 1:36. The Corps's EA engaged in a further written analysis of certain, more relevant factors:

---

[25] 33 C.F.R. § 320.4(a) requires a public interest review of "the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. *Id.* The list of factors includes "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people. *Id.*

[26] Plaintiffs claim, in the alternative, that the Corps failed to consider the impact of Phase II on the Carmelite Monastery, *Compl.* ¶ 272, and on the tile drainage system. *Compl.* ¶¶ 273-74. In addition, Plaintiffs claim that the Corps did not consider the detrimental impact on recreational uses of the land. *Compl.* ¶ 283. The Record does not support the Plaintiffs' assertions. The EA mentions the Carmelite Monastery and potential noise problems. *See* AR 1:37. The Corps was aware of the concerns about the tile drainage system. *See infra* at V.A.2.c. Finally, the Corps discussed the impact of Phase II on recreation. *See* AR 1:34, 40, 42.

> The chief benefit of the project will be the increased safety of pedestrians and the reduced congestion of traffic which will result from providing an alternate additional means of vehicular access to the Concord Hospital complex from I-89 and Clinton Street. The chief detriment will be the loss of 3½ acres of wetland and a small part of the countryside just outside the existing edge of the city which will be incorporated into the more urbanized part of the city by being divided from the country by a city road.
>
> . . .
>
> The construction of a new segment of road will have a slight to moderate adverse affect on a number of factors of concern to the public interest. These factors have been weighed and considered. It is our evaluation that while these loses (sic) are a concern, there is not . . . sufficient reason for denial of a Federal Clean Water Act Permit considering that there will be other important public interest benefits.

AR 1:41-42. Because the Corps expanded on some factors does not mean it failed to consider others. The Court concludes that the Plaintiffs have not shown that they are likely to succeed on the merits of this aspect of their CWA claim.

###   f.    Regulatory Guidance Letter

Another claim under the CWA is that, in addressing wetlands mitigation, the Corps did not follow the provisions of its own regulatory guidance letter (RGL). *Compl.* ¶ 328; *Pls.' Mot.* at 18. The record contains RGL 02-2, which states: "Districts may give compensatory mitigation credit when existing wetlands, or other aquatic resources are preserved in conjunction with establishment, restoration, and enhancement activities . . . . In exceptional circumstances, the preservation of existing wetlands or other aquatic resources may be authorized as the sole basis for generating credits as mitigation projects. AR 7:24. Plaintiffs argue that the Corps's EA "does not identify any 'exceptional circumstances' as would warrant acceptance only of simple preservation of existing wetlands resources [as wetlands mitigation] in accordance with those binding provisions . . . . *Pls.' Mot.* at 18.

Plaintiffs' main obstacle is that, contrary to their contention, RGLs are not binding. "[N]ot all agency policy pronouncements which find their way to the public can be considered to

be regulations enforceable in federal court.   *Chasse v. Chasen*, 595 F.2d 59, 62 (1st Cir. 1979). In deciding whether a particular agency policy pronouncement may properly serve as the basis for jurisdiction, the courts examine "(I) the statutory authority for the promulgation, and (II) the formality of the promulgation.   *Id.*   RGLs are "issued without notice and comment and do not purport to change or interpret the regulations applicable to the section 404 program . . . [and] are not binding, either upon permit applicants or Corps District Engineers.   *Envtl. Def. v. United States Army Corps of Eng'rs*, No. 04-1575 (JR), 2006 U.S. Dist. LEXIS 47969, at *22 (D.D.C. July 14, 2006); *see Hobbs v. United States*, No. 90-1861, 1991 U.S. App. LEXIS 30480, at *12-14 (4th Cir. November 8, 1991) (concluding that the EPA's wetland delineation manuals are interpretive guidance documents without the force of law).[27]

The Corps further argues that, in any event, it followed RGL 02-2 in this case.   *Corps Opp'n* at 13.   The Corps points out that the "exceptional circumstances  language does not operate as a bar to the use of preservation-only mitigation.   However, under RGL 02-2, if preservation alone – as opposed to creation of wetlands  – is proposed as the sole basis for mitigation, the Corps must consider whether the preserved wetlands "perform important physical, chemical or biological functions, the protection and maintenance of which is important to the region  and whether they are under "demonstrable threat of loss or substantial degradation from human activities  not caused by the applicant or otherwise avoidable.   *Id.*; AR 7:24-25. The Corps notes that the preserved areas perform functions important to the Turkey River Basin and absent the mitigation plan, some of the preserved parcels could have been developed without

---

[27] The Corps argues that the RGL does not provide the Plaintiffs with a cause of action to enforce compliance with its requirements. *Corps Opp'n* at 13. Be that as it may, the Court does not construe the Plaintiffs' arguments to mean that the failure to comply with the terms of the RLG would authorize a separate enforcement action based on the RLG alone, but rather that the failure to do so suggests that the Corps acted arbitrarily and capriciously in granting the permit.

a Section 404 permit.  *Id.*; AR 1:35.  The Corps concludes that the preservation plan thereby complied with the requirements of RGL 02-2.

The Plaintiffs have not satisfied their burden of showing a likelihood of success on the merits of Count VII.

### g.    Section 1341(d) compliance

Count VIII alleges that the Corps's permit requires the City to comply with two "substantially conflicting effluent limitations.  *Compl.* ¶ 339; *Pls.' Mot.* at 18.  The gist of this claim is that the amount of land the City is authorized to fill differs under the state and federal permits.  The state water quality certification (WQC) authorized the City to fill 4.39 acres, while the federal Section 404 permit (issued by the Corps) limits filling to 3.5 acres.  *Id.* ¶¶ 334, 336.  Plaintiffs claim that this is a violation of 33 U.S.C. 1341(d),[28] and thus is arbitrary and capricious.

The administrative record confirms Plaintiffs' factual assertions.[29]  However, the Corps explained the reason for the discrepancy:

> The original alignment for Phase II required filling 4.39 acres, because it avoided the Hillside Condominiums, and the State issued a water quality certification for this alignment, concluding that it would not impair water quality.  However, the City revised the alignment to pass closer to those condominiums, so as to fill fewer wetlands, and the revised permit application to the Corps reflected the lower acreage.  Because the Corps' authorization is to fill *fewer* acres, there is no conflict with the State's water quality certification.

---

[28] Pursuant to 33 U.S.C. § 1341(d):

> Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations . . . and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section.

