UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

NORTHWEST BYPASS GROUP, et al.　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiffs,　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　v.　　　　　　　　)　　　Civil No. 06-CV-00258-JAW
　　　　　　　　　　　　　　　　)
U.S. ARMY CORPS　　　　　　　　)
OF ENGINEERS, et al.　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　)

**<u>ORDER ON MOTIONS FOR SUMMARY JUDGMENT</u>**

| | | | |
|---|---|---|---|
| I. | | INTRODUCTION | 2 |
| II. | | STATEMENT OF FACTS | 3 |
| III. | | PROCEDURAL HISTORY | 7 |
| | A. | Background | 7 |
| | B. | Motions for Summary Judgment | 8 |
| IV. | | STANDARD OF REVIEW | 9 |
| V. | | DISCUSSION | 12 |
| | A. | Clean Water Act Claims | 12 |
| | | 1.　Practicable Alternatives | 13 |
| | | 2.　Public Interest Review | 19 |
| | | 　　a.　Traffic Impacts | 20 |
| | | 　　　　i.　Impact of Dunbarton and Silk Roads | 20 |
| | | 　　　　ii.　General Impacts of Phase II | 22 |
| | | 　　b.　Balancing Recreational and Educational Resource Impacts | 25 |
| | | 　　　　i.　Recreational Impacts | 25 |
| | | 　　　　ii.　Educational Impacts | 26 |
| | | 3.　Deference to State and Local Zoning and Land Use Decisions | 27 |
| | | 4.　Wetland Mitigation | 31 |
| | | 5.　Effluent Limitations – 33 U.S.C. § 1341(d) Compliance | 36 |
| | B. | Scope of the Environmental Assessment & Cumulative Impacts | 38 |
| | | 1.　Segmentation:  Connected and Cumulative Actions | 39 |
| | | 2.　Cumulative Impacts | 41 |
| | | 3.　Secondary Impacts | 44 |
| | C. | Historic Preservation | 44 |
| | | 1.　The Tuttle House | 46 |
| | | 2.　Pleasant View Home | 48 |
| | | 3.　Consideration of Alternatives | 49 |
| | | 4.　Documentation and Public Participation Requirements | 51 |

    D.    NEPA    52
        1.    FONSI Review    53
        2.    Whether the Effects are "Highly Controversial"    56
VI.    CONCLUSION    58

## I.    INTRODUCTION

Northwest Bypass Group,[1] Morton and Carolyn Tuttle,[2] and Leslie Ludtke[3] allege that the United States Army Corps of Engineers (Corps) violated the Clean Water Act (CWA), the National Environmental Policy Act (NEPA), and the National Historic Preservation Act (NHPA), when it issued a permit pursuant to Section 404 of the CWA, allowing the City of Concord to fill three and one half acres of wetlands to build a 4,300-foot connector road.[4]  In a comprehensive nineteen-count complaint spanning 140 pages, the Plaintiffs allege that the Corps committed numerous statutory violations.  *See generally Compl.* (Docket # 1).  This case has been exhaustively litigated and now comes on dueling motions for summary disposition.  The Court grants the motions for summary judgment filed by the Federal Defendants,[5] the city of Concord, and the Intervenors;[6] the Court denies the motion for summary judgment filed by the Plaintiffs.

---

[1] Northwest Bypass Group – composed of unnamed members – was formed in 2001 to oppose construction of the Northwest Bypass.  *Compl.* ¶ 5 (Docket # 1).

[2] The Tuttles are the owners of the Tuttle House, a historic home which stands in the path of Phase II of the Northwest Bypass.  *Compl.* ¶ 6.

[3] Ms. Ludtke is a recreational user of the Turkey River White Farm Trails system, which would be bisected by Phase II.  *Compl.* ¶ 7.

[4] The Court has considered this case in several prior orders, and refers to those orders as appropriate.  *See, e.g.*, *Northwest Bypass Group v. United States Army Corps of Eng'rs*, 470 F. Supp. 2d 30 (D.N.H. 2007) [*Northwest Bypass II*]; *Northwest Bypass Group v. United States Army Corps of Eng'rs*, 453 F. Supp. 2d 333 (D.N.H. 2006) [*Northwest Bypass I*].  To the extent there are issues raised in the Complaint not addressed in the pending motions for summary judgment, the Court relies upon its earlier rulings.

[5] The Plaintiffs impleaded as Defendants the United States Army Corps of Engineers, Lieutenant General Carl A. Strock, Chief Engineer of the United States Army Corps of Engineers, and Colonel Curtis Phalken, New England District Commander of the United States Army Corps of Engineers.  *Compl.* ¶¶ 8-9.  The Court refers to the Corps Defendants variously either as the Corps or the Federal Defendants.

[6] On August 10, 2006, Concord Hospital and St. Paul's School moved to intervene under Rule 24.  *Mot. of Concord Hospital and St. Paul's School to Intervene As Defs. Under F.R.C.P. Rule 24* (Docket # 12).  The motion was granted on August 22, 2006.  *Oral Order Granting Mot. to Intervene.*

## II.    STATEMENT OF FACTS

Within the capitol city of Concord, New Hampshire, there is a roughly V-shaped parcel of open land that runs from the center of the city to the playing fields of St. Paul's School.[7]  The V lies on its side, pointing east.  The northern leg of the V is Pleasant Street, the southern leg is Clinton Street, and it is capped on the west by the Silk Farm Road and Dunbarton Road, which wend through St. Paul's campus.  Concord has grown around the V.  Concord Hospital, a major regional medical center, is located on Langley Drive, which intersects with Pleasant Street; downtown Concord and Concord High School lie to the east of the point of the V; and, I-89 intersects with Clinton Street, the southerly leg of the V.

Surprisingly, the land inside the V has remained pristine.  The V contains the state-owned White Farm complex, a farm that has been listed on the National Register of Historic Places since May 15, 1981, for its significance as representing the practice and evolution of progressive agriculture.  The V includes the Pleasant View Home, also listed on the National Historic Register and known for its beautiful vistas; the Tuttle House, a property eligible for listing on the National Historic Register; and a monastery for the Carmelite Sisters, a cloistered religious order that prizes peace and quiet.  This open, undeveloped area not only has an extensive system of cross-country skiing and hiking trails often enjoyed by Concord residents, but also it has significant wetlands.

In the late 1940s, Concord city planners developed a vision for a Northwest Bypass, a circumferential roadway around the City.  As Concord grew, only one portion of the Northwest Bypass was constructed and the remaining plans to ring the city remained visionary.   In 1956, Concord Hospital, now one of the busiest hospitals in New Hampshire, moved to Pleasant Street

---

[7] This statement of facts has been gleaned largely from the allegations in the Plaintiffs' Complaint and matters of public record, such as court and administrative decisions.

and as patient volume grew, so did traffic volume.  After I-93 and I-89 were built and as the surrounding area developed, the streets that formed the V became increasingly congested funnels into and out of Concord.  The worst of the problem centered around the notorious five prong intersection of Pleasant, Warren, and Fruit Streets, a problem exacerbated by its location between Concord High School and its athletic fields and the constant ebb and flow of students.  City planners began to conceive of ways to loosen the snarl; they harkened back to the old concept of a Northwest Bypass and began to focus on placing a road transecting the V.  The entire project was divided into three phases:  Phase I would reconstruct a portion of Pleasant Street with turning lanes and a traffic signal and build a new access road to Concord Hospital, called Langley Parkway South; Phase II would intersect the V connecting Pleasant and Clinton Streets through the V; and, Phase III would extend Langley Parkway South about one mile north to Penacook Street in the north central part of Concord.

In the early 1990s, the city filed for governmental approvals of the entire Northwest Bypass project and on April 30, 1993, it received the necessary approvals from the New Hampshire Department of Environmental Services (NHDES) for the whole project.  The Corps also issued a permit, but restricted its approval to Phase I.[8]  The changes on Pleasant Street and the relatively short roadway to the Hospital – only 1,500 feet long – were not controversial.  As originally designed, Langley Parkway South was limited to a single curb-cut, and did not

---

[8] In February 1993, the Corps suspended processing the application at the city's request.  The city later continued with Phase I, which because of its small impact, qualified for the New Hampshire State General Permit and did not require individual permitting.

impinge on the unspoiled land in the center of the V.[9]  Once Phase I was completed in 1995, the city turned back to Phase II, the road transecting the V.[10]

From a planning perspective, Phase II made good sense.  The residential streets were never designed to carry such heavy traffic loads, patients and emergency vehicles were caught in interminable, unsafe delays, and traffic had shifted over to Silk Farm Road, which leads to Dunbarton Road, and through the campus of St. Paul's School, a private secondary residential school of about 525 students.  Silk Farm Road and Dunbarton Road even now remain bucolic, winding country roads, but they endure approximately 1,600 motor vehicles daily, some racing through the campus and placing the students and others at risk.  St. Paul's, anxious to restrict access, and Concord Hospital, anxious to facilitate access, joined forces with the City and the three agreed to share the costs of the project.  In addition, the City agreed to declare Silk Farm Road and Dunbarton Road private, thereby limiting access to those who have business at St. Paul's.

In November 2000, the City announced its intention to proceed with Phase II by filing an application with the NHDES for a wetland fill permit and water quality certificate.  The City also sought the requisite CWA section 404 permit from the Corps to fill wetlands in the path of the proposed Phase II.  AR 1:137.  On December 12, 2000, the Corps issued a public notice, soliciting comment on whether to approve the permit with respect to Phase II.  *Id.*; AR 1:38.  The NHDES held two public hearings, which the Corps's regulatory project manager attended.  *Id*.  In addition, in response to the 2000 public notice, the Corps received and considered numerous public comments.  AR 1:39-41.

---

[9] Plaintiffs allege that the original design has been altered and the city has allowed "six serial violations of the express single-curb-cut condition of its Phase I permit . . . ."  *Compl.* ¶ 216 (Docket # 1).
[10] Phase III is described as a potential continuation of the road from Pleasant Street to Penacook Street.  The City has applied only for a road reaching from Clinton Street to Pleasant Street, and asserted to the Corps during the Phase II permitting process that it had no plans to begin permitting for the northerly "Phase III."  AR 1:32.

The City's decision provoked a firestorm of controversy.  A nonprofit unincorporated association of residents, called the Northwest Bypass Group (NBG), coalesced opposition to Phase II, which the Complaint aptly describes as "fierce."  *Compl.* ¶ 5.  NBG is dedicated to protecting and preserving "the scenic, historical, ecological and aesthetic values that would be impacted by this project's construction, and [raising] public awareness about the impact it would have on nearby neighborhoods."  *Id.*  The opponents of Phase II have determinedly fought the project at each stage beginning with the multiple state approvals and continuing with the final approval process of the Corps.  Between 2000 and 2006, the project was held in abeyance due to state court proceedings.  The opponents were unsuccessful, the culmination being a New Hampshire Supreme Court decision affirming summary judgment in favor of the City.  *See Blakeney v. City of Concord*, No. 2004-0438, slip. op. (N.H. August 19, 2005) (Corrected Order).

On January 10, 2006, the Corps completed an Environmental Assessment (EA) of the proposed project to determine whether an Environmental Impact Statement (EIS) was necessary.  *See* AR 1:32.  The EA identified the basic purpose of the project:  "to relieve traffic congestion and to allow for the safe and efficient flow of traffic in this quadrant of the city.  Improved pedestrian safety is an inherent part of the basic project purpose."  AR 1:34.  Next, the Corps considered and rejected three alternatives.  *Id.*  The Corps determined that, "[f]rom our environmental assessment of the project we find that our decision to permit fill for this project is not a major Federal Action significantly affecting the human environment.  Therefore, an EIS is not required and our Environmental Assessment will suffice for the purposes of compliance with NEPA."  AR 1:41.  According to the EA, the Corps considered "all factors relevant to this proposal including cumulative effects" and concluded that "this project is not contrary to the public interest and that a Department of the Army permit should be issued."  *Id.*  Consistent with

their determined opposition to the project, the Plaintiffs waged a full scale assault in this Court against the Corps's approval.[11]

## III.   PROCEDURAL HISTORY

### A.   Background

Consisting of 140 pages and nineteen separate counts, the Complaint, dated July 13, 2006, is an articulate treatise on environmental and administrative law complete with case law, statutory, and regulatory support.  In addition to NBG, the plaintiffs include Morton C. and Carolyn H. Tuttle, owners and residents of the historic Tuttle House, and Leslie J. Ludtke, a New Hampshire resident and avid user of the Turkey River White Farm Trails system that the connector road would intersect.  The Defendants include the Corps and the city of Concord and, as intervenors, Concord Hospital and St. Paul's School.

On the same day as they filed their Complaint, Plaintiffs moved for a temporary restraining order (TRO) and a preliminary injunction.  *See Pls.' Mot. for TRO and Prelim. Inj*. (Docket # 2).  Plaintiffs subsequently filed an emergency motion for a TRO and requested an expedited hearing on September 6, 2006.  *Pls.' Emergency Mot. for TRO & Req. for Expedited Hr'g* (Docket #32).  The Court held a hearing on both the TRO and preliminary injunction on September 13, 2006, and denied the TRO by order dated September 15, 2006.  *See Order on*

---

[11] This Court is sitting by designation.  The Plaintiffs filed the Complaint in the United States District Court for New Hampshire.  Chief Judge McAuliffe recused himself by Order dated September 1, 2006, *Order* (Docket # 29); Judges DiClerico and Barbadoro followed suit on September 5, 2006, and September 6, 2006.  *Orders* (Docket # 30, 33).  Once all judges of the District of New Hampshire were recused, Chief Judge McAuliffe referred the case to the District of Maine, sitting by designation.  Chief Judge McAuliffe concluded the recusal of all the judges in New Hampshire constituted an "emergency" within the meaning of 28 U.S.C. § 636(f) and concurred in the assignment of a magistrate judge to perform the duties specified in 28 U.S.C. § 636(a) – (c).  *Order* (Docket # 33).  A procedural order issued on September 8, 2006, referring the case to this Court.  *Order* (Docket # 34).

*Emergency Mot. for TRO* (Docket # 46).[12]   Plaintiffs moved for reconsideration of that order. *Pls.' Mot. to Reconsider Order on Pls.' Mot. for TRO* (Docket # 50).