*Id.*

[29] The NHDES WQC states: "Phase II will require the filling of 4.39 acres (191,228 ft) of wetland . . . .  AR 4:50. In its project description, the Department of the Army permit states:  "Place fill in approximately 3.5 acres of wetland. . . .  AR 1:10.

*Corps Opp'n* at 14 (citations omitted).  The Corps also asserts that the City must meet the standards set forth in the WQC irrespective of the number of acres that are actually filled.  *Id.*

Given the common sense explanation for the difference between the state and federal acreages, the Court concludes that the Plaintiffs have not shown a likelihood of success on the merits of Count VIII.

### h.     Ecological Issues

Plaintiffs' final claim under the CWA, contained in Count IX, is that the Corps did not comply with EPA regulations set forth in 40 C.F.R. §§ 230.11 and 230.12(b), which require the Corps to "determine in writing the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment . . . .  40 C.F.R. § 230.11.[30]

The administrative record reflects that attached to the EA was a document entitled "Short Form – Section 404(b)(1) Guidelines Compliance Determination.   AR 1:44-48; *Corps Opp'n* at 15.  This document, headed "Factual Determination (230.11), is a 4-page checklist signed by Richard Roach, finding that there is a "minimal potential for short or long-term environmental effects of the proposed discharge for each category.  AR 1:47.   In light of this, Plaintiffs have not demonstrated a likelihood of success on the merits with respect to Count IX.

### 2.     NHPA – Counts X - XVI

Section 106 of the National Historical Preservation Act (NHPA) requires that before issuing any license, a federal agency must "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register.   16 U.S.C. § 470f.   In addition, the agency must "afford the Advisory

---

[30] Among other things, the Corps must consider: the impact of the discharge on the substrate; water circulation, normal water fluctuation, and salinity; suspended particulate/turbidity; the introduction, relocation, or increase in contaminants; and the aquatic ecosystem and organisms. *See* 40 C.F.R. §§ 230.11(a)–(f).

Council on Historic Preservation (ACHP) . . . a reasonable opportunity to comment with regard to such undertaking.   *Id.*   In other words, "Section 106 is characterized aptly as a requirement that agency decisionmakers 'stop, look, and listen,' but not that they reach particular outcomes. *Narragansett Indian Tribe v. Warwick Sewer Auth.*, 334 F.3d 161, 166 (1st Cir. 2003).   As the First Circuit observed in *Narragansett*, the obligation to "consult  can "lead to differing views and to conflicting judicial interpretations.   *Id.*   However, the NHPA "delegates to the (ACHP) to promulgate regulations interpreting and implementing § 106  and the ACHP has "issued detailed regulations to give substance to § 106's consultation requirements.   *Id.*

The federal regulations promulgated by the ACHP provide the framework for an agency to assess the impact of a federal action on historic properties.   The agency must first determine whether the proposed federal action "is a type of activity that has the potential to cause effects on historic properties.    36 C.F.R. § 800.3(a).   If so, the agency must identify the State Historic Preservation Officer (SHPO) "to be involved in the section 106 process.   *Id.*   Next, the agency, in consultation with the SHPO, must "make a reasonable and good faith effort  to identify the historic properties that could be affected by the proposed action. 36 C.F.R. § 800.4.[31]   Third, the agency considers, with respect to any identified historic properties, the "criteria of adverse effect.   36 C.F.R. § 800.5.[32]   Fourth, in consultation with the SHPO, the agency official "shall plan for involving the public in the section 106 process. 36 C.F.R. § 800.3(e).   Finally, the

---

[31] This also involves applying "the National Register criteria to properties identified within the area of potential effects that have not been previously evaluated for National Register eligibility.   36 C.F.R. § 800.4(c).
[32] The criteria are defined:

> An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association. Consideration shall be given to all qualifying characteristics of a historic property, including those that may have been identified subsequent to the original evaluation of the property's eligibility for the National Register. Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative.

36 C.F.R. § 800.5.

agency must try to resolve the adverse effects by developing and evaluating alternatives to the project "that could avoid, minimize, or mitigate adverse effects on historic properties.   36 C.F.R. § 800.6(a).  This final section also addresses the so-called "memorandum of agreement, the culmination of the process.  "A memorandum of agreement executed and implemented pursuant to this section evidences the agency official's compliance with section 106 and this part and shall govern the undertaking and all of its parts. The agency official shall ensure that the undertaking is carried out in accordance with the memorandum of agreement.   36 C.F.R. § 800.6(c).

Over the course of seven counts in the Complaint, Plaintiffs allege numerous violations of the NHPA by the Corps.  To satisfy its burden for the preliminary injunction, Plaintiffs must show that they are likely to succeed on the merits that the Corps failed to follow the NHPA procedure, and such failure rendered its decision arbitrary and capricious.  As a threshold matter, Plaintiffs identify the Corps's CWA permit as the federal action that is tethered to the NHPA claims.  *Compl.* ¶ 353.  The SHPO is  the New Hampshire Division of Historical Resources. *Compl.* ¶ 362.

### a.      Count X

Plaintiffs' general NHPA claim – contained in Count X – alleges that the Corps failed to consider alternatives, did not determine whether the project would affect any properties eligible for the National Register, did not explain why the criteria for adverse effect were inapplicable, and did not involve the public.  *Compl.* ¶¶ 367-71.   Essentially, Plaintiffs argue that the Corps did not follow the procedure set forth in Section 106 and the implementing regulations. Plaintiffs also complain that the EA did not describe the affected historic properties, "including information on the characteristics that qualify them for the National Register,   and did not

31

explain "why the criteria of adverse effect were found applicable or inapplicable.   *Pls.' Mot.* at 18.

Preliminarily, the Corps raises a standing argument, asserting that, with the exception of the Tuttle House, Plaintiffs have not alleged any injury-in-fact.  *Corps Opp'n* at 16.  But, with respect to White Farm, the Complaint alleges that Leslie Ludtke uses the trails system which is part of that historic property.  *Compl.* ¶ 7.  Standing with respect to the remaining National Register property – the Pleasant View Home – and the three non-register properties (Dunbarton Road, Carmelite Monastery, and Turkey River/Turkey Pond Basin) is more questionable.  However, for independent reasons, the Court concludes that the Plaintiffs failed to meet their burden of showing a likelihood of success with respect to the NHPA claims.

### b.   Count XI – Tuttle Home [33]

According to the Complaint, the Corps committed several violations of § 106 of the NHPA, "by failing to make a reasonable and good faith effort to involve the Tuttles and consider their views, *Compl.* ¶ 397, by failing to make "information available to the public  and failing to provide "an opportunity for members of the public to express their views, *Compl.* ¶ 398, and "by failing to make a reasonable and good faith effort to adequately minimize or mitigate the adverse effects on the Tuttle House in the final Memorandum of Agreement (MOA).   *Compl.* ¶ 400.