On January 5, 2007, the Court denied Plaintiffs' motion for a preliminary injunction.  *See Order* (Docket # 81) (*Prelim. Inj. Order*).  Within that Order, the Court also denied Plaintiffs' motion for reconsideration of the Order on the TRO.  *Id.* at 2 n.5.  On January 29, 2007, the Plaintiffs moved for reconsideration of the order denying a preliminary injunction.  *See Mot. for Recons. of Order on Pls.' Mot. for Prelim. Inj.* (Docket # 87).  Plaintiffs replaced that motion with an amended motion the following day, which the Court denied on June 4, 2007.  *Pls.' Am. Mot. to Reconsider Order on Pls.' Mot. for Prelimin. Inj.* (Docket # 91); *Order on Pls.' Am. Mot. to Reconsider Order for Partial Recons. of Order on Pls.' Mot. for Prelimin. Inj.* (Docket # 124).

**B.     Motions for Summary Judgment**

Before the Court are several motions and cross-motions for summary judgment.  On June 26, 2007, the City of Concord filed a motion for summary judgment.  *Def. City of Concord's Mot. for Summ. J.* (Docket # 136) (*City's Mot.*).  The Plaintiffs responded with their opposition on August 13, 2007, *Pls.' Mem. in Opp'n to City of Concord's Mot. for Summ. J.* (Docket # 144), and amended their memorandum on August 15, 2007.  *Pls.' Am. Mem. in Opp'n to City of Concord's Mot. for Summ. J.* (Docket # 146) (*Pls.' Am. Opp'n to City*).   On July 3, 2007, the intervenors, Concord Hospital and St. Paul's School, filed their motion for summary judgment. *Intervenor's Mot. for Summ. J.* (Docket # 138) (*Intervenor's Mot.*).  On August 13, Plaintiffs filed their objection to that motion.  *Pls.' Obj. to Intervenor's Mot. for Summ. J.* (Docket # 145) (*Pls.' Obj. to Intervenors*).  Also on August 13, 2007, the Corps filed its motion for summary judgment.  *Federal Defs.' Mot. for Summ. J.* (Docket # 142) (*Corps' Mot.*).  The Plaintiffs filed

---

[12] The Court ruled on the motion for TRO on an expedited basis and focused on narrow issues, because the construction would have had a limited initial effect.  The Order denying the preliminary injunction addressed the full range of issues contained in the Complaint.

their response on September 18, 2007.  *Pls.' Resp. to the Federal Defs.' Mem. in Supp. of Mot. for Summ. J.* (Docket # 152) (*Pls.' Resp. to Corps*).  The Federal Defendants filed a reply on October 9, 2007.  *Federal Defs.' Reply Mem. in Supp. of Mot. for Summ. J.* (Docket # 154) (*Corps' Reply*).

Plaintiffs filed a motion for summary judgment on August 13, 2007.  *Pls.' Mot. for Summ. J.* (Docket # 143) (*Pls.' Mot.*).  The City of Concord objected on September 17, 2007. *City of Concord's Obj. to Pls.' Mot. for Summ. J.* (Docket # 148) (*City's Obj.*).  The intervenors objected to the Plaintiff's motion on September 18, 2007, and the federal defendants objected on the same day.  *Intervenor's Obj. to Pls.' Mot. for Summ. J.* (Docket # 149) (*Intervenor's Obj.*); *Federal Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J.* (Docket # 151) (*Corps' Opp'n*). Plaintiffs replied on October 9, 2007, to both the City's opposition and the Federal Defendant's opposition.  *Pls.' Reply to City of Concord's Mem. in Opp'n to Pls.' Mot. for Summ. J.* (Docket # 155) (*Pls.' Reply to City*); *Pls.' Reply to the Federal Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J.* (Docket # 156) (*Pls.' Reply to Corps*).

## IV.   STANDARD OF REVIEW

Because this is a review of an action by a federal agency, the standard of review is supplied by the Administrative Procedure Act (APA).  *See* 5 U.S.C. § 702.  Under the APA, a district court will uphold an agency's decision unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706(2)(A);[13] *see also*

---

[13] This statutory provision reads:
> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>> (B) contrary to constitutional right, power, privilege, or immunity;
>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97-98 (1983) ("The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."). The First Circuit has explained that the task of a court reviewing an agency action under the APA's "arbitrary and capricious" standard is "to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Dubois v. United States Dep't of Agric.*, 102 F.3d 1273, 1284 (1st Cir. 1996); *see also Assoc. Fisheries of Maine v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) (explaining that an agency action is "arbitrary and capricious if the agency lacks a rational basis for adopting it – for example, if the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise"); *Penobscot Air Servs. v. FAA*, 164 F.3d 713, 719 (1st Cir. 1999) ("The task of a court reviewing agency action under the APA's 'arbitrary and capricious' standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.").

Conversely, an agency decision is not arbitrary or capricious if "the agency decision was based on a consideration of the relevant factors and there has not been 'a clear error of judgment' . . . ." *Dubois*, 102 F.3d at 1285 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401

---

(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or,
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

U.S. 402, 416 (1971)).  "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result and respond to relevant and significant public comments.  However, neither requirement is particularly demanding." *Penobscot Air Servs.*, 164 F.3d at 719 n.3 (internal citations and quotation marks omitted).

The Court's review under this standard is "highly deferential," in that the agency action is presumed valid.  *Assoc. Fisheries*, 127 F.3d at 109.  In other words, this Court "is not empowered to substitute its judgment for that of the agency."  *Overton Park*, 401 U.S. at 416; *see also* 33 Charles Alan Wright & Charles H. Koch, Jr., Federal Practice & Procedure § 8334 (current through 2008 update) ("Arbitrary and capricious review communicates the least judicial role, short of unreviewability, in the word formula system.").  Notwithstanding the deferential standard of review, "it is not a rubber stamp." *Dubois*, 102 F.3d at 1285.  Rather, the Court "must undertake a 'thorough, probing, in-depth review' and a 'searching and careful' inquiry into the record." *Id.* (quoting *Overton Park*, 401 U.S. at 415-16).  In carrying out its task under the APA, the scope of the Court's review will include the whole administrative record.  *See* 5 U.S.C. § 706; *Overton Park,* 401 U.S. at 420 (district court review "is to be based on the full administrative record that was before the [agency head] at the time he made his decision"); *Cousins v. Sec'y of United States Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989).

"[The] rubric [of summary judgment review] has a special twist in the administrative law context." *Assoc. Fisheries of Me., Inc.*, 127 F.3d at 109 . "[W]here the APA standard obtains, a court may set aside an administrative action only if that action is arbitrary, capricious, or otherwise contrary to law." *Id.* "Thus, a reviewing court's role in a case governed by the APA is 'not to resolve contested fact questions which may exist in the underlying administrative record,' but rather to 'determine the legal question of whether the agency's action was arbitrary and

capricious.'"  *Conservation Law Foundation v. Fed. Highway Admin.*, No. 06-45, 2007 U.S.

Dist. LEXIS 64465, *40 (D.N.H. Aug. 30, 2007) (quoting *Gilbert Equip. Co., Inc. v. Higgins*,

709 F. Supp. 1071, 1077 (S.D. Ala. 1989), *aff'd* 894 F.2d 412 (11th Cir. 1990)).


## V.    DISCUSSION

### A.    Clean Water Act Claims

The Clean Water Act (CWA) was a "bold and sweeping legislative initiative," *Dubois*,

102 F.3d at 1294 (citation omitted), enacted to "restore and maintain the chemical, physical, and

biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  "This objective incorporated a

broad, systemic view of the goal of maintaining and improving water quality: as the House

Report on the legislation put it, 'the word "integrity" . . . refers to a condition in which the

natural structure and function of ecosystems [are] maintained."  *United States v. Riverside*

*Bayview Homes, Inc.*, 474 U.S. 121, 132 (1985) (quoting H.R. Rep. No. 92-911, at 76 (1972)).

In contrast to NEPA's "focus on process," the CWA "is substantive, focusing on the integrity of

the nation's water, not the permit process."  *Dubois*, 102 F.3d at 1294 (internal citation and

punctuation omitted).

Pursuant to Section 404 of the CWA (33 U.S.C. § 1344), the Corps "may issue permits,

after notice and opportunity for public hearings, for the discharge of dredged or fill materials into

navigable waters at specified disposal sites." [14]  33 U.S.C. § 1344(a).  Before issuing a fill permit,

the Corps must insure that the proposed action complies with CWA § 404(b)(1) guidelines issued

---

[14] The CWA broadly defines "navigable waters" to mean "the waters of the United States, including the territorial
seas."  33 U.S.C. § 1362(7).  The regulations promulgated under the CWA further define "waters of the United
States" to mean wetlands adjacent to "waters used in interstate commerce," tributaries of those waters, or territorial
seas.  33 C.F.R. § 328.3.  Here, there is no argument on either side that the Corps lacked jurisdiction over the
wetlands at issue.  *Cf.  Rapanos v. United States*, 547 U.S. 715 (2006); *United States v. Johnson*, 467 F.3d 56 (1st
Cir. 2006).

by the Environmental Protection Agency (EPA).  33 C.F.R. § 320.4(a)(1).  Plaintiffs claim that the Corps failed to comply with these guidelines on several levels, including its findings on practicable alternatives, its balancing of the public interest, and its deference to state and local zoning and land use decisions.

### 1.      Practicable Alternatives

Plaintiffs claim that the "Corps failed to rebut 'the *very* strong presumption of the existence of practicable alternatives" and that "there is a 'very strong' presumption that practicable alternatives exist when a proposed project is not water dependent, and that *the agency carries the burden to rebut that presumption* by showing the alternatives to be impracticable." *Pls.' Mot.* at 12 (quoting *Compl.* and *Order on Pls.' Mot. for Partial Recons. on Pls.' Mot. for Prelim. Inj.* at 8) (emphasis in *Pls.' Mot.*).  Corps guidelines provide that the agency shall not issue a fill permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant environmental consequences." [15]  40 C.F.R. § 230.10(a).

EPA regulations presume that alternatives exist when the proposed project is not "water dependent," defined as not requiring "access or proximity to . . . the special aquatic site in question to fulfill its basic purpose."[16]  40 C.F.R. § 230.10(a)(3).  Thus, "when the basic purpose of a project may be accomplished without 'access or proximity' to a 'special aquatic site . . . practicable alternatives that do not involve special aquatic sites are presumed to be available,

---

[15] The regulations further explain: "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics *in light of overall project purposes*."  40 C.F.R. § 230.10(a)(2) (emphasis added).  *See also Sylvester v. United States Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989) ("The Corps has a duty to take into account the objectives of the applicant's project.  Indeed, it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable.") (citation omitted).

[16] Special aquatic sites are "identified in Subpart E [of 40 C.F.R. Part 230]" and they possess "special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values."  40 C.F.R. § 230.3(q-1).  Special aquatic sites include wetlands.  40 C.F.R. § 230.41.

unless clearly demonstrated otherwise.'" *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1262 n.12 (quoting 40 C.F.R. § 230.10(a)(3)). In other words, "under the CWA, it is not sufficient for the Corps to consider a range of alternatives to the proposed project: the Corps must rebut the presumption that there are practicable alternatives with less adverse environmental impact." *Id.*; *see also Nat'l Wildlife Fed'n, v. Whistler*, 27 F.3d 1341, 1344 (8th Cir. 1994) ("This presumption of practicable alternatives is very strong, creating an incentive for developers to avoid choosing wetlands when they could choose an alternative upland site . . . ." (internal citations and quotation marks omitted)) [hereinafter *Whistler*].[17] Here, it must be presumed that alternatives existed to the chosen course of action, because the Phase II project does not depend on an "aquatic site" for its existence. The question becomes whether any of the existing alternatives were practicable, such that the discharge of fill could be avoided.

The Corps contends that it weighed alternatives, including different routes and the "no build," and "upgrade alternatives" options, but rejected them. *Corps' Opp'n* at 5. The EA contains a section entitled "Alternatives: Section 404 Mitigation MOA Requirements." *See* AR 1:34. The Corps measured alternatives against the basic project purpose, which was "to relieve traffic congestion and to allow for the safe and efficient flow of traffic in this quadrant of the city." *Id.* The Corps considered the proposed alternative, a road alignment that would have re-routed the proposed roadway, and an "[u]pgrade alternative," wherein the City would widen existing roads and add more lanes. *Id.*

---

[17] The Plaintiffs cite *Whistler* in paragraph 109 of the Complaint. In *Whistler*, the Corps approved conversion of approximately 14.5 acres of wetlands into deep water habitat, to allow a housing project boat access to the nearby Missouri River. 27 F.3d at 1343. The National Wildlife Federation sought a preliminary injunction, alleging that the Corps conducted an improper alternatives analysis. *Id.* at 1344. The court noted the very deferential standard of review, even in light of the presumption of alternatives, and emphasized that "[c]entral to evaluating practicable alternatives is the determination of a project's purpose." *Id.* at 1345. Ultimately, the court found that the alternatives analysis was proper, explaining that because this project was water-dependent, the regulatory presumption did not exist. *Id.*

The Corps characterized the proposed alternative, permitted by the EA at issue in this case, as "crossing at a narrow point and nipping the edge of the existing wetlands."  AR 1:34. Another alternative would have cut "straight across a wide segment of wetland," resulting in a "greater direct impact and greater impact from the point of view of forest fragmentation."  *Id*.  A third option – a "no build alternative" that would require upgrading existing city streets – was found impractical because of the large number of properties affected and because it did not resolve pedestrian safety issues.  *Id*.

Regarding the "no build" alternative, the Corps observed that "[u]pgrade alternatives, to the extent that they might relieve congestion by widening the roads and adding more lanes for cars, would be of dubious value in achieving the pedestrian safety that is a part of the purpose of the project and would have occasioned the need for taking portions of numerous properties along South fruit [sic] Street and Pleasant Street."  *Id*.  The Corps also determined that "[u]pgrades of existing streets were not practicable because of the number of properties that would be effected [sic] in such an urbanized part of the city."  *Id*. at 1:34-35.  The Corps concluded that the proposed roadway was the "least environmentally damaging practicable alternative."  *Id*. at 1:35.

The Plaintiffs present three arguments regarding practicable alternatives.  First, they claim that while the Corps concluded that widening South Fruit and Pleasant streets was not a practical alternative, the evidence:

> [D]iscusses alternatives to the entire Northwest Bypass and contains no information either identifying or comparing the costs and benefits of just Phase II, with its alternatives; nor does the record contain any analysis by which information specific to Phase II is broken out of the 1991 study [upon which the Corps relied].