The administrative record does not support these allegations.  Rather, the record reflects that the Tuttles were consulted early in the process.  On October 6, 2000, the Corps, along with other city and state officials, met with the Tuttles and their attorney to discuss the relocation of their home.  AR 3:57-58.  Various relocation sites were considered and the relocation process

---

[33] The Tuttle Home – one of three National Register properties adversely affected by the construction of Phase II – stands directly in the path of the roadway.  The EA acknowledges that the Tuttle House will have to be relocated, and that "[t]he City has committed to do this.  AR 1:37.

was explained.  *Id.*   On March 12, 2001, the Corps wrote the Advisory Council on Historic Preservation (ACHP) in Washington, informing them that the City had applied for a Section 404 permit and that three National Register properties, including the Tuttle House, would be adversely affected.  AR 3:47.  A public hearing was held in April 2001.  AR 3:1.  After several years of negotiations with the Tuttles, the Tuttles decided they were simply too old to move.  *Id.*  On December 4, 2004, a Memorandum of Agreement was signed by the Corps, the SHPO, and the City, outlining plans for the Tuttle Home.  AR 3:3-7.  The Tuttles were not signatories.  AR 3:1.[34]  However, observing that the City "is determined to proceed, even if it requires they take the house by eminent domain,   the Corps issued a section 404 permit.  *Id.*

Contrary to Plaintiffs' position, the administrative record confirms that the Corps complied with the consultation regulations of NHPA and does not suggest a likelihood of success of Plaintiffs' claim that the Corps violated §106 of the NHPA with respect to the Tuttle Home.

### c.      Count XII – White Farm[35]

Regarding the White Farm, Plaintiffs allege that the Corps violated NHPA § 106 by failing to take into account or mitigate the "significant, extensive and permanent adverse effects upon the White Farm . . . .    *Compl.* ¶ 415.  In particular, Plaintiffs allege that construction of Phase II will wreak havoc on the drainage tile system that lies beneath the surface of White Farm and protects it from "significant periodic saturation.    *Id.* ¶¶ 416-17.  In essence, Plaintiffs claim that all criteria of adverse effect found in 33 C.F.R. § 800.5(a)(2) are implicated by the

---

[34] If there is a resolution without the ACHP, then the only required signatories to the memorandum of agreement are the agency official and the SHPO.  36 C.F.R. § 800.6(c)(1)(i).  The agency may, but is not required to, invite other signatories.  36 C.F.R. § 800.6(c)(3).  Here, the MOA was signed by the SHPO and the Corps's district engineer.  The Concord city manager also concurred in the agreement, pursuant to 36 C.F.R. § 800.6(c)(3).

[35] The Court previously considered the Plaintiffs' White Farm claim in the context of the request for a  temporary restraining order.  *See Northwest Bypass Group v. United States Army Corps of Eng'rs*, 453 F. Supp. 2d 333 (D.N.H. 2006).  In that Order, the Court concluded that the Plaintiffs failed to show a likelihood of success on the merits of their claim relating to White Farm.  The Court refers to and incorporates its discussion of the issue from the prior Order.

construction of the roadway, *id.* ¶ 419, and that the Corps failed to "evaluate and resolve these adverse effects. *Id.* ¶ 420.

The administrative record reveals that the Corps was aware of the historic significance of the White Farm. The EA expressly refers to the farm, though in the context of the impact of the road itself. AR 1:37. After the Corps's public comment period, Martha L. Drukker, City Engineer, wrote the Corps on April 9, 2001, to respond to certain public comments and she attached a letter, entitled "Response by the City of Concord to Comments Received by the ACOE During the Public Comment Period for the NW Bypass Application, which in part states:

> Those drainage tile systems in the White Farm agricultural fields that will be interrupted by the Bypass will be replaced and reconnected to assure continued proper drainage for agricultural use. The State Division of Forests and Lands which manages the White Farm on behalf of the State has been involved in the review of the designs to insure the continuity of drainage.

AR 2:306. The Corps had this information before it issued the Section 404 permit.

Plaintiffs' overriding concern is that the EA lacked a discussion of the impact on the tile drainage system.[36] *See Pls.' Mot.* at 18. The Corps responds that, because the tile drainage system was not endangered in any significant way, it was unnecessary to set forth any mitigation in the MOA. *Corps Opp'n* at 19. In addition, the Corps emphasizes that there is nothing in the NHPA regulations that requires the Corps to prepare an EA or EIS. *Id.* at 20. Rather, the agency

---

[36] Plaintiffs correctly point out that regarding the historic properties, including the White Farm, the EA concludes that the "MOA has been developed to take into account the impacts to historic resources and to ameliorate the adverse affects to the maximum extent practicable. AR 3:37. But, the MOA does not discuss the tile drainage system. *Id.* Instead, the section on White Farm focuses on aesthetics:
> Fencing and shrubs may be used to border the new roadway across the eastern end of the White Farm property. A tree border will not be acceptable, as it would tend to signify a historic separation of the field to either side of the roadway. The landscape design and fencing will be subject to review and approval by the SHPO and ACOE.
AR 3:5.

must make sure that its findings are "supported by sufficient documentation to enable any reviewing parties to understand its basis.   36 C.F.R. § 800.11(a).

The administrative record demonstrates that the Corps was aware of the tile drainage system, had received assurances from the City regarding both the minimal impact the project would have on the system and replacement and reconnection of the system once construction was completed as well as a promise to involve the state of New Hampshire, which manages the Farm, in any designs to assure continuity of drainage.[37]   The Court concludes that, with respect to White Farm, the Plaintiffs have not shown a likelihood of success on the merits.

### d.    Count XIII – Pleasant View Home

The Pleasant View Home is the third National Register property and the basis of Plaintiffs' claim under Count XIII, which essentially reiterates the allegations with respect to White Farm:  that the Corps failed to "identify, evaluate and resolve  certain adverse effects that it contends will arise with the construction of Phase II.  *Compl.* ¶ 446.  In addition, Plaintiffs assert that the Corps "failed to employ technical expertise in evaluating the adverse effects of noise generated by the undertaking on the residential Pleasant View Home historic property and has thereby violated NHPA § 106.   *Id.* ¶ 431; *Pls.' Mot.* at 18-19.