*Pls.' Mot.* at 14 (referencing AR 5:167).  In response, the Corps cites a Rizzo Associates document that states, regarding Phase II alone:

> The necessary intersection improvement would require property acquisition from 17 properties . . . .  The upgrade impacts an additional 9 properties.  More importantly, this alternative serves to pass more traffic through residential, recreation, and school areas, while the parkway diverts this traffic to a limited access roadway and in doing so improves operations and safety at the busy Pleasant Street intersection.

AR 6:18-19.  This document applies to Phase II alone, without reference to the 1991 study and Phases I and III of the project.  The record supports the Corps' determination that the road expansion alternative was not practicable in that it required significant property acquisition and would increase the amount of traffic moving through residential, recreation, and school areas.

Second, the Plaintiffs attack the Corps' rejection of the "no build" option.  *Pls.' Mot.* at 15.  They say that the Corps defended its approval in part on the assumption that "the project purpose of improved pedestrian safety is purportedly independent of congestion reduction."  *Id.* at 14.  The Plaintiffs argue the notion that pedestrian safety can be only addressed independently of traffic congestion is "unsupported."  *Id.* at 15.  Next, the Plaintiffs claim that even if "pedestrian safety can only be addressed independently of traffic congestion," the Corps failed "to study discrete pedestrian safety alternatives that were specifically brought to its attention in public comments."  *Id.*  Specifically, they say that the construction of a pedestrian overpass combined with repaving and upgrading the sidewalks was a viable alternative to the pedestrian concerns.[18]  *Id.*

Neither argument is convincing.  The Corps has not adopted the Plaintiffs' description of its own view of the pedestrian safety issue, which the Court views as somewhat opaque.

---

[18] For support, Plaintiffs point to Ms. Ludtke's own motion for reconsideration filed during the hearing process.  AR 4:59.  They quote extensively from this motion, note that the Corps underlined portions of it, and observe that the Corps added some marginal comments.  *Pls.' Mot.* at 15-16.  One marginal comment – near the portion of the motion that argued for consideration of a pedestrian overpass – states in handwritten notes, "Upgrades + Pod [sic] Bridges."  AR 4:61.  The Plaintiffs infer from these marginal notes and underlinings that the Corps "clearly acknowledges the contention that certain practicable alternatives – "Upgrades and pedestrian bridges" – had not been tried."  *Pls.' Mot.* at 16.  The Corps' underlinings and marginal notes confirm only that the Corps read the motion; any other inference is unwarranted.

Moreover, even if pedestrian safety could be alternatively addressed, the Corps concluded that none of the alternatives would adequately ameliorate the traffic congestion problem.  Finally, the Corps' underlining and notation on Ms. Ludtke's motion for reconsideration to NHDES does not suggest that the Corps ignored the Plaintiffs' contentions; rather, it confirms that it did consider them. The Corps merely reached a different conclusion.   The Corps was not arbitrary and capricious in finding that the upgrade alternatives were not practicable regardless of whether a pedestrian bridge is included, so this argument is not determinative.  40 C.F.R. § 230.10(a)(2) ("An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of *overall project purposes*.") (emphasis added).

Third, Plaintiffs describe an alternative not considered in the EA.  They cite a 1996 study by a consulting firm, VHB/Vanasse Hangen Brustlin, Inc. (VBH), "which would include realignment of the notorious 5-pronged Pleasant Street/Fruit Street/Warren Street intersection, and would require neither widening South Fruit Street, nor any costs and impacts to developed properties fronting on it."  *Pls.' Mot.* at 14 (referencing AR 6:1134).  Plaintiffs assert that this realignment will be required with or without Phase II construction, and that it will resolve the same issues that Phase II is purported to resolve.[19]   *Pls.' Resp. to Corps* at 5.  The Corps contends that the VHB report suggests this alternative in response to "a different set of traffic concerns in downtown Concord than the City was trying to address with Phase II . . . .  While the 1996 VHB report addressed traffic issues in the Pleasant Street corridor, the report's analysis assumed that Phase II would be built."  *Fed. Def.'s Opp'n* at 6 (citing AR 6:1152).  The Corps

---

[19] Plaintiffs' argument that the realignment will occur with or without Phase II, and that Phase II is, therefore, unnecessary, does not withstand analysis.  The City's recognition that renovations of the five-prong intersection will be required for reasons both related to and independent from Phase II's purposes reflects ongoing city planning, and is not evidence that Phase II does not also serve a utility.

asserts that the realignment outlined in the VHB report would not result in a decrease in "left-hand turns from South Fruit Street to Pleasant Street" and would not achieve the benefit of "the overall reduction of traffic on the Clinton-South Fruit-Pleasant Streets Route." *Id.* Plaintiffs reply that, according to the purpose of the project, because pedestrian safety is "inherent" in reduced traffic congestion, "pedestrian safety is among the purposes *accomplished* by relieving traffic congestion," so the realignment is a practicable alternative that should have been considered. *Pls.' Mot.* at 15 (emphasis in original); *Pls.' Resp. to Corps* at 4.

The VHB report itself states:

> The purpose of this study is to develop a conceptual improvement plan for a 1.4 mile section of the Pleasant Street Corridor extending from Concord Hospital to South Spring Street, to evaluate and recommend a preferred improvement plan for the critical Pleasant Street/Warren Street/South Fruit Street intersection, and lastly to develop a traffic management plan aimed at protecting the nearby residential neighborhoods from intrusion of continued traffic growth.

AR 6:1140. The report mentions the Northwest Bypass in its section concerning "physical roadway conditions," and appears to describe the Bypass, including Phases II and III, as conditions assumed into the report. AR 6:1143. A map of the studied area includes the Future "Northwest By-Pass" in its depiction of traffic volumes. AR 6:1147-48. The report also assumes that the road will be built in its section on "future conditions." AR 6:1152 (stating that "[c]urrent plans call for the construction of the southern leg of the Bypass – from Pleasant Street to Clinton Street – by 1999"). Further, the EA states that the utility of Phase II is that it "could ease congestion on South Fruit Street and improve pedestrian and traffic safety by providing an alternate means to get from Route I-89 via Clinton Street to Concord Hospital."[20] AR 1:32. The

---

[20] In response to the argument regarding the utility of the project concerning South Fruit Street, Plaintiffs argue that congestion on South Fruit Street alone is not a problem, and therefore, this reasoning is arbitrary and capricious. *Pls.' Resp. to Corps* at 5 (citing a statement by the City's consultant concerning the no-build option that "South Fruit Street itself would not warrant any improvements; rather the intersection of South Fruit Street/Pleasant Street/Warren Street would need to be improved"); *Pls.' Am. Opp'n to City* at 2. Further, the Plaintiffs suggest that

realignment does not meet this basic description of the purpose of the project.[21]   The Corps'
determination that the VHB report did not create an alternative (practicable or not) to the Bypass
was not arbitrary and capricious.

## 2.   Public Interest Review

If the Corps determines that the proposed action complies with the Section 404(b)
requirements, it "will grant the permit unless issuance would be contrary to the public interest."
33 C.F.R. § 323.6(a).   The "public interest review" involves a weighing of the benefits of the
proposed activity against the foreseeable detriments.   33 C.F.R. § 320.4(a)(1).   The regulations
list the factors that the agency must consider:

> (i) The relative extent of the public and private need for the proposed structure or
> work; (ii) Where there are unresolved conflicts as to resource use, the
> practicability of using reasonable alternative locations and methods to accomplish
> the objective of the proposed structure or work; and (iii) The extent and
> permanence of the beneficial and/or detrimental effects which the proposed
> structure or work is likely to have on the public and private uses to which the area
> is suited.

33 C.F.R. § 320.4(a)(2).   The regulations grant the agency flexibility in determining how to
weigh those factors:

> The specific weight of each factor is determined by its importance and relevance
> to the particular proposal.   Accordingly, how important a factor is and how much
> consideration it deserves will vary with each proposal.   A specific factor may be
> given great weight on one proposal, while it may not be present or as important
> on another.   However, full consideration and appropriate weight will be given to
> all comments, including those of federal, state, and local agencies, and other
> experts on matters within their expertise.

---

no studies have considered or documented problems on South Fruit Street.   *Pls.' Am. Opp'n to City* at 2.   However,
one purpose of the project is to relieve congestion at the intersection of South Fruit, Pleasant, and Warren streets,
which by definition, responds to a problem on South Fruit Street.

[21] In their reply, Plaintiffs take issue with the Defendants' reliance on ambulance or emergency vehicle transport to
the hospital in their practicable alternatives reasoning.   *Pls.' Reply to City* at 6.   This contention avoids the obvious.
The Corps notes that Phase II "could ease congestion . . . by providing an alternative means to Concord Hospital."
AR 1:32, 37.   The Corps need not spell out that emergency vehicles are part of the traffic congestion that Phase II is
designed to alleviate for better access to the hospital.

33 C.F.R. § 320.4(a)(3).  "Under the 'public interest' review, the Corps conducts a general balancing of a number of economic and environmental factors and its ultimate determinations are entitled to substantial deference."  *Town of Norfolk v. United States Army Corps of Eng'rs*, 968 F.2d 1438, 1454-55 (1st. Cir. 1992) (citing *Broward County, Inc. v. Myers*, 831 F.2d 984, 986 (11th Cir. 1987).

In their motion for summary judgment, the Plaintiffs argue "not only that the Corps lacked sufficient information regarding the impact of constructing Phase II as originally conceived (a project that did not include the closure of Silk Farm/Dunbarton Road), but that the agency also lacked sufficient information regarding the impact of Phase II as actually proposed (a project that does include closure of the other road)."[22] *Pls.' Mot.* at 4.

### a.    Traffic Impacts

Plaintiffs make two public interest arguments regarding traffic:  (1) that the Corps did not address the impacts of closing Dunbarton and Silk Roads; and, (2) that the Corps relied on conflicting statements about whether the project would increase or decrease congestion on Pleasant Street, and thus "lacked sufficient information regarding the impact of constructing Phase II as originally conceived [without the closure of Dunbarton and Silk roads]."  *Pls.' Mot.* at 4.

---

[22] Several reports and other discussions of traffic concerns in the relevant area are included in the administrative record:  (1) Rizzo Assoc., Traffic Summary and Response to Laurie Rauseo Proposed Parkway from Clinton Street to Pleasant Street (Sept. 12, 2001), AR 6:14; (2) Resource Systems Group, Inc., Travel Demand Model Development and Traffic Impact Study for the Northwest Bypass (April 17, 1998), AR 6:582; (3) VHB/Vanasse Hangen Brustlin, Inc., Pleasant Street Corridor Improvement Plan (July 29, 1996), AR 6:1134; (4) VHB/Vanasse Hangen Brustlin, Inc., Concord Parking Shuttle Policy and Operations Feasibility Analysis (Feb. 1999), AR 6:530; (5) Resource Systems Group, Inc, The Northwest Concord Traffic Improvements Study (Nov. 4, 1996), AR 6:1011; and, (6) Rizzo Assoc., Inc., Traffic Impact and Access Study (April 2001), AR 6:185.  Regarding the traffic studies, the Plaintiffs argue that "[w]hile a CWA application related to such a controversial project certainly *ought* to include 'several' traffic studies (or at least more than one) claiming to show a benefit, only three (3) of the cited 'studies' even *mention* 'the impact of Phase II alone' (according to the Corps) . . . ." *Pls.' Mot.* at 5.  The Plaintiffs go on to characterize two reports as relying on earlier studies, leaving only one report upon which the other studies rely.  *Id.* The Court is unaware of any law or regulation that specifies the number of studies a project must include, and Plaintiffs supply no support for this assertion.

### i.    Impact of Dunbarton and Silk Roads

Plaintiffs argue that "[t]he City of Concord has not done *any* study, which specifically addresses the impact of closing off Dunbarton and Silk Farm Roads *and* building the hospital connector road." *Pls.' Mot.* at 7 (quoting AR 2:266) (emphasis supplied by Plaintiffs). Plaintiffs assert that the 1998 RSG study did not address the closing of Silk Farm/Dunbarton roads because "the closure of these roads was only belatedly added to the project plan."[23] *Pls.' Mot.* at 7.

The City responds that "Silk Farm Road is not a major public thoroughfare. It is a small country road running through the St. Paul's School campus." *Def. Concord Obj.* at 3. It asserts that the "information available from the extensive modeling performed in the numerous applicable traffic studies enables transportation experts to easily extrapolate the amount of Silk Farm Road traffic which would be diverted from Silk Farm Road to the Phase II Parkway." *Id.* In addition, the City cites the 2001 Rizzo Report:

> Based upon the [RSG] results of the Build and Close Silk Farm Road model and a review of the roadway network north of Pleasant Street, one can conclude that the traffic remaining on Silk Farm Road (approximately 600 vpd) is the local traffic bound for St. Paul's School. Silk Farm Road/Dunbarton Road provides a link between Clinton Street and Pleasant Street, and therefore the only segment of the bypass that would have substantial impact on this roadway segment is Phase II. The same diversion of traffic from Silk Farm Road to the Parkway can be expected for the Phase I construction as was projected for the Full Build.

AR 6:21; *Def. Concord Obj.* at 3.. The Corps also cites the same report, stating that "Plaintiffs incorrectly assert that the RSG study does not address the traffic impacts associated with the

---

[23] The Plaintiffs further characterize the roads as a "closure of a major public thoroughfare." *Pls.' Mot.* at 8. First, although the term "closing" is used by the parties and the experts, it seems to be a slight misnomer. The roads will be generally closed to the public, but open to individuals with business at St. Paul's School, so to a more limited extent, they will continue to carry some of the current traffic load. The Rizzo Report also states that the City will retain permanent easements for public passage of pedestrian, bicycle, and emergency traffic. AR 6:17. Second, Plaintiffs cite *Penobscot Air Servs.*, 164 F.3d 713 at n.3 for the proposition that the Corps must respond to "'relevant' and 'significant' public comments." *Id.* (citation omitted). But, the authority goes on to state that the "requirement is [not] particularly demanding." *Id.* (citation omitted). Here, the record shows that that Silk and Dunbarton Roads would be closed, AR 6:16-17, and the Corps was not arbitrary and capricious in finding that there are traffic benefits of the project without requiring further study of the closure of those two roads.

closures of Dunbarton and Silk Farm Roads." *Corps' Opp'n* at 3; *Corps' Mot.* at 7.  The Corps further states that "while the closure of Silk Farm Road was not modeled in combination with the construction of Phase II alone, it is only Phase II that would be impacted by the closure of Silk Farm Road, so the results of the model run with Phase II and III and the closure of Silk Farm Road can easily be extrapolated to Phase II as well." *Corps' Mot.* at 7 (citing AR 6:20-21, 595-96).