Pleasant View Home – now owned by Genesis Eldercare – was consulted on October 4, 2000, when the City and its consultants met with representatives from Genesis to discuss the

---

[37] This Court previously noted:
> [T]he Plaintiffs have not demonstrated that construction of Phase II will have a wide-ranging, detrimental impact on White Farm. Plaintiff's engineering expert is Raymond Helmer testified by telephone at the September 13, 2006 hearing. Mr. Helmer asserted that the method for locating the drainage tiles, described in the study by GEI Consultants, is improper. Furthermore, in his opinion, the Phase II construction project could result in significant damage to the tiles. On cross-examination at the hearing, however, Mr. Helmer admitted that he had no personal knowledge of the tile system at White Farm, had never visited the project site to see the property, had relied solely on a hard-to-read schematic to determine the placement of the drain tiles, and had not ascertained the contractor's planned method for locating the tiles.

*Northwest Bypass Group v. United States Army Corps of Eng'rs*, 453 F. Supp. 2d 333,  2006 U.S. Dist. LEXIS 67117, at *22-23 (D.N.H. 2006).

impact of Phase II on Pleasant View Home.  *See* AR 3:59.  The primary concern at that time was the need to "limit the visual impacts to the property,  including the need to screen headlight glare.  *Id.* at 59-60.  The Corps was not present at that meeting, but the minutes are part of the administrative record.

With respect to the Pleasant View Home, the MOA outlines a plan for mitigating adverse effects, including noise.  AR 3:5.  Trees and fencing will be used to shield the property from "adverse visual and audible impacts and to protect residents and wildlife.  *Id.*  In addition, the MOA requires that the "open meadow on the rear portion of the Pleasant View property  be held in "protective easement.  *Id*.  According to the MOA, the portion of land abutting the Pleasant View Home cannot be developed or farmed.  The Corps concedes that it did not conduct any noise studies, but explains:  "[U]nlike the [Carmelite] Monastery, given the distance from Phase II, visual impacts, rather than noise, were of primary concern . . . .  *Corps Opp'n* at 20.

Both the EA and the MOA mention noise as a concern with regard to the Pleasant View Home and, after consultation with the SHPO, the Corps resolved that the distance of the Pleasant View property from the roadway, together with the plan to screen Pleasant View with trees and fencing to mitigate the impact, were sufficient to meet the Corps's obligation under the statute and regulations.  *Corps Opp'n* at 19-20.  Section 106 of NHPA merely requires the Corps to "stop, look, and listen.  As such, this Court cannot conclude that  the Corps's determinations with respect to Pleasant View Home were arbitrary and capricious.

### e.    Non-Register Properties – Counts XIV - XVI

With respect to the remaining properties – the Carmelite Monastery, the Dunbarton/Silk Farm Road, and the Turkey River/Turkey Pond Basin – Plaintiffs complaints are similar:  that the Corps should have made a "reasonable and good faith effort  to determine whether Phase II

would adversely affect these properties.   Under 36 C.F.R. 800.4(c)(1), the agency, in consultation with the SHPO, "shall apply the National Register criteria (36 CFR part 63) to properties identified within the area of potential effects that have not been previously evaluated for National Register eligibility.   *Id.*   If it determines that a property is eligible, it "shall be considered eligible for the National Register for section 106 purposes. [38] *Id.*

According to the Complaint, the path of the Phase II roadway comes close to the site of the Carmelite Monastery, "creating a permanent and intolerably intrusive disruption of the Monastery's essential mission.   *Compl.* ¶ 451.   In addition, the Phase II proposal includes a plan to close Dunbarton Road to public use and transfer it to St. Paul's School.   The Plaintiffs allege that this "discontinuation   would jeopardize the character of physical features that "contribute to its historic significance.   *Compl.* ¶ 467.   Plaintiffs worry that, without "sufficient restrictions or conditions to ensure long-term preservation of Dunbarton Road's historic significance,   the road will suffer adverse effects.   Finally, Plaintiffs allege that Phase II will cause fragmentation to the once-contiguous Turkey River/Turkey Pond Basin and will result in an environmental and visual degradation of "an unbroken river valley with fields and uplands providing residents and visitors to New Hampshire's Capital City a profound sense of place.   *Compl.* ¶¶ 479-81.

The Corps challenges Plaintiffs' characterization of the review process, and provides ample citation to the administrative record.   As early as 1993, the Corps cooperated with the New Hampshire Division of Historical Resources, which served as the SHPO.   On May 21, 1993, the SHPO confirmed to the Corps that it had "reviewed the [Northwest Bypass project] to identify potential effects on properties listed, or potentially eligible for listing, in the National

---

[38] For purposes of this Order, the Court assumes, without deciding, that these properties would be "eligible   for inclusion in the National Register as the Plaintiffs allege.   *Compl.* ¶¶ 450, 471, 476.   This is not, however, a certainty.   The City points out that the Plaintiffs have failed to produce any evidence to support its allegations that the properties are National Register eligible.   *City's Opp'n* at 23 n.20.

Register of Historic Places.    AR 3:140.   The SHPO concluded that "the preferred alternative (Corridor 2_B) would have the least impacts on archaeologically sensitive areas and architectural and/or historical properties listed, or potentially eligible for listing, in the National Register of Historic Places.    *Id.*   Furthermore, the record contains evidence that the Corps received and considered public comment.[39]  *See* AR 2:276-79 (letter from Carmelite Monastery to NHDES); AR 2:316 (City's response to public comments received by the Corps relating to Carmelite Monastery); AR 2:384 (response to 1992 public comments); AR 6:62 (City's response to public comments received by the Corps in 2001).   In fact, the EA cites Mr. and Ms. Blakeney's letter, "objecting to the project as . . . adversely effecting properties listed as eligible for listing on the national Register of Historic Places, allowing St. Paul's School to close a city street, to the destruction of wetlands and the fragmentation of wildlife habitat . . . .   AR 1:39.

Regarding the Carmelite Monastery, the EA establishes that the Corps was aware of the increase in ambient noise. AR 1:37. ("Traffic sounds will emanate from the new road.  The closer proximity will increase the ambient noise for . . . the Carmelite monastery . . . which will be close by the new road. ).  The Corps was also aware, however, that when the NHDES granted approval of the state wetlands permit, it conditioned its approval on the construction of a sound barrier to limit noise from the road.[40]  AR 4:67.   The record is sufficient to establish that the

---

[39] The regulations require that, during the processing of Department of Army permits, the Corps must consider public comments:

> The district engineer will consider all comments received in response to the public notice in his subsequent actions on the permit application. Receipt of the comments will be acknowledged, if appropriate, and they will be made a part of the administrative record of the application.