The RSG report separately considered (a) traffic for Phase II alone, and also, in relevant part, (b) the full Northwest Bypass together with the closure of Silk Farm and Dunbarton Roads. AR 6:592.  Thus, it did not explicitly consider the combination of Phase II alone together with the Silk Farm Road closure.  However, there is evidence on the record that the results of such a combination were extrapolated from earlier reports and the closings will not adversely impact the project's ability to fulfill its purpose.[24]  AR 6:20-21.  Contrary to Plaintiffs' protestations, this "extrapolation" is not an arbitrary and capricious analysis of the  traffic impact of closing Silk Farm and Dunbarton Roads; instead it is a common-sense consideration of the available facts.

### ii.    General Impacts of Phase II

Plaintiffs first assert that the Corps relies upon "vague generalized references, by a City consultant or employee, to others' studies, without identifying what those studies are, or without producing studies actually showing what the consultant or employee claim they have found, thereby leaving the Corps without the factual information necessary to reach its conclusion . . . ."

---

[24] Plaintiffs cite *Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1186 (10th Cir. 2002), for the assertion that the Corps must "delineate the information it purports to have relied upon, in '*detailed, clear* and *convincing*' fashion, 'with independent *verification* by the [Army Corps]." *Pls.' Mot.* at 12.  However, these statements concern the heavier standard borne by the Corps regarding practicable alternatives, not conclusions regarding the impacts of the project itself.  *Id.*  Further, at issue in *Utahns* was the cost of a particular alternative, and the Corps admitted to having no records regarding those costs.  *Utahns*, 305 F.3d at 1165.  In *Utahns*, the Corps also did not respond to specific information suggesting an alternative might not have been as cost-prohibitive as the Corps suggested.  *Id.* at 1166.  Here, Plaintiffs have provided no evidence that the Corps was incorrect in its conclusions regarding the impacts of the Silk Farm Road and Dunbarton Road closings.

*Pls.' Mot.* at 5.  They claim that the Corps' "repeated invocation of 'the City's extensive traffic studies' is entirely apocryphal."   *Id.* (internal citation omitted).   The Rizzo Report dated September 12, 2001, which is part of the administrative record, belies the Plaintiffs' contentions. The Report lists seven separate traffic studies completed by three firms, including two by Rizzo itself.  AR 6:19.  Throughout the Rizzo Report, the author repeatedly refers to findings in the other reports.  The fact that the Rizzo Report refers to and summarizes those reports does not render the evidence suspect or incompetent anymore than a physician's reliance on a radiologist's report compromises his professional opinion.

Plaintiffs also assert that the Corps relied upon conflicting conclusions regarding whether traffic on Pleasant Street will increase or decrease.[25]   *Pls.' Mot.* at 6 (citing AR 2:267, 6:19, 23). For this assertion, they cite their own expert, Laurie Rauseo, and point to her concerns about the conclusions in the RSG traffic volume study.   *Pls.' Mot.* at 6.   But, the Court has already determined that the Corps was not required to rely upon the Plaintiff's expert.   *Order on Pls.' Mot. for Prelim. Inj.* at 14 ("The existence of opposing views does not render the Corps's decision arbitrary and capricious."); *Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision*, 934

---

[25] In a related argument, the Plaintiffs argue that the project will not fulfill what they claim is one of the principle project purposes:  a decrease in traffic on smaller neighborhood streets.  *Pls.' Mot.* at 6; *Pls.' Am. Opp'n to City* at 2; AR 5:214 ("The Northwest Bypass . . . will ameliorate congestion, traffic flow, and pedestrian safety on existing city streets in neighborhoods adjacent to downtown . . . .").  There appears to be some question as to what the project purposes are.  The citations provided by the Plaintiffs are (1) what is referred to in the consolidated index as a "Draft Statement of Purpose and Need," dated September 4, 1991; and (2) a letter that refers to an enclosed "Purpose and Need Statement" but the statement itself is not included as an attachment.  *Pls.' Mot.* at 6 (citing AR 5:214-16 and AR 1:139).  The purpose statement that appears to have been submitted to the Corps is included in a letter from William Lawless to Martha Burnham on October 29, 1991.  AR 5:160.  It states that the "basic project purpose" is "to relieve traffic congestion and to allow for the safe and efficient flow of local traffic through the northwest side of the City of Concord, New Hampshire."  *Id.*  An earlier statement that was edited by hand appears to include more specific references to residential streets and school zones.  AR 1:163.  The EA itself reflects the October 29 purpose. AR 1:32 ("The purpose of the work is to relieve traffic congestion, and to allow the safe and efficient flow of traffic in this quadrant of the city.  Improved pedestrian safety is an inherent part of the basic project purpose.").  The Court relies upon the statement of purpose in the EA, and therefore, need not address the Plaintiff's specific claims regarding traffic on smaller neighborhood streets.  At any rate, the Corps responds to the Plaintiffs arguments by stating that it "considered 'cut-through traffic,' and found that Phase II would not attract additional traffic to neighborhoods."  *Corps' Mot.* at 7.  The Corps further asserts that "no traffic analysis – including a previous submission by Plaintiffs' traffic consultant – indicates that Phase II will increase 'cut-through traffic.'"  *Id.* (citing AR 2:265; AR 6:23-24).

F.2d 1127, 1144 (10th Cir. 1991) ("Conflicting expert opinion, however, is not sufficient to allow a reviewing court to conclude the agency decision was arbitrary, capricious or an abuse of discretion, nor is such evidence sufficient to overcome the presumption of regularity and correctness afforded to the [agency] decision.").

The Plaintiffs also rely upon the 2001 Rizzo Associates Report, which states in relevant part that "Phase II removes traffic from South Fruit Street, Pleasant Street and Dunbarton Road, provides essential safety benefits and enhances the neighborhoods adjacent to these corridors" and that "[t]he additional traffic is what is expected with the new parkway. The direct access to the medical complex increases the vehicle trips to and from the south and west. In turn this provides for increased capacity on other road segments as volumes decline." AR 6:19, 23. The Federal Defendants interpret this statement to mean that "while more vehicles will use Phase II to access the Hospital (leading to higher volume overall), *congestion* will decline on other roads like South Fruit Street and Pleasant Street because traffic volume on those roads will decline." *Corps' Mot.* at 7. The Plaintiffs respond that the document relied upon by the Corps is "an opinion letter from a City consultant, rather than . . . any of the purported studies themselves." *Pls.' Resp. to Corps* at 3.

The Federal Defendants further state that the reports on the record find that traffic volume at the "difficult Pleasant-Fruit-Warren Streets intersection" will be reduced and that "the traffic volume on Clinton, South Fruit, and Pleasant Streets to the east of Phase II, where vehicles now travel to reach Concord Hospital when exiting I-89, was predicted to be lower with Phase II than without it." *Fed. Def.'s Opp.* at 2 (citing AR 6:18, 594-96). The Plaintiffs argue that the City's consultant made this assertion without factual support. *Pls.' Mot.* at 6. But, this is incorrect. The consultant's assertion summarizes the findings of other traffic reports and expressly refers to

the findings of a "detailed traffic study prepared by Resource Systems Group, dated November 1996."  AR 6:19.

The record shows that the Corps was not arbitrary and capricious in determining that though traffic from the South and West of the hospital will increase, current traffic problems will be alleviated to the North and East.  This conclusion meets the project's purpose to "relieve traffic congestion, and to allow the safe and efficient flow of traffic in this quadrant of the city." AR 1:32.  Further, the Corps' reliance on the Rizzo Associates' summary of other traffic studies was not arbitrary and capricious in the context of determining the traffic benefits of Phase II.

### b.    Balancing Recreational and Educational Resource Impacts

Plaintiffs argue that the Corps failed to "give sufficient weight to recreational and educational resource impacts."  *Pls.' Mot.* at 8.  Emphasizing both the physical activity opportunities offered by the Turkey River White Farm Trails system and the educational opportunities offered by the Concord School District's School Environmental Education Project (Project SEE), Plaintiffs claim that the Corps did not sufficiently consider the impacts to these uses.

### i.    Recreational Impacts

Plaintiffs note that while the road would transect two trails at disparate points, the City proposes a single tunnel under the road.  *Pls.' Mot.* at 9.  Plaintiffs also refer to comments by the Concord Conservation Commission requesting additional measures to maintain the trails system, and state that the Corps "minimizes the degree of recreational impact, in conclusory fashion." *Pls.' Mot.* at 10.  The Corps responds that it considered these impacts in the EA, which states that the area "provides recreation and open space for people who reside around the area and many who come out from nearby parts of the city to use it."  *Fed. Def.'s Opp.* at 4 (quoting AR 1:33).

In addition, the City asserts that the Corps weighed the impacts to recreational resources, requiring the tunnel under the bypass, and finding that some recreational uses would be "slightly diminished." *Concord Obj.* at 4. In their reply, the Plaintiffs cite a letter from Mary Louise Hancock, Chair of the Turkey River Basin Trust, which states that the Trust "opposes the building of any roadway between Clinton and Pleasant Streets." AR 2:484.

Concerning recreational opportunities, the Corps clearly weighed the impacts of the project and included at least one mitigating element in the EA – the tunnel. The EA states:

> Having to see and cross under a new road to get out into the lager [sic] Turkey river floodplain tract, beyond the loom of city lights, would in many peoples [sic] mind [sic] diminish the value of the recreational experience to some degree. Hikers, bikers and cross country skiers will have to trek west of the bypass to have the sense that they are truly out in the country. If memorial field is used for a point of access it will take a little longer to get out into the country.

AR 1:37. The Corps considered the recreational impacts of the project, "evaluated relevant factors and reached a reasoned decision." *Van Abbema v. Fornell*, 807 F.2d 633, 636 (7th Cir. 1986); *Audubon Naturalist Soc'y of the Cent. Atlantic States v. United States Dep't of Transp.*, Nos. 06-3386, 07-1480, 2007 U.S. Dist. LEXIS 84051, at *110 (D. Md. Nov. 8, 2007) ("The law only requires that the Corps consider the factors and make a determination based from that analysis.").

### ii.    Educational Impacts

The Plaintiffs assert that the EA provides "*no* discussion of the road's educational impact."[26] *Pls.' Mot.* at 12. The EA states that the area "serves as a convenient outdoor class

---

[26] Plaintiffs also claim that the Corps "confess[ed]" "complete ignorance of recreational (and educational) impacts in its answer." *Pls.' Mot.* at 10. The Corps responds that "Plaintiffs mischaracterize the Federal Defendants' Answer . . . . In its Answer, the Federal Defendants appropriately responded that they lack knowledge or information sufficient to form a belief as to the truth of some of Plaintiffs' broadest allegations, for example that Project SEE is 'unique and irreplaceable.'" *Fed. Def.'s Opp.* at 5. The Court rejects the Plaintiffs' attempt to extrapolate from the Corps' initial "without knowledge" answer to some allegations in their 140 page Complaint a conclusion that the Corps was wholly ignorant of the allegations.

room [sic] for the schools located nearby," and that "[d]ue to its proximity to the school system it is also used in environmental education."  AR 1:33.  The Corps responds with a record statement by the City that "[t]he educational value and access to these and other wetlands would not be expected to be negatively impacted by the Bypass; in fact these wetlands will be more easily accessible due to the construction of the sidewalk and bicycle path."  AR 6:156.  The City claims that Plaintiffs cite no record evidence regarding negative impacts to school programs.  *City's Obj.* at 5.  In their response, the Plaintiffs point to a description of the Project SEE, which describes the school system's use of White Farm and the surrounding areas, and states that "[t]he area is used extensively by the school district as an outdoor science laboratory for kindergarten to high school grade levels."  *Pls.' Reply to City* at 4; AR 2:586.  The document, for which the author is not specified, also states that Project SEE works with the Turkey River trust, with a joint purpose to "preserve the area in perpetuity as an open space resource for the Concord community."  *Id.*

Based on this record, considering both the City's statements on the record that the road would improve educational opportunities and the document regarding Project SEE, the Corps duly considered the educational impacts of the Parkway and was not arbitrary and capricious in its weighing of the Parkway's impact on these resources.

### 3. Deference to State and Local Zoning and Land Use Decisions

Plaintiffs claim that the Corps gave undue deference to state and local decisions in its reliance on 33 C.F.R. § 320.4(j)(2) and (4).  In pertinent part, the regulations carve out a specific role for state and local decisionmaking:

---

Moreover, the Court must consider the record before the Corps to decide whether the EA is arbitrary and capricious.  *Sierra Club v. Marsh,* 976 F.2d 763, 769 (1st Cir. 1992) ("[T]he court must '*look to see if the agency decision*, in the context of the record, is too '*unreasonable*' (given its statutory and factual context) *for the law to permit it to stand*.") (quoting *Sierra Club v. Marsh,* 769 F.2d 868 (1st Cir. 1985)) (emphasis added by the Court in 1992).

> The primary responsibility for determining zoning and land use matters rests with state, local and tribal governments. The district engineer will normally accept decisions by such governments on those matters unless there are significant issues of overriding national importance. Such issues would include but are not necessarily limited to national security, navigation, national economic development, water quality, preservation of special aquatic areas, including wetlands, with significant interstate importance, and national energy needs. Whether a factor has overriding importance will depend on the degree of impact in an individual case.

33 C.F.R. 320.4(j)(2).  If there are no "overriding national factors of the public interest . . . a permit will generally be issued following receipt of a favorable state determination provided the concerns, policies, goals, and requirements as expressed in 33 CFR parts 320-324, and the applicable statutes have been considered and followed . . . ." *Id.* § 320.4(j)(4).  The language in the EA mirrors these two sections of regulation, and states that "[t]he criteria for permitting the discharge have been met . . . .  The decision to use the land, for recreation or a road, properly belongs with the City and the State."  AR 1:42.

At the outset, clarification is required concerning what these sections of the Federal Regulations allow the Corps to do.  The sections cited by the Plaintiffs allow the Corps to defer to a "favorable state determination" *only when* federal requirements are also met.  33 C.F.R. § 320.4(j)(4).  Thus, the Corps' decision must meet not only the other relevant sections of regulation but also related federal statutes.  *Id.*  Plaintiffs' arguments appear to claim that the Federal Government deferred the sum total of its decisionmaking responsibilities to state and local governments.  This is assertion does not hold water.  The Federal Government deferred to the state and local governments regarding land use and zoning, but made its own determinations regarding the federal requirements required for a section 404 wetlands permit.