33 C.F.R. § 325.2(a)(3).

[40] The NHDES permit reads in part:  THIS APPROVAL IS SUBJECT TO THE FOLLOWING PROJECT SPECIFIC CONDITIONS:  8. Ambient noise levels in the location of the roadway section nearest the Carmelite Monastery shall be determined in accordance with NH Department of Transportation standards and a noise attenuation barrier shall be constructed at this location prior to the start of the roadway construction. AR 4:67. The letter dated March 12, 2002 from the NHDES, enclosing the permit, explained further:

> The potential for excessive noise at the Carmelite Monastery was also raised by the monastery residents.  To address this concern, the permit will be conditioned, also consistent with the City's written commitments, to require the construction of a noise attenuation barrier together with

Corps was aware of the impact on the monastery and approved the permit with knowledge that the state permit was conditioned on a plan designed to mitigate the impact.[41]

Plaintiffs' Dunbarton Road argument is somewhat counterintuitive. If the concern is that Dunbarton Road has been subject to overuse and is in jeopardy of losing its historic character, a transfer that limits access would seem to preserve, rather than diminish, its uniqueness. But, the Corps was aware of the Dunbarton Road concerns as expressed in the public record by Mr. and Ms. Blakeney, including the concern that the transfer from public to private hands would alter the historic character of the road.

The Plaintiffs draw a poetic picture of the Turkey River/Turkey Pond Basin in its current state. Nevertheless, the administrative record establishes that the Corps was aware that Phase II would have an impact on the Basin and that it considered this impact in its evaluation of the merits of the project. *See* AR 1:33, 36-37.

Here, the Corps sought to identify historic properties, consulted with the SHPO regarding those properties, received public comment, mentioned those concerns in its EA, but simply reached a different conclusion than the Plaintiffs would have reached. That the Corps arrived at a different conclusion does not by itself form the basis for a cause of action under NHPA. This Court concludes that the Corps fully met the "stop, look, and listen requirement of section 106. Under the law, Plaintiffs do not have a right to a "particular outcome[]. *Narragansett Indian Tribe*, 334 F.3d at 166.

---

landscape plantings to minimize the noise and visual effects of the roadway adjacent to the Carmelite Monastery in accordance with the standards of the New Hampshire Department of Transportation.

AR 4:65.

[41] The City attached to its opposition memorandum a copy of a letter from the Carmelite Sisters to Concord Mayor Donovan dated June 12, 2006, which reads in part: "[I]f an acceptable design for the noise mitigation can be agreed upon, and if Concord Hospital remains willing to provide supplemental landscaping, if necessary, post-construction, as previously discussed with them, then we do not oppose the proposed road layout as it affects us. *City's Opp'n*, Ex. R, Letter from Carmelite Sisters to Mayor Donovan and the Concord City Council dated June 12, 2006. As the Carmelite Sisters wrote this letter after the Corps issued its approval of the permit, the Court has not considered it.

### 3.    NEPA

The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., "declares a broad national commitment to protecting and promoting environmental quality.    *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989).  At the same time, "it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process.    *Id*. at 350.  "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action. *Id*. at 351.  The role of the court reviewing the agency decision under NEPA  is somewhat limited: "The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken.    *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) (citations omitted); *see also Dubois*, 102 F.3d at 1284; 33 Charles Alan Wright & Charles H. Koch, Jr., Federal Practice & Procedure § 8335 ("Without engaging in review of the actual resolution of factual questions of this variety, courts, by using the hard look standard, assure that the agency did a careful job at fact gathering and otherwise supporting its position.  ).

The  primary  means  to  achieve  the  goals  of  NEPA  is  to  require  federal  agencies  to consider  the  environmental  impact  of  their  actions,  which  often  take  shape  in  the  form  of  an environmental impact statement (EIS).  NEPA requires federal agencies to prepare an EIS for any major federal action "significantly affecting the quality of the human environment . . . .   42 U.S.C. § 4332(2)(C).  An EIS is a detailed statement which evaluates "the environmental impact of the proposed action, [] any adverse environmental effects which cannot be avoided should the proposal be implemented, [] alternatives to the proposed action, [] the relationship between local short-term  uses  of  man's  environment  and  the  maintenance  and  enhancement  of  long-term

productivity, and [] any irreversible commitments of resources which would be involved in the proposed action should it be implemented.   42 U.S.C. § 4332(2)(C).   "An exception to this requirement applies when a less comprehensive environmental review, or environmental assessment ("EA ), provides a basis for a finding of no significant impact ("FONSI ).   *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987).

The passage of NEPA also resulted in the creation of the Council on Environmental Quality (CEQ), which has promulgated regulations outlining when an EA or an EIS is required. *See* 40 C.F.R. §§ 1501.3, 1501.4, 1508.9, 1508.13.   The regulations define an environmental assessment (EA) as a "concise public document  that serves to "briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact [FONSI].   40 C.F.R. § 1508.9(a);[42] *see also Sierra Club v. Babbitt*, 65 F.3d 1502 (9th Cir. 1995); *Save Our Sonoran, Inc. v. Flowers*, CV-02-0761-PHX-SRB, 2006 U.S. Dist. LEXIS 26185, at *28 (D. Ariz. May 2, 2006).   In addition, the Corps's regulations implementing NEPA make clear that an EIS is not necessarily required; in fact, "[m]ost permits will normally require only an EA.   33 C.F.R. § 230.7(a).   Under the Corps's regulations, the stated purpose of the EA is for the Corps to evaluate "potential environmental effects of the proposed action and, if appropriate, its alternatives, for determining whether to prepare an EIS or a FONSI.   33 C.F.R. § 230.10.[43]

---

[42] This section also provides that the EA is to "[a]id an agency's compliance with [NEPA] when no environmental impact statement is necessary.   40 C.F.R. § 1508.9(a)(2).   Indeed, in this case, the Corps did not prepare an EIS. *See* AR 1:43 ("I find that based on the evaluation of environmental effects discussed in this document, the decision on this application is not a major federal action significantly affecting the quality of the human environment.   Hence, an environmental impact statement is not required. ).

[43] This regulation further instructs the Corps:

> While no special format is required, the EA should include a brief discussion of the need for the proposed action, or appropriate alternatives if there are unresolved conflicts concerning alternative uses of available resources, of the environmental impacts of the proposed action and alternatives and a list of the agencies, interested groups and the public consulted. The document is to be concise for meaningful review and decision.