Plaintiffs first argue that "the defendant City's decision to construct Phase II was not a zoning or land use decision falling within the jurisdictional exception intended by 33 C.F.R. §

320.4(j)(2)." *Pls.' Mot.* at 17.  Citing the fact that no zoning decision or land use ordinance was involved with the project, the Complaint states that "[t]he only decision was to construct a road with two private partners through wetlands, an area in which Army Corps responsibility is primary, and land use impacts are secondary effects outside the scope of jurisdictional exception contained in 33 C.F.R. § 320.4(j)(2)." *Compl.* ¶ 291.  The Corps responds that the decision to build the road is a "land use" decision.  *Fed. Def.'s Opp'n* at 8.  Plaintiffs argue that the Corps definition "would swallow whole much of the Army Corps' independent jurisdiction."  *Pls.' Reply to Corps* at 4.

This claim is a non-starter.  While the term "land use" is not defined in the regulations, Concord's decision to build a road on its property is a "land use" determination, and the NHDES' approval of the project is undoubtedly a land use decision.  AR 6:48, 4:67-69; *See Hoosier Envtl. Counsel, Inc. v. United States Army Corps of Eng'rs*, 105 F. Supp. 2d 953, 988 (S.D. Ind. 2000); *Sierra Club v. United States Army Corps of Eng'rs*, 450 F. Supp. 2d 503, 532-33 (D.N.J. 2006).  The Corps cannot second guess the City's decision to build a road merely from a land use perspective.  It can and does analyze the project based upon the considerations required by § 404 and the relevant regulations.  Furthermore, the Corps' jurisdiction is not at issue here – the regulations merely require it to take into account state and local decisionmaking, and then draw its own conclusion based on several factors, including the various impacts of the proposal.

Second, Plaintiffs argue that the project falls within the "significant issues of overriding national importance" exception to § 320.4(j)(2), because it is covered by the exemption for "preservation of special aquatic areas, including wetlands, with significant interstate importance."  *Pls.' Mot.* at 17 (quoting 33 C.F.R. § 320.4(j)(2)).  The Corps made the

determination that there is not an "overriding national factor" in this case.   AR 1:42.   This decision may be made "depend[ing] on the degree of impact in an individual case," and is owed deference by the Court.   33 C.F.R. § 320.4(j)(2).   Because the Corps found that the degree of impact on the wetlands "are minor, unavoidable and adequately mitigated," its decision that there is not an "overriding national factor" is not arbitrary and capricious.   AR 1:42; 33 C.F.R. § 320(j)(2).

Third, relying on *Park v. United States*, 286 F. Supp. 2d 201 (D.P.R. 2003), in which a disgruntled developer brought suit after being granted state permits but having the federal permits withheld by the Corps, Plaintiffs argue that deference based on § 320.4(j)(2) is an error of law.   *Pls.' Mot.* at 17.   In *Park*, the court rightly stated that "[t]o posit that issuance of state permits guarantees the issuance of the Corps' permit would serve to render the agency irrelevant and would annul its independent criteria."   286 F. Supp. at 208.   In this case, the Corps did not merely accept the conclusions drawn by state and local organizations, it analyzed the factors under the regulations and concluded that "[a]lternatives have been considered, the impacts have been minimized to the maximum extent practicable and the applicant proposes to mitigate the unavoidable loss to the maximum degree practicable."   AR 1:42.

Fourth, Plaintiffs claim that the Corps substituted the State's decisionmaking for its own. However, as noted, the Corps incorporated state and local land use and zoning considerations into its larger § 404 permitting decision.   Plaintiffs make specific allegations regarding the Corps' reliance on state and local decisions elsewhere in their complaint and motions based upon specific Corps decisions, and the Court considers those assertions as they arise topically. However, Plaintiffs' blanket argument regarding deference based upon 33 C.F.R. §§ 320.4(j)(2),

(j)(4) is not convincing; the Corps did not act arbitrarily in its deference to state and local decisionmakers on land use issues.

Finally, in its motion, the Corps cites paragraphs 146 and 157 of the Plaintiff's Complaint as asserting that the Plaintiffs engaged in "issues prejudgment" and did not conduct an independent review of Phase II. *Corps' Mot.* at 9 (citing *Compl.* ¶¶ 146, 157). The Corps asserts that it is allowed to "rely on studies done by the applicant or consultants, as long as the agency undertakes an independent evaluation of the information submitted and accepts responsibility for its accuracy." *Id.* at 9-10 (citing 40 C.F.R. § 1506.5(a); 33 C.F.R. Part 325, App. B, § 3). The Corps further asserts that it "independently evaluated relevant studies supplied by the City, and considered all relevant factors including conservation, aesthetics, general environmental concerns, wetlands and historic properties." *Id.* at 10. Plaintiffs do not respond to these arguments either in their motion or their responses. Based upon the record, the Court cannot find that the Corps failed to meet its duty to "independently evaluate the information submitted by the applicant . . . ." 40 C.F.R. § 1506.5(a).

### 4.    Wetland Mitigation

The Plaintiffs assert that the Corps did not follow the provisions of its own Regulatory Guidance Letter (RGL) 02-2, which states that "[u]nder existing law, the Corps requires compensatory mitigation to replace aquatic resource functions unavoidably lost or adversely affected by unauthorized activities," and that "[p]reservation does not result in a gain of wetland acres and will be used only in exceptional circumstances." AR 7:21, 24. The RGL continues, "[i]f preservation alone is proposed as mitigation, Districts will consider whether the wetlands or other aquatic resources: 1) perform important physical, chemical or biological functions, the protection and maintenance of which is important to the region; and, 2) are under demonstrable

threat of loss or substantial degradation from human activities" not caused by the applicant or otherwise avoidable.  *Id.* at 7:24-25.

Contrary to the Plaintiffs' premise, in its Preliminary Injunction Order, the Court concluded that RGLs are not binding on the Corps.  *Northwest Bypass II*, 470 F. Supp. 2d at 51. It is true that the differences between binding substantive rules, and interpretive rules or policy statements are, at times, hazy.[27]   Substantive rules are binding, while "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" are generally not.  5 U.S.C. § 553(b)(3)(A); *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997); *Nat'l Latino Media Coal. v. F.C.C.*, 816 F.2d 785 (D.C. Cir. 1987).  Accordingly,

> [a]n agency policy statement does not seek to impose or elaborate or interpret a legal norm.  It merely represents an agency position with respect to how it will treat – typically enforce – the governing legal norm.   By issuing a policy statement, an agency simply lets the public know its current enforcement or adjudicatory approach.   The agency retains the discretion and the authority to change its position-even abruptly-in any specific case because a change in its policy does not affect the legal norm.

*Syncor Int'l Corp.*, 127 F.3d at 94.

There are two means of determining whether "an agency has issued a binding norm or merely a statement of policy."  *Wilderness Soc'y v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006). One requires the court to ask whether the agency has "(1) 'impose[d] any rights and obligations,' or (2) 'genuinely [left] the agency and its decisionmakers free to exercise discretion.'"  *CropLife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003) (quoting *Cmty. Nutrition Inst.*, 818 F.2d at 946) (internal quotations omitted).   The other is to look to the agency's intent, considering three factors: "(1) the agency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action

---

[27] For example, see *Community Nutrition Institution v. Young,* 818 F.2d 943, 946 (D.C. Cir. 1987), which explains that courts and commentators have described the distinction between substantive rules, interpretative rules, and policy statements as, *inter alia*, "tenuous," "fuzzy," "blurred," "baffling," and "enshrouded in considerable smog."

has binding effects on private parties or on the agency."[28] *Wilderness Soc'y*, 434 F.3d at 595 (quoting *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999)).

First, the RGL does not "impose any rights and obligations," and continues to leave the agency free to exercise discretion when making wetland mitigation determinations.  It provides a guideline for how mitigation decisions should be made, but not the outcome of those determinations.   For example, it states that districts "will consider" certain factors when determining whether a preservation credit will be allowed to be the sole form of mitigation, but it does not dictate a particular outcome.  AR 7:24.  Second, considering the agency's intent, the RGL states that it "does not modify existing mitigation policies, regulations, or guidance."  AR 7:21.  It lists, in the appendix, existing authorities upon which the RGL is based, and states that it "does not establish new requirements."  AR 7:32.  It was not published in the Federal Register or the Code of Federal Regulations, and the language in the RGL does not "evidence an intent on the part of the agency to limit its discretion and create enforceable rights."  *Wilderness Soc'y*, 434 F.3d at 596.  The fact that the RGL "channels" the discretion of Corps employees is not, in itself, dispositive.  *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 600 (5th Cir. 1995).

Thus, RGLs are "issued without notice and comment and do not purport to change or interpret the regulations applicable to the section 404 program . . . [and] are not binding, either upon permit applicants or Corps District Engineers."  *Envtl. Def. v. United States Army Corps of Eng'rs*, No. 04-1575 (JR), 2006 U.S. Dist. LEXIS 47969, at *22 (D.D.C. July 14, 2006); *Hobbs v. United States*, No. 90-1861, 1991 U.S. App. LEXIS 27696, at *12-14 (4th Cir. Nov. 8, 1991) (concluding that the EPA's wetland delineation manuals are interpretive guidance documents

---

[28] Courts have noted that these two tests may overlap, especially as to the last part of the *Molycorp* test.  *See Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002).

without the force of law); *see also United States v. Alameda Gateway Ltd.*, 213 F.3d 1161, 1168 (9th Cir. 2000) (finding that an Engineering Regulation is interpretive rather than substantive because "it was not intended to have the force of law, but was instead a policy statement to guide the practice of district engineers"); Mark A. Chertok, *Federal Regulation of Wetlands*, SM092 American Law Institute – American Bar Association Continuing Legal Education 1235 (2007) ("In addition to its permit issuances, the Corps enacts regulations under Section 404 and publishes non-binding Regulatory Guidance Letters ('RGLs').").  The Plaintiffs have not made a showing that RGLs should be considered binding.

The Plaintiffs argue that the responsibility to mitigate wetlands is also found in another binding document, the *Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army Concerning the Determination of Mitigation Under the Clean Water Act Section 404(b)(1) Guidelines* (Feb. 6, 1990), *available at* http://www.usace.army.mil/cw/cecwo/reg/mou/mitigate.htm (last visited April 21, 2008).  The Memorandum of Agreement states that "[s]imple purchase or 'preservation' of existing wetlands resources may in only exceptional circumstances be accepted as compensatory mitigation.  EPA and Army will develop specific guidance for preservation in the context of compensatory mitigation at a later date."  *Id.*  Without considering whether the MOA is binding on the Corps, this document does not provide guidance for how to determine when wetland preservation will suffice, and, according to the Corps, "RGL 02-02 is the 'specific guidance' that supersedes the memorandum's general terms."  *Fed. Def.'s Opp'n* at 10.

Nonetheless, the Corps followed RGL 02-2 in this case.  The Corps found that the preserved areas "perform important physical, chemical or biological functions . . . ."  AR 7:24-25.  The mitigation plan preserves seventy-six acres of land; approximately half is wetland and

34

the other half upland.  The Corps notes that the preserved areas "contribute [to] habitat diversity" and "will contribute to the preservation of the general area and is considered to contribute to the environmental health of the watershed."  AR 1:35.  The Corps further found that that one of the parcels protected "will preserve the value of Turkey Pond."  *Id.*  Other preserved areas include farm fields that "will add to the diversity of habitat in the area and are a diminishing resource in this part of the watershed area," parcels that include wetland and vernal pools.  *Id.*  While the Corps considered one site as a "wetland establishment area," it determined that "because of the extensive wetlands in the Turkey River Basin, the extensive excavation that would be necessary to insure adequate soil saturation, the small size of the area and the steep slopes that would result, it would not be worth the effort and expense and that simply preserving the farm field would be adequate."  *Id.*

Also consistent with RGL 02-02, the Corps considered whether the properties were "under demonstrable threat of loss or substantial degradation from human activities" not caused by the applicant or otherwise avoidable.  AR 7:25.  The Corps reviewed the mitigation plan and noted that within the seventy-six acres set aside for mitigation, Concord Hospital, during Phase I, had agreed to preserve twenty-eight acres north of the hospital complex, the so-called site number eighteen.  AR 1:35.  Even though the Hospital made this agreement during Phase I, the Corps considered it as mitigation in Phase II, because "the preservation of site # 18 was also intended to be a part of the overall mitigation package for the entire Northwest Bypass Project."  *Id.*  The record contains one study that contemplates the hospital's expansion by approximately 120,000 square feet of office space.[29]  *Fed. Def.'s Opp'n* at 9; AR 5:10; AR 6:1152.  The Corps

---

[29] It is true, as Plaintiffs' claim, that the record does not expressly state where and when Concord Hospital's expansion is anticipated.  The Plaintiffs go on to claim that the record, therefore, does not sustain the Corps' determination of "demonstrable threat."  The Court agrees that it would have been helpful if there had been more record evidence of the immediacy of Hospital's expansion plans and the likelihood that the Hospital planned to

further found that some of the areas preserved could have been developed in the future without a Corps permit.   AR 1:35.   Given the record evidence, the Corps was not unreasonable in determining that the mitigation package was adequate.   *N. Mun. Distributors Group v. FERC*, 165 F.3d 935, 941 (D.C. Cir. 1999) ("Upon examining the record the court inquires whether it can discern a rational connection between the facts found and the choice made by the [agency] . . . . ").