Toward the end of the complaint, Plaintiffs advance three main arguments under the NEPA attacking the Corps's decision to grant the permit:  (1) that the FONSI and decision not to perform an EIS was in error; (2) that the Corps failed to give a "hard look" at the need; and, (3) that the Corps failed to give a "hard look" at alternatives.  To succeed on the merits of these claims, Plaintiffs must show that the Corps's determination was arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A); *Advocates for Transp. Alternatives, Inc. v. United States Army Corps of Eng'rs*, 453 F. Supp. 2d 289, 2006 U.S. Dist. LEXIS 70927, at *17 (D. Mass. 2006).

### a.   FONSI

Plaintiffs' first charge under NEPA, contained in Count XVII, is that the Corps's "Finding of No Significant Impact and failure to prepare an Environmental Impact Statement prior to issuing a permit authorizing construction of Phase II is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law."  *Compl.* ¶ 495.

The Court's role "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."  *Coalition on Sensible Transp.*, 826 F.2d at 66 (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97-98 (1983)).  Review of an agency's FONSI is conducted under a four part analysis:

> First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.

---

33 C.F.R. § 230.10.

*Coalition on Sensible Transp.*, 826 F.2d at 67; *see also City of Waltham v. United States Postal Serv.*, 786 F. Supp. 105, 121 (D. Mass. 1992); *Advocates for Transp. Alternatives*, 453 F. Supp. 2d 289.

Plaintiffs' chief complaint relates to the traffic concern: "The [Corps's] finding that it 'do[es] not think the [road] will attract much traffic to residential neighborhoods,' EA/SOF at 9, is contradicted by the evidence in the administrative record and is therefore [] arbitrary and capricious. *Compl.* ¶ 492. Plaintiffs argue that the record reflects a "substantial possibility that traffic will worsen as a result of the construction of Phase II, which justifies the development of an EIS rather than an EA. *Id.* ¶ 493. Plaintiffs also point to 40 C.F.R. § 1508.27(b), which provides several mandatory considerations, including the unique characteristics of the area, the cumulative impacts of the project, and the effect on historical sites or resources. *Compl.* ¶ 489.

The Court concludes that Plaintiffs are not likely to succeed on the merits in showing that the Corps acted in an arbitrary and capricious manner by failing to prepare an EIS. The four-factor analysis from *Dole* does not militate in favor of the Plaintiffs' position. First, the Corps identified and outlined the relevant environmental concerns, including the impact on wetlands, traffic concerns, and historical properties. Second, notwithstanding the Plaintiffs' earnest arguments, the record reflects that the agency took the mandatory "hard look at the traffic problem in preparing the EA. The record contains a detailed traffic study prepared for the City in 1998 by Resource Systems Group, which concluded that construction of the new Parkway would decrease traffic on South Fruit Street, and "the new Parkway will contribute to the convenience of the street network in Concord and reduce traffic volumes at nearby parallel roads. AR 6:602. Third, the Corps outlined a convincing case for its FONSI. *See* AR 1:40-41. Finally, because the Corps did not find any "impacts of true significance, the fourth factor does

not apply. Nonetheless, the Corps, in conjunction with the City and NHDES, has sought to minimize any detrimental effects. Having reviewed the administrative record, the Court concludes that the Plaintiffs are not likely to show that the Corps's FONSI conclusion and its decision not to proceed with an EIS were arbitrary or capricious.

### b.   "Hard Look" at Need

Count XVIII of the Complaint contains Plaintiffs' next claim under NEPA -- that the Corps "failed to fulfill its 'hard look' duty with regard to the need for the proposed project. *Compl.* ¶ 498. Under 40 C.F.R. § 1508.9(b), the Corps is required, as a part of its environmental analysis, to briefly discuss in the EA "the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted. *See Compl.* ¶ 499. Mindful of the limited scope of judicial review, the Court has carefully considered the contents of the Corps's environmental assessment and concludes that it fully satisfies NEPA "hard look  duty as to the need for the project.[44] The Court concludes that Plaintiffs are not likely to succeed on the merits of Count XVIII.

### c.   "Hard Look" at Alternatives

The final count of Plaintiffs' complaint, also under NEPA, charges that the Corps failed to take a "hard look  at alternatives to the proposed roadway, and such failure was arbitrary and capricious. *Compl.* ¶ 505.

---

[44] The EA summarizes the Corps's analysis: "The numerous consultant reports produced for the city, the testimony of public officials, including many pubic safety officials, field visits to the area by the Regulatory Project Manager and the city's and its partner's willingness to pay for the construction clearly indicate the need for the project.   AR 1:41.

The alternatives analysis under NEPA differs slightly from the CWA standard discussed above.[45]   NEPA imposes a general requirement that a federal agency "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources . . . .   42 U.S.C. § 4332(2)(E).[46]   However, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS.   *Native Ecosystems Council v. United States Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005); *see also Mt. Lookout - Mt. Nebo Prop. Protection Ass'n v. FERC*, 143 F.3d 165, 172 (4th Cir. 1998) ("The rigor with which an agency must consider alternatives is greater when the agency determines that an EIS is required for a particular federal action. ); *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1558 (2d Cir. 1992) ("Indeed, the range of alternatives an agency must consider is narrower when, as here, the agency has found that a project will not have a significant environmental impact. ).[47]   Under the CEQ definition of an environmental assessment, the regulation requires that the EA "include . . . alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the

---

[45] While noting the differing standards, the Court refers to and incorporates its earlier discussion, *see supra* V.A.1.b, addressing the Corps's alternatives analysis under the CWA.

[46] According to the Second Circuit, "[i]t is well-settled that under NEPA the range of alternatives that must be discussed is a matter within an agency's discretion.   *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1558 (2d Cir. 1992).

[47] The CEQ regulation implementing this statute goes into greater detail about what an agency must do for an EIS evaluation of alternatives:

> (a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.
>
> (b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.
>
> (c) Include reasonable alternatives not within the jurisdiction of the lead agency.
>
> (d) Include the alternative of no action.
>
> (e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.
>
> (f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

40 C.F.R. § 1502.14.  It is noteworthy, however that this section would only arise in the EIS context.  As discussed above, the Corps found in its EA that an EIS was not required.

proposed action and alternatives, and a listing of agencies and persons consulted.   40 C.F.R. §

1508.9.   The Corps's own NEPA regulations regarding environmental assessments essentially

echo the CEQ guidelines: "the EA should include a brief discussion of the need for the proposed

action, or appropriate alternatives if there are unresolved conflicts concerning alternative uses of

available resources, of the environmental impacts of the proposed action and alternatives and a

list of the agencies, interested groups and the public consulted.   33 C.F.R. § 230.10(b).