RGL 02-2 states that "[i]f preservation alone is proposed as mitigation, Districts will consider whether the wetlands or other aquatic resources" fulfill the important function and demonstrable threat of loss requirements.   AR 7:24-25.   Thus, the document does not provide a mandatory outcome, but instead provides guidance as to how the Corps should consider various mitigation practices.   In this case, the Corps did consider both the "physical, chemical, or biological functions" of the preserved properties and whether the properties to be preserved were under "demonstrable threat of loss or substantial degradation from human activities."   AR 7:24-25.   The Court will not replace its consideration of these guidance materials for the Corps' own expertise and concludes that the Corps was not arbitrary and capricious in finding that the preserved areas "perform important physical, chemical or biological functions" and that they were under "demonstrable threat of loss or substantial degradation."   *Id.*

### 5.    Effluent Limitations – 33 U.S.C. § 1341(d) Compliance

Plaintiffs claim that the permit "requires the defendant City to comply with two (2) substantially conflicting effluent limitations."   *Compl.* ¶ 339.   The gist of this claim is that the amount of land the City is authorized to fill differs under the state and federal permits.   The state water quality certification (WQC) authorized the City to fill 4.39 acres, while the federal § 404

---

develop site # 18.  But, the evidence does confirm the existence of the Hospital's expansion plans and the proximity of site # 18.  AR 5:464-65.  In view of the Court's standard of review, it cannot conclude that it was unreasonable for the Corps to consider the preservation of this area in evaluating mitigation issues.  AR 5:10, 465; AR 6:1152.

permit (issued by the Corps) limits filling to 3.5 acres.  *Id.* ¶¶ 334, 336.  Plaintiffs claim that "because the description of the effluent acreage limitation in the [WQC] is incorporated as a condition in the [404 Permit], the description of the effluent acreage limitation required by section 1341(d) in the [404 permit] contains an unresolved ambiguity."  *Pls.' Resp. to Corps* at 7 (citation omitted).  Plaintiffs claim that this violates 33 U.S.C. 1341(d), and is arbitrary and capricious.[30]

The administrative record confirms Plaintiffs' factual assertions.[31]  However, the Corps explained the reason for the discrepancy:

> The original alignment for Phase II required filling 4.39 acres, because it avoided the Hillside Condominiums, and the State issued a water quality certification for this alignment, concluding that it would not impair water quality.  However, the City revised the alignment to pass closer to those condominiums, so as to fill fewer wetlands, and the revised permit application to the Corps reflected the lower acreage.  Because the Corps' authorization is to fill *fewer* acres, there is no conflict with the State's water quality certification.

*Corps Opp'n* at 14 (citations omitted).

The Corps also asserts that the City must meet the actual standards set forth in the WQC regardless of the number of acres filled under the 404 permit.  *Id.*  This is supported by the purpose of § 1341: "to preserve the authority for the States to set standards that are more stringent than the level of protection afforded in a federal permit, and, therefore, the purpose of this section is to *supplement* not *supplant* the requirements for obtaining a federal permit."  *Nat'l Ass'n of Home Builders v. United States Army Corps of Eng'rs*, 453 F. Supp. 2d 116, 134

---

[30] 33 U.S.C. § 1341(d) states:
> Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations . . . and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section.

*Id.*
[31] The NHDES WQC states:  "Phase II will require the filling of 4.39 acres (191,228 ft) of wetland . . . ."  AR 4:50.
In its project description, the Corps permit states:  "Place fill in approximately 3.5 acres of wetland . . . ."  AR 1:10.

(D.D.C. 2006) (stating, regarding a nationwide permit, that "nothing in Section 401 implies that a State's limitations or requirements allows that permit seeker to avoid the [Nationwide Permit]-specific requirements to obtain a permit").

The Corps asserts that the Plaintiffs misapply § 1341(d) because they refer to the fill of wetlands as "an effluent acreage limitation."  Regardless of how the Plaintiffs refer to the filling of wetlands, § 1341(d) "allows the State to impose 'other limitations' on the project in general to assure compliance with various provisions of the Clean Water Act and with 'any other appropriate requirement of State law.'"  *PUD No. 1 of Jefferson County v. Washington Dep't of Ecology*, 511 U.S. 700, 711 (1994).  These "other limitations . . . become a condition on any Federal license or permit subject to the provisions" of § 1341.  33 U.S.C. § 1341(d).  Here, where the federal requirement is more stringent than the state requirement, there is no "ambiguity" as to what standard the permittee must follow.[32]

### B.    Scope of the Environmental Assessment & Cumulative Impacts

Plaintiffs charge the Corps with "incremental segmentation," meaning that the Corps considered the impacts of Phase II alone when it should have considered the impacts of the entire Northwest Bypass as a whole.[33]  As described above, the Northwest Bypass project initially envisioned three "Phases."  Phase I "entailed widening Pleasant Street, to provide turning lanes, a traffic signal at the intersection and a new hospital complex access road."  AR 1:32.  Phase I

---

[32] Plaintiffs also assert that the Corps failed to "describe the effluent limitation it intends as a permit condition." *Pls.' Resp. to Corps* at 7.  The Corps responds that the limitations described in the 404 permit are not "effluent limitations." *Corps Reply* at 10 (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992)).  Regardless of the nomenclature, the EA limits the fill to 3.5 acres and the City must meet this requirement to go forward with Phase II. AR 1:32.

[33] As a related segmentation issue, Count V of the Complaint asserts that the Corps considered an incomplete application; that is, that the Corps provided permitting of Phase II "without determining the impacts of constructing the full project for which the permit is sought." *Compl.* ¶ 257.  Plaintiffs claim that because "[c]onstruction of Phase I, Phase II, and Phase III of the Northwest Bypass are reasonably related activities," *id.* ¶ 71, the permit application should have included consideration of Phase I (already constructed) and Phase III (foreseeably constructed).  *Id.* ¶¶ 250-52.  However, the EA reflects that Phase III did receive some attention from the Corps.  *See* AR 1:32 ("The City asserts that it has no present plans to construct Phase 3 of the original project and has requested authorization to fill only those wetlands in the path of Phase 2.").

has been completed.  *Id.*  Phase II is the project that is under consideration in the EA before the Court.  Phase III "would extend from the Phase I access drive approximately 1 mile north to join Penacook Street near the intersection of Rumford Street in the north central part of the city."  *Id.*  "The City asserts that it has no present plans to construct Phase 3 of the original project and has requested authorization to fill only those wetlands in the path of Phase 2."  *Id.*

The Plaintiffs assert that the Corps was arbitrary and capricious concerning two related issues: first, that Phase II and Phase III are connected or cumulative actions under the Federal Regulations, 40 C.F.R. § 1508.25(a)(1)-(2), and therefore cannot be segmented, and second, that the Corps improperly analyzed the cumulative impacts of the project under 40 C.F.R. §§ 1508.07, 1508.25(a)(3).

### 1.     Segmentation:  Connected and Cumulative Actions

Under 40 C.F.R. § 1508.25, an agency is required to consider connected, cumulative, or similar actions in the same environmental impact statement.[34]  *Id.*  The regulation defines "connected actions" as those that are "closely related and therefore should be discussed in the same impact statement."  40 C.F.R. § 1508.25(a)(1).  According to the regulation, actions are connected if they: "(i) Automatically trigger other actions which may require environmental impact statements; (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; [or] (iii) Are interdependent parts of a larger action and depend on the larger action for their justification."  40 C.F.R. § 1508.25(a)(1)(i)-(iii).  "Cumulative actions" are those that, "when viewed with other proposed actions have cumulatively significant impacts."  40 C.F.R. § 1508.25(a)(2).  Finally, "similar actions" are those "which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for

---

[34] 40 C.F.R. § 1508.25 is part of the Council on Environmental Quality (CEQ) regulations promulgated pursuant to NEPA.

evaluating their environmental consequences together, such as common timing or geography." 40 C.F.R. § 1508.25(a)(3).  The regulation states that an agency "*may wish* to analyze similar actions in the same impact statement."  *Id.* (emphasis added).  This subsection provides much more latitude to the Corps than connected and cumulative actions and "provides no basis for finding a violation of NEPA."  *North Carolina Alliance for Transp. Reform, Inc. v. United States Dep't of Transp.*, 151 F. Supp. 2d 661, 684 n.19 (M.D.N.C. 2001).

Connected and cumulative actions are considered in the EA "to assure that decisionmakers, as well as the public, are aware of the environmental impacts of the entire project, as *an interconnected whole,* so as to avoid irreversible commitment to an entire project on the strength of a segmented analysis of the impacts associated with something less than the entire project."  *Sierra Club v. Marsh*, 744 F. Supp. 352, 364 (D. Me. 1990).  Thus, courts have found segmentation improper when the segmented project "has no independent justification, no life of its own, or is simply illogical when viewed in isolation."  *One Thousand Friends v. Mineta*, 364 F.3d 890, 894 (8th Cir. 2004) (quoting *Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1139 (5th Cir. 1992)) (quotations omitted).[35]

Under the regulations, Phase III is not a "connected action" to the Phase II proposal. Plaintiffs have provided no evidence that Phase II would "automatically trigger" Phase III or that Phase III "cannot or will not proceed" unless Phase II is undertaken "previously or simultaneously."  40 C.F.R. § 1508.25(a)(1), (2).  Further, contrary to the Plaintiffs' assertions, Phase II is not "an interdependent part[] of a larger action," and does not depend on the "larger

---

[35]  In *One Thousand Friends*, the Eighth Circuit concluded that a highway interchange was not improperly segmented because the interchange had independent utility.  364 F.3d at 894.

action" of the whole proposed bypass for its justification.[36]  *Id.* § 1508.25(a)(iii).  As stated in the Preliminary Injunction Order, "the Phase II project alone – taking away the existence of Phase I or the possibility of a Phase III – has a clear independent utility: to relieve traffic congestion, promote public safety, and provide a more direct route to the hospital."  *Northwest Bypass II*, 470 F. Supp. 2d at 48.  The Corps was not arbitrary and capricious when it found that Phase II alone would "relieve traffic congestion and to allow for the safe and efficient flow of traffic in this quadrant of the city.  Improved pedestrian safety is an inherent part of the basic project purpose."  AR 1:32.

Finally, Phases II and III are not "cumulative action[s]" because there is no evidence that Phase III is a "proposed action" under the regulations.  40 C.F.R. § 1508.25(a)(2).  A "proposed action" "exists at that stage in the development of an action when an agency subject to [NEPA] has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated."  40 C.F.R. § 1508.23.  The Corps states that "[t]here has not been a proposal to pursue Phase III since the City submitted its Section 404 application for Phase II to the Corps in 2000," *Fed. Def.'s Opp'n* at 12, and Plaintiffs provide no evidence to the contrary.  Therefore, the Corps was not arbitrary and capricious in determining that Phase III is not a cumulative action, a connective action, or a similar action to the Phase II proposal.

### 2.    Cumulative Impacts

Plaintiffs also claim that the Corps did not properly consider the cumulative impacts of Phase II.

---

[36] Plaintiffs contend that the purpose of Phase II is largely the same as "those advanced for the Northwest Bypass as a whole."  *Pls.' Mot.* at 24.  However, the issue is whether justification for Phase II depends on Phase III, not whether their purposes are similar or even identical.

> '[C]umulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.  If an agency lacks the information to perform a cumulative impact analysis, "the agency shall always make clear that such information is lacking." 40 C.F.R. § 1502.22.

At issue is whether Phase III should have been considered a "reasonably foreseeable future action[] . . . ." 40 C.F.R. § 1508.7.  The First Circuit has stated that the agency "need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.  In this context, reasonable foreseeability means that the impact is sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision." *Dubois*, 102 F.3d at 1286 (citations and internal punctuation omitted).  According to the First Circuit,

> Whether a particular set of impacts is definite enough to take into account, or too speculative to warrant consideration, reflects several different factors.  With what confidence can one say that the impacts are likely to occur?  Can one describe them 'now' with sufficient specificity to make their consideration useful?  If the decisionmaker does not take them into account 'now,' will the decisionmaker be able to take account of them before the agency is so firmly committed to the project that further environmental knowledge, as a practical matter, will prove irrelevant to the government's decision?

*Sierra Club v. Marsh*, 976 F.2d 763, 768 (1st Cir. 1992) (quoting *Sierra Club v. Marsh*, 769 F.2d 868, 878 (1st Cir. 1985)).

The First Circuit has also suggested that "reasonably foreseeable" means that the project is "imminent" or "inevitable." *Airport Impact Relief v. Wykle*, 192 F.3d 197 (1st Cir. 1999) (quoting *Village of Grand View v. Skinner*, 947 F.2d 651 (2nd Cir. 1991)); *Sierra Club*, 976 F.2d at 768.  In *Airport Impact Relief*, the appellants claimed the Federal Highway Administration's

environmental review of the Central Artery/Tunnel Project should have included an analysis of a potential move and expansion of a service road near Logan Airport. *Airport Impact Relief*, 192 F.3d at 200. Emphasizing that the state had not received the necessary permits and approvals to expand the airport and there was no evidence of plans or funding for such a project, the District Court found that the potential project could not be considered a "cumulative impact" under the regulations. *Airport Impact Relief, Inc. v. Wykle*, 45 F. Supp. 2d 89, 105 (D. Mass. 1999), *aff'd* 192 F.3d 197, 206 (1st Cir. 1999).

Plaintiffs here have a stronger case. Until the 1990s, the City studied and proposed the "Northwest Bypass" as one project. AR 1:39. Phase III has been proposed in the City's budget, albeit as an "out year" project in the City's six year Capital Improvement Program and Budget.[37] AR 1:139. Several studies have been done on the impacts of all three phases together, including the influential RSG study.

At the same time, the City has stated that it does not have plans to go forward on Phase III, and if Phase III were initiated, it appears likely to take years before the project can be evaluated by the appropriate authorities. AR 1:32; *see Airport Impact Relief*, 192 F.3d at 206. Furthermore, even if Phase III is describable with some amount of specificity, because Phase II

---

[37] The City attached to its objection to the Plaintiffs' motion for summary judgment an affidavit from Martha Drukker, which explains that although Phase III is part of the budget, it is included in a section "with only general information for future reference so that [it] can be referred to during future discussions relating to when and if those projects will actually be considered for implementation." *Concord Obj.* Attach. 3 at ¶ 6. The Plaintiffs object to the Court's consideration of the Drukker affidavit, since it was "not part of the administrative record." *Pls.' Reply to City* at 2.

    This particular contra dance between the parties raises an interesting question. In their motion for summary judgment, the Plaintiffs point to the administrative record, which contains the City's permit application cover letter to the Corps, stating in part that Phase III is identified in the out years of our six (6) year Capital Improvement Program and Budget to connect through to Penacook and North State Streets." AR 1:139. The Plaintiffs say that the "inclusion of Phase III in the City's governing budget plan . . . makes it a far cry from being 'too speculative to mandate . . . consideration.'" *Pls.' Mot.* at 25-26 (internal punctuation and citation omitted). The City responded by providing an affidavit from the City's Project Manager, explaining the inclusion of Phase III within the context of the City's budgetary practices. The Court is not clear that considering the Drukker affidavit, which provides context for a point the Plaintiffs raised in their dispositive motion, would improperly go outside the administrative record. But, in excess of caution, the Court will not consider the Drukker affidavit.

stands on its own merit in supporting its purposes, the relevant agencies will not be "so firmly committed" to Phase III that they will not be able to consider the environmental consequences of that project if it is proposed. *Sierra Club*, 976 F.2d at 768. The Court concludes that on this record, the Corps was not arbitrary and capricious in not including Phase III as a cumulative impact, because it is too speculative to be "reasonably foreseeable." 40 C.F.R. § 1508.7.