        In addition, the First Circuit applies a "rule of reason  standard when reviewing an

agency's EIS findings:[48]

> The courts have applied a rule of reason in determining whether an EIS contains a
> reasonably thorough discussion of the significant aspects of the probable
> environmental consequences. One aspect of this determination is whether the
> agency has gone beyond mere assertions and indicated its basis for them. The
> agency must explicate fully its course of inquiry, its analysis and its reasoning.
> The court must determine whether, in the context of the record, the agency's
> decision – and the analysis on which it is based – is too unreasonable for the law
> to permit it to stand.  We apply a rule of reason because courts should not "fly
> speck  an EIS and hold it insufficient based on inconsequential or technical
> deficiencies.

*Dubois*, 102 F.3d at 1287 (internal quotation marks and citations omitted).

        As this case involves an EA and not an EIS, the Corps conducted an analysis of

alternatives, as required by 42 U.S.C. § 4332, consulting with other agencies, finding that the

proposed Phase II path was the least environmentally damaging practicable alternative, and

explaining its reasons for this conclusion.  Applying the rule of reason standard, this Court finds

that the Corps's conclusion is not too unreasonable for the law to permit it to stand.

        The Plaintiffs are not likely to succeed on the merits of this part of their claim.

---

[48] The parties differ as to whether this is a heightened standard of review.  *See Pls.' Mot*. at 15 (asserting "a
heightened 'rule of reason' standard ); *Corps Opp'n* at 3 n.2 (countering that "the 'rule of reason' is not a
heightened standard ).  The language "too unreasonable for the law to permit it to stand  appears rather deferential.
But, regardless how it is characterized, the rule of reason is the rule the Court must apply.

### B.      Irreparable Harm[49]

For a traditional preliminary injunction, the onus is on the moving party to show the second prong of the four-part inquiry.   The First Circuit interpreted Federal Rule of Civil Procedure 65(a) as placing "the burden of demonstrating that a denial of interim injunctive relief would cause irreparable harm squarely upon the movant.   *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 17 (1st Cir. 2003).   In the classic meaning of the term, an injury is irreparable if it "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy.   *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).   Since the Plaintiffs allege damages that "cannot be made whole by an end-of-case award of money damages,   the Court proceeds with this prong of the analysis.   *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003).

Here, Plaintiffs have not claimed irreparable injury in the classic sense of damage which cannot be corrected by a monetary award or by remediation.   Even though the Supreme Court noted that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable,   *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987), the Court declined to impose a presumption of irreparable injury, stating that such a presumption is "contrary to traditional equitable principles.   *Id.*  (addressing the Alaska National Interest Lands Conservation Act).[50]  Even if the Court makes the safe assumption that filling in wetlands must cause some environmental

---

[49] Having concluded that the Plaintiffs failed to meet their burden to demonstrate a reasonable likelihood of success, the Court need not proceed any further.  For the sake of completeness, the Court will evaluate the remaining three prongs.

[50] The First Circuit has observed that there is a difference between NEPA and ANILCA in that NEPA, unlike ANILCA, is "a *purely* procedural statute in the sense that ANILCA is not.   *Marsh*, 872 F.2d at 502 (emphasis in original). This difference leads to *Marsh's* discussion of irreparable harm flowing from procedural violations. But, it does not appear to alter the analysis as to the preliminary question as to whether the movant has sustained its burden to demonstrate irreparable harm in the more classic sense.

damage, there is no evidence in this record that the damage is irreparable in the legal sense that, if they win on the merits, it could not be remediated.

Instead, the Plaintiffs elected to argue irreparable injury from the Corps's issuance of a decision "without the informed environmental consideration that NEPA requires . . . . *Pls.'* *Mot*. at 5 (quoting *Massachusetts v. Watt*, 716 F.2d 946, 952 (1st Cir. 1983)). Plaintiffs correctly point out that under NEPA, there is a more expansive definition of "irreparable injury. As the First Circuit has explained, NEPA is a "*purely* procedural statute . . . [which] demands that a decisionmaker consider all significant environmental impacts before choosing a course of action; the decisionmaker is compelled to follow NEPA's evaluative process before acting. *Sierra Club v. Marsh*, 872 F.2d 497, 502 (1st Cir. 1989). In other words, NEPA is "designed to influence the decisionmaking process; its aim is to make government officials notice environmental considerations and take them into account. *Watt*, 716 F.2d at 952. Thus, "when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered. *Id.*, *see also Marsh*, 872 F.2d at 500. However, the First Circuit has also recognized that the harm is not purely procedural: there is an "added risk to the environment that takes place when governmental decision makers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment. *Conservation Law Found. v. Busey*, 79 F.3d 1250, 1271-72 (1st Cir. 1996) (citing *Marsh*, 872 F.2d at 500).

Even under this analysis, the First Circuit has cautioned that "our holdings did not mean that a likely NEPA violation automatically calls for an injunction; the balance of harms may point the other way. *Busey*, 79 F.3d at 1272 (citations and internal punctuation omitted).

Here, there is no "likely NEPA violation.    Having staked their claim of irreparable injury to a failed premise, *Pls.' Mot.* at 5, their irreparable injury argument fails as well. Moreover, in this case, the "balance of harms" referred to in *Busey* points "the other way.    79 F.3d at 1272.  The Plaintiffs have failed to demonstrate irreparable harm.

### C.     Balance of Hardships

The First Circuit has termed the third factor the "balance of relevant impositions, consisting of an assessment of "the hardship to the nonmovant if enjoined as contrasted to the hardship to the movant if no injunction is granted.    *Esso*, 445 F.3d at 18.

#### 1.     Hardship to Corps

The Corps asserts that a preliminary injunction would "undermine the integrity of the Corps's permitting program,   because the request for injunctive relief came months after issuance of the permit and just before construction was to begin.  *Corps Opp'n* at 24.  The Corps cannot mean that the Plaintiffs' challenge to the Corps's permitting process constitutes a challenge to its integrity or that the law suit itself provides a hardship within the meaning of the law.  To credit the Corps's argument would be to create a "Catch-22,   since the filing of the law suit seeking injunctive relief would itself be grounds to deny the relief sought.  This cannot be and is not the law.