### 3.    Secondary Impacts

The Court extensively discussed secondary impacts in its Order on the motion for preliminary injunction. *See Northwest Bypass II*, 470 F. Supp. 2d at 48-49. In response to the Corps' motion for summary judgment, rather than rebrief the issue, the Plaintiffs elected to adopt their prior argument. *Fed. Defs.' Mot.* at 11-12; *Pls.' Resp. to Corps.* at 6. The Plaintiffs did not raise the question separately in their motion for summary judgment. *Pls.' Mot.* at 22-26. To the extent the Corps' consideration of secondary impacts remains a current controversy, the Court adopts the reasoning in its earlier ruling. *Northwest Bypass II*, 470 F. Supp. 2d at 48-49.

### C.    Historic Preservation

Section 106 of the National Historical Preservation Act (NHPA) requires that before issuing any license, a federal agency must "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register."[38]  16 U.S.C. § 470f. In addition, the agency must "afford the Advisory Council on Historic Preservation (ACHP) . . . a reasonable opportunity to comment with regard to such undertaking." *Id.* In other words, "Section 106 is characterized aptly as a requirement that agency decisionmakers 'stop, look, and listen,' but not that they reach particular outcomes."

---

[38] The Court considered the Plaintiffs' historic preservation arguments extensively in its prior orders, particularly in the Preliminary Injunction Order. *Northwest Bypass II*, 470 F. Supp. 2d at 54-59; *Northwest Bypass I*, 453 F. Supp. 2d at 339-41. The Court incorporates its reasoning and findings regarding the NHPA from these earlier orders and explicitly discusses here only those arguments raised by the Plaintiffs in their summary judgment motion or assertions  not considered elsewhere.

*Narragansett Indian Tribe v. Warwick Sewer Auth.*, 334 F.3d 161, 166 (1st Cir. 2003).  As the

First Circuit observed in *Narragansett*, the obligation to "consult" can "lead to differing views

and to conflicting judicial interpretations."  *Id.*  However, the NHPA "delegates authority to the

[ACHP] to promulgate regulations interpreting and implementing § 106" and the ACHP has

"issued detailed regulations to give substance to § 106's consultation requirements."  *Id.*

Federal regulations provide the framework for an agency to assess the impact of a federal

action on historic properties.  The agency must first determine whether the proposed federal

action "is a type of activity that has the potential to cause effects on historic properties."  36

C.F.R. § 800.3(a).  If so, the agency must identify the State Historic Preservation Officer (SHPO)

"to be involved in the section 106 process."[39]  *Id.*  Next, the agency, in consultation with the

SHPO, must "make a reasonable and good faith effort" to identify the historic properties that

could be affected by the proposed action.[40]  36 C.F.R. § 800.4.  Third, the agency must assess

any "adverse effects" to identified historic properties.[41]  36 C.F.R. § 800.5.   Fourth, in

consultation with the SHPO, the agency official "shall plan for involving the public in the section

106 process."  36 C.F.R. § 800.3(e).  Finally, the agency must try to resolve the adverse effects

by developing and evaluating alternatives to the project "that could avoid, minimize, or mitigate

adverse effects on historic properties."  36 C.F.R. § 800.6(a).  This final section also addresses

the so-called "memorandum of agreement," the culmination of the process.  "A memorandum of

---

[39] The New Hampshire Division of Historical Resources (NHDHR) acts as the State's SHPO.

[40] This also involves applying "the National Register criteria to properties identified within the area of potential effects that have not been previously evaluated for National Register eligibility."  36 C.F.R. § 800.4(c).

[41] The criteria are defined:

> An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association.  Consideration shall be given to all qualifying characteristics of a historic property, including those that may have been identified subsequent to the original evaluation of the property's eligibility for the National Register.  Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative.

36 C.F.R. § 800.5.

agreement executed and implemented pursuant to this section evidences the agency official's compliance with section 106 and this part and shall govern the undertaking and all of its parts. The agency official shall ensure that the undertaking is carried out in accordance with the memorandum of agreement." 36 C.F.R. § 800.6(c).

In their Complaint, Plaintiffs essentially allege that the Corps did not follow the procedure set forth in § 106 and implementing regulations.[42] The court considers these alleged violations below.[43]

### 1. The Tuttle House

The Tuttle House is a property listed on the National Register of Historic Places and is in the path of the Phase II proposal. AR 3:106. According to the Complaint, the Corps committed several violations of § 106 of the NHPA, "by failing to make a reasonable and good faith effort to involve the Tuttles and consider their views," *Compl.* ¶ 397, by failing to make "information available to the public" and failing to provide "an opportunity for members of the public to express their views," *Compl.* ¶ 398, and "by failing to make a reasonable and good faith effort to adequately minimize or mitigate the adverse effects on the Tuttle House in the final Memorandum of Agreement (MOA)." *Compl.* ¶ 400. In their amended memorandum in opposition to the City's motion, the Plaintiffs assert that because the Corps met with the Tuttles two years before the City purchased a relocation site for the Tuttle home, but did not meet again

---

[42] Regarding any potential standing argument brought by the Corps, *Corps' Mot.* at 15, and as stated in the Court's *Order on Plaintiffs' Motion for Preliminary Injunction*, the Court concludes for independent reasons that Plaintiffs failed to show that the Corps was arbitrary and capricious in its consideration of historic preservation issues, the Court need not reach the standing arguments.

[43] Plaintiffs also allege that the Corps failed to apply 36 C.F.R. part 68. *Compl.* ¶¶ 358, 419. However, these regulations "set forth standards for the treatment of historic properties containing standards for preservation, rehabilitation, restoration and reconstruction." 36 C.F.R. § 68.1. According to the Corps, "construction of Phase II does not involve any such actions, and therefore the provisions" do not apply. *Corps' Mot.* at 21. Plaintiffs do not respond to this argument, and it appears that Phase II does not implicate Part 68.

with the Tuttles, that the Corps failed to meet its statutory and regulatory responsibilities.  *Pls.'*
*Am. Mem. in Opp'n to City* at 4-5.

      The administrative record does not support the allegation that the Corps failed to meet its
duties.  Rather, the record reflects that the Corps fulfilled their "stop, look, and listen"
responsibilities with regard to the Tuttle House.  *Narragansett Indian Tribe*, 334 F.3d at 166.  On
October 6, 2000, the Corps, along with other city and state officials, met with the Tuttles and
their attorney to discuss the relocation of their home.  AR 3:28, 57-58.  Various relocation sites
were considered and the relocation process was explained.  *Id.*  On March 12, 2001, the Corps
wrote the Advisory Council on Historic Preservation (ACHP) in Washington, informing them
that the City had applied for a Section 404 permit and that three National Register properties,
including the Tuttle House, would be adversely affected.  AR 3:47.  A public hearing was held in
April 2001.  AR 3:1.  The City also repeatedly offered to purchase the Tuttle's land, relocate
their house, and provide financial settlement.  AR 3:25-26, 35-36.  After several years of
negotiations, the Tuttles decided they were simply too old to move.  AR 3:1.  In spite of the
Tuttles' objections, the SHPO supported the City's purchase of a site for the relocation of the
Tuttle home.  AR 3:32.  On December 4, 2004, a Memorandum of Agreement was signed by the
Corps, the SHPO, and the City, outlining plans to relocate the Tuttle Home.  AR 3:3-7.  The
Tuttles were not signatories, but were invited to discuss the MOA with the City, which the
Tuttles declined. [44]  AR 3:1, 7:9-10.  Observing that the City "is determined to proceed, even if it
requires they take the house by eminent domain," the Corps decided to issue a section 404
permit.  *Id.*

---

[44] If there is a resolution without the ACHP, then the only required signatories to the memorandum of agreement are
the agency official and the SHPO.  36 C.F.R. § 800.6(c)(1)(i).  The agency may, but is not required to, invite other
signatories.  *Id.* § 800.6(c)(3).  Here, the MOA was signed by the SHPO and the Corps's district engineer.  The
Concord city manager also concurred in the agreement, pursuant to 36 C.F.R. § 800.6(c)(3).

Contrary to Plaintiffs' position, the administrative record confirms that the Corps complied with the consultation regulations of NHPA.  As "consultation is not the same thing as control over a project," the Plaintiffs' claims regarding the Tuttle home fail.  *Narragansett Indian Tribe*, 334 F.3d at 168.


###           2.       Pleasant View Home

Plaintiffs argue that the Corps failed to "identify, evaluate and take into account" certain adverse effects to the Pleasant View Home that it contends will arise with the construction of Phase II.  *Pls.' Mot.* at 26.  Plaintiffs focus on the grounds of the Pleasant View Home, which were planned by landscape architect Arthur Shurcliff.  *Id.* (quoting *Compl.* ¶ 424; (citing AR 3:146-150)).  They claim that the Corps did not "take into account the effect of the [parkway]" on the Pleasant View Home as required by 16 U.S.C. § 470f.  Plaintiffs paint a beautiful picture of the grounds that will be impacted, but their arguments do not meet the standards set out in the NHPA.

After finding that the project results in adverse effects to the Pleasant View Home, 33 C.F.R. § 800.5, the Corps must consult with the SHPO "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties."  33 C.F.R. § 800.6(a).  Here, the record shows that the Corps considered impacts to the Pleasant View Home property in a 1993 meeting with the SHPO.  AR 3:120 (mentioning "mitigation visual screening[;] need landscape plan").  Further, the City held several meetings which discussed the property, and the minutes of those meetings were on the record.  AR 3:63 (describing, in Sept. 12, 2000 minutes, discussion of visual screens and sound buffers for the Pleasant View Home property); AR 3:59 (stating in Oct. 4, 2000 minutes that "special

effort be made with regard to the landscaping improvements in order to limit the visual impacts to the property").

The Memorandum of Agreement that the Corps entered into with the SHPO shows that the Corps consulted with the SHPO to develop mitigation to counter adverse effects on the property.  AR 1:14, 16 (requiring "trees, other plantings, and fencing . . . to mitigate adverse visual and audible impacts . . . .").  While Plaintiffs argue that the Corps did not consider the adverse impacts to the "meadowland" that will be bifurcated by the parkway, the MOA requires that the severed section of the meadow to be "held in protective easement," and requires specific upkeep to "maintain the area as good songbird habitat into the foreseeable future and the cultural land use and setting of the Pleasant View property."  AR 1:16.  In addition, Plaintiffs argue that the Corps did not properly consider the noise impacts to the Pleasant View Home.  *Compl.* ¶¶ 430-31.  Regarding technical issues such as noise impacts, "[t]he methodology used . . . is a matter of agency expertise."  *City of Oxford v. FAA*, 428 F.3d 1346, 1358 (11th Cir. 2005).  In *City of Oxford*, the Federal Aviation Administration (FAA) regulations established a particular methodology for measuring airport noise impacts, and the court upheld the agency's determination.  *Id.*  However, *City of Oxford* does not stand for the proposition that the Corps had to use some particular technical methodology to measure the noise from a local road, and Plaintiffs cite no regulation requiring a particular Army Corps methodology for such a measurement.  Further, in this case, the SHPO did not request any further auditory tests, and, as stated above, the EA requires mitigation for noise impacts to the property.

According to the FHPA regulations, "[a] memorandum of agreement executed and implemented pursuant to [36 C.F.R. § 800.6] evidences the agency official's compliance with section 106 and this part . . . ."  36 C.F.R. § 800.6(c); *Advocates for Transp. Alternatives, Inc. v.*

*United States Army Corps of Eng'rs*, 453 F. Supp. 2d 289, 313 (D. Mass. 2006).  The Corps was

not arbitrary and capricious in its consideration of effects to Pleasant View Home.

### 3.      Consideration of Alternatives

Plaintiffs claim that the Corps failed to "develop and evaluate alternatives that could

avoid the undertaking's adverse effects on historic properties."  *Pls.' Mot.* at 26 (quoting *Compl.*

¶ 367).   Instead of providing separate evidence regarding this "failure," Plaintiffs rely on their

arguments concerning practicable alternatives under the Clean Water Act.  *Id.*  As stated above,

the relevant NHPA regulations require the Corps "to develop and evaluate alternatives or

modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on

historic properties."  36 C.F.R. 800.6(a).  The record shows that the Corps consulted with the

New Hampshire SHPO and developed "alternatives or modifications" to minimize and mitigate

the effects to historic properties.  AR 1:14-17; *see also Lesser v. City of Cape May*, 110 F. Supp.

2d 303, 325 (D.N.J. 200), *aff'd by* 2003 U.S. App. LEXIS 21182 (3rd Cir. Oct. 17, 2003)

(finding that under historic preservation regulations, "there is no binding authority which

required the City to consider prudent and feasible project alternatives"); *Wicker Park Historic*

*Dist. Pres. Fund v. Pierce*, 565 F. Supp. 1066, 1076 (N.D. Ill. 1982) ("These references to

alternatives are thus more sensibly interpreted as applying only to changes in the *existing*

proposal that could make it more compatible with its surrounding environment.  If we were to

adopt plaintiffs' argument that HUD must consider completely independent and different

proposals for the use of federal funds, *i.e.*, construction outside the historic district or

rehabilitation of existing housing within it, then any proposal for construction within a historic

district would always have to be rejected since the alternatives would always create less of an

impact on the district.  This court does not believe the NHPA was intended to go so far.").

Finally, to the extent the Plaintiffs have adopted their Clean Water Act argument, the Court in turn adopts its earlier discussion and having found that the Corps properly considered alternatives under the Clean Water Act, the Court also concludes that the Corps properly considered alternatives under NHPA § 106.