In this case, the Court does not fault the Plaintiffs for the delay in bringing their complaint.  As earlier noted, the complaint, "[c]onsisting of one hundred and forty pages and nineteen separate counts . . . is an articulate treatise on environmental and administrative law complete with case law, statutory, and regulatory support.   *Northwest Bypass Group v. United States Army Corps of Eng'rs*, 453 F. Supp. 2d at __, 2006 U.S. Dist. LEXIS 67117, *8-9 (D.N.H. 2006).  The Plaintiffs' cause of action reflects a degree of thought and attention to detail that

only the expenditure of time and effort could bring.  In addition, while the practice is not to be encouraged, it is not uncommon for plaintiffs to seek preliminary injunctive relief at the eleventh hour.  *See, e.g., Nassau Boulevard Shell Serv. Station, Inc. v. Shell Oil Co.*, 869 F.2d 23 (2d Cir. 1989).  Although the Corps cites *Allens Creek/Corbetts Glen Preservation Group, Inc. v. Caldera*, 88 F. Supp. 2d 81, 83-84 (W.D.N.Y. 2000), *aff'd* 242 F.3d 364 (2d Cir. 2001), where the district court applied the doctrine of laches to a late challenge, the facts in *Allens Creek* were much more egregious than the facts in this case.

### 2.    Hardship to the City and Intervenors

More persuasive is the hardship that the City, Concord Hospital, and St. Paul's School would sustain if a preliminary injunction issues.[51]  Plaintiffs argue that the Defendants will only suffer "temporary delay" of the road construction, and that "no undue prejudice" would result from this delay.  *Pls.' Mot.* at 10.  However, to say that the construction of Phase II has been temporarily delayed does not fairly characterize the facts.  As this Court determined earlier, past delays in the commencement of Phase II have resulted in literally millions of dollars in additional costs and a further delay from fall to spring would likely result in over half a million dollars to boot.[52]  Additionally, by the time Plaintiffs filed their complaint and request for injunctive relief, the City had already made certain commitments.  On March 23, 2006 – after obtaining the CWA permit from the Corps – the City accepted the bid of F.W. Merrill, Inc., as contractor for the construction of Phase II.  *Aff. of Martha Drukker* ¶ 3.

---

[51] The Court has not considered any hardship from undoing the work the City has done since commencing construction.  In its earlier Order, this Court warned the City that if the motion for preliminary injunction were granted, it "will be required to undo what it has done.  *Northwest Bypass Group*, 453 F. Supp. 2d at __, 2006 U.S. Dist. LEXIS 67117, at *16.  The City cannot create its own hardship by electing to proceed with the preparatory work in the face of this pending motion.

[52] In its Order denying the Plaintiffs' motion for temporary restraining order, the Court observed that the City "relying on the principle that time is money, noted that the cost of the project had mushroomed during the extended period of contention from $3.7 million to $6.5 million; it estimated the additional cost . . . from the delay would total $580,000.00.  *Northwest Bypass Group*, 453 F. Supp. 2d at __, 2006 U.S. Dist. LEXIS 67117 at * 27-28.

### 3.   Hardship to Plaintiffs if Not Granted

The Plaintiffs have summarized their claim of hardship if the motion for preliminary injunction is not granted:

> The costs to the plaintiffs from denying preliminary relief to preserve the status quo would be permanent and irreparable injury to a panoply of interests, including but not limited to plaintiffs Morton C. and Carolyn H. Tuttle's ("the Tuttles ) interest in remaining in their home of 50-plus years and maintaining the National Register Tuttle House as both a personal and public legacy . . . and other plaintiffs' varied interests, from the safety of their neighborhoods to the continued viability of the Turkey River White Farm Trails system, to safeguarding all the other scenic, historical, ecological and aesthetic values that would be impacted by this project's construction.

*Pls.' Mot.* at 12.  Even though this analysis is broader than the irreparable harm inquiry, which dealt exclusively with the potential for environmental harm, the Court concludes that the demonstrated harm to the City from granting the preliminary injunction exceeds the potential harm to the Plaintiffs from failing to grant it.

### D.   Public Interest

"The public interest factor requires this Court to inquire whether there are public interests beyond the private interests of the litigants that would be affected by the issuance or denial of injunctive relief.   *Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d 180, 193 (D. Me. 2005). This factor also weighs against the Plaintiffs' request for preliminary injunctive relief.  Plaintiffs' main argument is that, because private entities – Concord Hospital and St. Paul's School – are financing the lion's share of the construction costs, Phase II is not in the public interest.  *See Pls.' Mot.* at 6 ("The fact that two private boards of directors presumably acting fiduciarily on behalf of their own corporate interests have agreed to underwrite approximately 70% of this project's costs gives rise to a presumption that the project's principal benefits – approximately 70% – will also accrue to those private interests. ).

As the Corps points out, however, the Phase II bypass will bestow a range of benefits on the general public: (1) more efficient patient access to Concord Hospital, which is the only emergency and trauma facility within 20 miles;[53] (2) decreased traffic congestion, benefiting all drivers and passengers, not solely the persons financing the project; and, (3) general improvement in public safety. *See Corps Opp'n* at 25. Therefore, while the project directly benefits Concord Hospital, the public at large benefits from enhanced access to this critical healthcare facility. In addition, the students and employees of both St. Paul's School and Concord High School will benefit from the eased traffic congestion, making the roadways and crosswalks less treacherous. Lastly, the City Council, which reflects the public will, has been the driving force behind the Northwest Bypass project from the start. Despite the undoubted ability of the project's opponents to participate in local elections, Phase II has consistently represented the Council's long-term judgment of what is in the best interest of the people of Concord.

Plaintiffs further claim that the public interest is not served by the project because the environment will be physically harmed and Dunbarton Road will be closed. However, the Corps weighed these considerations against the public interest in proceeding with the project, and granted the permit. This Court concludes that the Plaintiffs have failed to sustain their burden to demonstrate that the Corps's decision was not in the public interest.

## VI.    Conclusion

Because (1) the Plaintiffs are not likely to succeed on the merits; (2) Plaintiffs have not demonstrated irreparable harm from denial of preliminary relief; (3) the balance of hardships favors the Defendants over the Plaintiffs; and, (3) the public interest does not favor a preliminary injunction, the Court DENIES Plaintiffs' request for preliminary injunction.

---

[53] This Court previously noted: "The record provides ample support for the proposition that the project, if completed, will lessen the delays emergency vehicles now encounter before delivering their critically ill patients to the emergency room. *Northwest Bypass Group*, 453 F. Supp. 2d at __, 2006 U.S. Dist. LEXIS 67117, at *32.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE
SITTING BY DESIGNATION

Dated this 5th day of January, 2007