Plaintiffs also contend that the Corps "did not make information available to the public concerning efforts to 'develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties.'" *Compl.* ¶ 371 (quoting 36 C.F.R. § 800.6(a)). The Administrative Record shows that the Corps issued public notice in December 2000, requesting public comments regarding the proposed project. AR 1:121. The notice stated that "considerable likelihood exists for the proposed work to effect properties listed on the national (sic) Register of Historic Places . . . and further consideration of the requirements of Section 106 of the National Historic Preservation Act of 1966, as amended, is necessary." AR 1:122. The notice continues, alerting the public to ongoing consultation with the City and SHPO and the development of the MOA. *Id.* The State held two public hearings (one regarding the "Northwest Bypass" before it was split into parts and one regarding Phase II) attended by the Corps, and comments at these meetings included concerns about historic properties. The Corps then properly considered historic preservation issues in its EA. AR 1:37, 41, 43. Via participation in the public hearings and review of the record, the Corps complied with the "listen" requirements of the NHPA. *See Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 333 (D. Mass. 2005).

### 4.   Documentation and Public Participation Requirements

In their Complaint, Plaintiffs state that the EA violates § 106 because it "does not contain '[a] description of the affected historic properties, including information on the characteristics

that qualify them for the National Register.'" *Compl.* ¶ 369 (quoting 36 C.F.R. § 800.11(e)(3)). The Corps responds that the regulation "*permits* the use of NEPA documents to comply with documentation requirements, but does not require such use." *Corps' Mot.* at 22 (citing 36 C.F.R. § 800.11(b)) (emphasis in *Corps' Mot.*).  In addition, the Corps emphasizes that there is nothing in the NHPA regulations that requires the Corps to prepare an EA or EIS.  *Id.* at 22.  Rather, the agency must make sure that its findings are "supported by sufficient documentation to enable any reviewing parties to understand its basis."   36 C.F.R. § 800.11(a).   The underlying documentation in this case described the properties (AR 3:124-39, 142-67), included notes from meetings regarding impacts to those properties (AR 3:57-65, 6:46), public comments (AR 2:1-587), and the MOA (AR 3:3-12).  The EA is supported by this documentation and, in accordance with CEQ requirements, 40 C.F.R. § 1508.9(b), provides a description of the impacts to the historic properties and states that "[a]n MOA has been developed to take into account the impacts to historic resources and to ameliorate the adverse affects to the maximum extent practicable."  AR 1:37, 41.

### D. NEPA

Plaintiffs argue, on summary judgment, that the Corps' decision, under NEPA, 42 U.S.C. §§ 4321 et seq., to prepare an EA instead of an EIS was arbitrary and capricious.  *Pls.' Mot.* at 28.  NEPA "declares a broad national commitment to protecting and promoting environmental quality."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989).  The role of the reviewing court under NEPA is somewhat limited: "The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken."  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) (citations omitted); *see also Dubois*, 102 F.3d at 1284;

33 Charles Alan Wright & Charles H. Koch, Jr., Federal Practice & Procedure § 8335 (current through 2008 update) ("Without engaging in review of the actual resolution of factual questions of this variety, courts, by using the hard look standard, assure that the agency did a careful job at fact gathering and otherwise supporting its position.").

### 1.    FONSI Review

CEQ NEPA regulations set forth ten factors to determine whether a proposal will result in a significant impact and require an EIS, otherwise the agency will make a Finding of No Significant Impact (FONSI).[45]  40 C.F.R. § 1508.27(b).  Plaintiffs argue that the Corps failed to properly consider several of these factors.  The Court's role "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Coal. on Sensible Transp. Inc. v. Dole,* 826 F.2d 60, 66 (D.C. Cir. 1987) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97-98 (1983)).  Review of an agency's FONSI is conducted under a four part analysis:

---

[45]The regulations state the following list should be considered:
  (1) Impacts that may be both beneficial and adverse.  A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
  (2) The degree to which the proposed action affects public health or safety.
  (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
  (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
  (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
  (6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.
  (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.  Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment.  Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.
  (8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.
  (9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.
  (10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.
40 C.F.R. § 1508.27(b).

First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Coal. on Sensible Transp.*, 826 F.2d at 67; *see also City of Waltham v. United States Postal Serv.*, 786 F. Supp. 105, 121 (D. Mass. 1992); *Advocates for Transp. Alternatives*, 453 F. Supp. 2d at 289.

The four-factor analysis does not favor the Plaintiffs' position. First, the Corps identified and outlined the relevant environmental concerns, including the impact on wetlands, traffic concerns, and historical properties. In their motion, Plaintiffs first claim that "the Corps completely failed to accurately identify recreational and educational resource concerns that are highly relevant to the project" under the first part of the FONSI analysis. *Pls.' Mot.* at 28. To support this claim, they cite arguments discussed under the CWA section of this Order. As discussed above, this claim fails because the Corps' consideration and weight of the recreational and educational impacts was not arbitrary and capricious.

Plaintiffs then claim that under the second part of the FONSI analysis, the agency did not take a "hard look at the traffic problem" and that the record includes "a factually unsupported conclusion of a *net* traffic benefit and the indisputable fact that no traffic modeling has been done for the building of Phase II *plus* the closure of Silk Farm Road/Dunbarton Road . . . ."[46] *Pls.' Mot.* at 29. Notwithstanding the Plaintiffs' earnest arguments, the record reflects that the agency took the mandatory "hard look" at the traffic problem in preparing the EA. The record contains a detailed traffic study prepared for the City in 1998 by Resource Systems Group, which

---

[46] Plaintiffs also claim, under the second part of the FONSI analysis, that the Corps did not properly consider whether the project was "highly controversial." The Court considers this issue separately below.

concluded that construction of the new Parkway would decrease traffic on South Fruit Street, and "the new Parkway will contribute to the convenience of the street network in Concord and reduce traffic volumes at nearby parallel roads."[47]  AR 6:602.

Plaintiffs assert that under the third part of the FONSI analysis, "the EA/SOF discusses traffic impacts in conclusory fashion, dismissing the concern that Phase II 'will attract much traffic to residential neighborhoods.'"  *Pls.' Mot.* at 29 (quoting AR 1:40).  Plaintiffs continue: "The insufficiency of the rest of the case made for a FONSI by the Corps, which concerns issues identical to those discussed, *supra*, is equally apparent, based on the discussions above."  *Id.* Since the Court found that the Plaintiffs' conclusions are not "equally apparent" in its discussion of the CWA claims, the Plaintiffs' arguments under NEPA must fail.  The Court concludes that the Corps outlined a convincing case for its FONSI.  *See* AR 1:40-41.

Finally, concerning the fourth part of the FONSI analysis, Plaintiffs argue that the Corps was mistaken in finding that there were no "impacts of true significance," and therefore, the Corps must "accomplish" impact minimization.  *Pls.' Mot.* at 29.  Plaintiffs continue: "Given a correct finding that 'impacts of true significance' exist, however, the rule does not require simply a finding that minimization of any detrimental effects has been 'sought'; such minimization must have been accomplished, and that has not been shown."  *Id.*  The EA states that the "effects on wetlands are minor, unavoidable and adequately mitigated," and that the project "is not a major federal action significantly affecting the quality of the human environment."  AR 1:42-43.  The City's expert supports this finding.  AR 6:35-36 (noting, after a description of the impacts of the project, that "[n]one of the above mentioned impacts are to wetlands of high value . . . .  While the overall complex may have high functions and values, the actual impacts, if located to the

---

[47] While it is true that this report does not include the closure of Dunbarton and Silk Roads, the Court has already found that the use of the report to model the benefits of Phase II, including the closure of those roads, as permitted by the Corps to be reasonable, and not arbitrary and capricious.

edge of the complex as proposed, will not have significant impacts").  The Court finds that the Corps was not arbitrary and capricious in finding that there were no "impacts of true significance," so the fourth factor does not apply.  Nonetheless, the Corps, in conjunction with the City and NHDES, sought to minimize any detrimental effects.  Having reviewed the administrative record, the Court concludes that the Plaintiffs have not shown that the Corps' FONSI conclusion and its decision not to proceed with an EIS were arbitrary or capricious.

### 2.        Whether the Effects are "Highly Controversial"

Plaintiffs also contest the Corps' finding that an EIS is not required, arguing that under 40 C.F.R. § 1508.27(b), the Corps did not properly consider "[t]he degree to which the effects on the quality of the human environment are likely to be *highly controversial*."  *Pls.' Mot.* at 29 (quoting 40 C.F.R. § 1508.27(b)(4)).  The Corps responds that this regulation "establish[es] that NEPA controversy must involve disagreement over the effects on the environment, not merely the popularity of a proposal."  *Fed. Def.'s Opp'n* at 18.

The First Circuit has not defined "highly controversial."  *Advocates for Transp. Alternatives, Inc.*, 453 F. Supp. 2d at 303.  However, as the Fourth Circuit has pointed out, and as common sense dictates, the term "controversial" is not synonymous with "opposition."  *See North Carolina v. FAA,* 957 F.2d 1125, 1134 (4th Cir.1992) (adding that "[o]therwise, opposition, and not the reasoned analysis set forth in an environmental assessment, would determine whether an environmental impact statement would have to be prepared . . . .  The outcome would be governed by a 'heckler's veto.'").

To support their argument that "highly controversial" includes "reasonable disagreement concerning the facts in dispute," Plaintiffs cite *Save Our Heritage, Inc. v. FAA*, in which the First Circuit considered a FAA regulation that requires at least an environmental assessment (as

opposed to merely a categorical exclusion) if "the proposed action was 'highly controversial on environmental grounds.'"  269 F.3d 49, 60-61 (1st Cir. 2001) (stating that the FAA regulations indicate that this test is met if the "'action' in question is 'opposed on environmental grounds by a Federal, State, or local government agency or by a substantial number of the persons affected'").  In *Save Our Heritage*, the FAA argued that the First Circuit should adopt a reading of "highly controversial" that "does not depend on whether vocal opponents exist but on whether reasonable disagreement exists over the project's risk of causing environmental harm." *Id.* at 61. The First Circuit disagreed, and directly contrasted the FAA regulation with 40 C.F.R. § 1508.27(b)(4), finding differences in the language of the two regulations that resulted in divergent outcomes. *Id.* (stating that "[b]y contrast, the decisions on which the FAA relies interpret 'controversial' as used in other regulations, where the term modifies 'effects' – phrasing more helpful to the FAA's reading," and citing 40 C.F.R. § 1508.27(b)(4) as an example).

Plaintiffs also rely on *Center for Biological Diversity v. United States Fish and Wildlife Serv.*, in which the Western District of Texas compiled cases and found that "highly controversial" means "a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use," but also emphasized the number of objections made to various projects.  202 F. Supp. 2d 594, 568 (W.D. Tex. 2002).  However, despite some emphasis on the number of comments, the overriding issue in *Center for Biological Diversity* (and the cases it collects) is whether there is a controversy that "cast[s] substantial doubt on the adequacy of the [agency's] methodology and data." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001).  In other words, a "federal action [is] controversial if 'a substantial dispute exits as to [its] size, nature, or effect.'" *Advocates for Transp. Alternatives*, 453 F. Supp. at 304 (quoting *Greenpeace Action v. Franklin*, 14 F.3d 1324,

1333 (9th Cir. 1992)).  Further, mere disagreement among experts does not rise to this standard. *Greenpeace Action*, 14 F.3d at 1335 (stating that controversy does not exist merely "whenever qualified experts disagree").  Here, Plaintiffs rest their argument on the number of persons opposed to the Northwest Bypass and do not make an express claim that the controversy itself is "a substantial dispute" due to its "size, nature, or effect."  *Id.* at 1333 (quoting *Found. for N. Am. Wild Sheep v. United States Dep't of Agric.*, 681 F.2d 1172, 1182 (9th Cir.1982)).  Because the Northwest Bypass has stirred opposition and controversy in a lay sense does not mean that it is "highly controversial," so as to require an EIS under 40 C.F.R. § 1508.27(b)(4).[48]

## VI.   CONCLUSION

The Plaintiffs have not shown that the Corps was arbitrary and capricious in its findings regarding Phase II of the Northwest Bypass regarding the Clean Water Act, the National Environmental Policy Act, or the National Historic Preservation Act.  The Court, therefore, GRANTS summary judgment in favor of Defendants the U.S. Army Corps of Engineers, the

---

[48] According to the Plaintiffs,

> The Corps' notes from the April 9, 2001 State hearing devote five (5) pages to supporters, AR 2:286-89; AR 2:299, and eight (8) pages to opponents, AR 2:290-98.  In response to its request for comments, the Corps received a single supportive comment from the public, *i.e.*, not from the City, Concord Hospital or St. Paul's School, consisting of a single page, AR 2:322, and ten (10) opposing comments spanning seventy eight (78) pages, AR 2:217-18; AR 2:220 to AR 2:285 [only first and last in appendix]; AR 2:323-324; AR 2:325; AR 2:327; AR 2:328; AR 2:329-30; AR 2:331; AR 2:332; and AR 2:336.  The transcript of the second state hearing, on November 28, 2001, showed no waning of opposition, whose testimony spans 114 pages (AR 2:72 to AR 2:185) [only first and last in appendix] of 172 total pages of testimony (AR 2:31 to AR 2:202 [only first and last in appendix]).  About two-thirds of the attached Corps hearing notes are devoted to opponents' views.  AR 2:209-215.

*Pls.' Mot.* at 30.  However, as the Corps points out,

> Plaintiffs disregard comments in favor of the project from organizations like St. Paul's School and Concord Hospital, presumably on the theory that these organizations had some sort of financial interest at stake in Phase II.  Yet Plaintiffs apparently do not exclude opponents to the project, such as the Tuttles, who also had a financial stake in the outcome of the Phase II decision.

*Fed. Def.'s Opp'n* at 18.  Even assuming that the Corps correctly left some interested parties out of the computation, their tally hardly shows a "highly controversial" project in a city of over 40,000 people.  *Nat. Parks & Conservation Ass'n*, 241 F.3d at 763 (finding that the Parks Service had received 450 comments, approximately 85% of which were in opposition to the project).

> Also, this discussion begs the question about whether the Plaintiffs themselves can generate their own controversy within the meaning of the regulation.  There is no doubt that the Plaintiffs vigorously oppose the Northwest Bypass, but whether by that opposition alone they meet the "highly controversial" element of federal regulation is another matter.

City of Concord, and the Interveners.  The Court DENIES Plaintiffs' Motion for Summary Judgment (Docket # 143) and GRANTS (1) Federal Defendants Motion for Summary Judgment (Docket # 142); (2) Defendant City of Concord's Motion for Summary Judgment (Docket # 136); and (3) Intervenor's Motion for Summary Judgment (Docket # 138).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE
SITTING BY DESIGNATION

Dated this 22nd day of April, 2008